[No. S004384. Crim. No. 22136. Dec. 3, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
JESSE EDWARD GONZALEZ, Defendant and Appellant.

[No. S004384. Crim. No. 24041. Dec. 3, 1990.]

In re JESSE EDWARD GONZALEZ on Habeas Corpus.

[No. S012508. Dec. 3, 1990.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
JESSE EDWARD GONZALEZ Real Party in Interest.

1188

**COUNSEL**

Richard C. Chier, Perry S. Reich, Chaleff & English, Gerald L. Chaleff and Gigi Gordon for Defendant and Appellant and Real Party in Interest.

Michael G. Millman, Steven W. Parnes, Gail Weinheimer, Ephraim Margolin and Nicholas C. Arguimbau as Amici Curiae on behalf of Petitioner, Defendant and Appellant and Real Party in Interest.

John K. Van de Kamp, Attorney General, Steve White and Richard B. Iglehart, Chief Assistant Attorneys General, Edward T. Fogel, Jr., Assistant Attorney General, Susan Lee Frierson, Marc E. Turchin, Ellen Birnbaum Kehr, John R. Gorey, Robert F. Katz and Susanne C. Wylie, Deputy Attorneys General, Ira Reiner, District Attorney, Harry B. Sondheim, Patricia H. Horikawa, Abram Weisbrot and George G. Size, Deputy District Attorneys, James K. Hahn, City Attorney, Linda F. Lefkowitz and Donna Weisz Jones, Deputy City Attorneys, De Witt W. Clinton, County Counsel, and James M. Owens, Deputy County Counsel, for Plaintiff and Respondent and Petitioner

Kent S. Scheidegger and Charles L. Hobson as Amici Curiae on behalf of Plaintiff and Respondent and Petitioner.

**OPINION**

EAGLESON, J.—A jury convicted defendant Jesse Edward Gonzalez of the first degree murder of Deputy Sheriff Jack Williams (Pen. Code, §§ 187, 189)[1] and of assault upon a peace officer, Deputy Sheriff Robert Esquivel, by means likely to produce great bodily injury (§ 245, former subd. (b), now subd. (c)). With respect to both offenses, the jury found that defendant had personally used a firearm. (§ 12022.5.) Under the 1978 death penalty statute, the jury also found, as a special circumstance of the murder, that

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

defendant intentionally killed a peace officer engaged in the performance of duty. (§ 190.2, subd. (a)(7).)

A separate penalty jury became deadlocked, and the court declared a mistrial. A second penalty jury returned a death verdict. The trial judge declined to modify the verdict (§ 190.4, subd. (e)) and sentenced defendant to death for the murder. The court imposed a six-year prison term for the assault, representing the middle term of four years plus a two-year enhancement for use of a firearm. Execution of the noncapital sentence was stayed.

This appeal is automatic.

Defendant also petitions for habeas corpus, and the People petition for mandate to overturn the trial court's postjudgment discovery order. These matters have been consolidated with the appeal. We shall affirm the guilt and penalty judgments, deny the petitions for habeas corpus, and order issuance of a peremptory writ of mandate as requested by the People.

## I. GUILT TRIAL

### A. *Prosecution's case-in-chief.*

Around 7:30 p.m. on May 29, 1979, Los Angeles County deputy sheriffs and narcotics officers from two city police forces drove to 16123 Abbey Street in La Puente to execute a search warrant. (The facts surrounding the validity of the warrant are discussed below.) The officers, who included Deputies Williams and Esquivel, were of various ethnic backgrounds. They were dressed in plain clothes (Levi's, tank tops, jackets, and T-shirts) and were using unmarked vehicles (a Camaro, a Ford LTD, and a Ford Granada).

One car drove quickly to the rear of the house, the second stopped in the side driveway, and the third remained in front. Four deputies, armed with pistols, positioned themselves at the front door. Williams and Deputy Zabokrtsky each knocked forcefully and announced the group's identity and purpose.

The officers then heard hasty movements inside the house and suspected evidence was being destroyed or concealed. Williams told Esquivel to "take the front door out." After four tries, Esquivel kicked the door open, and the officers rushed in. Forty-five seconds to one minute had elapsed between the first knock-notice and the entry.

Esquivel, his badge clipped to his Army fatigue jacket, was the first to enter. Williams, holding an open badge case in his hand, was close behind. As Esquivel's momentum brought him across the threshold, he saw defendant braced against a wall, pointing a shotgun at him. Esquivel turned aside

and defendant fired. The blast struck Williams in the chest, wounding him fatally.

Defendant fled down a hallway, carrying the shotgun against his shoulder in a "port arms" position. Esquivel pursued. Seeing or hearing Esquivel behind him, defendant turned the shotgun's barrel "backwards and downwards" in Esquivel's direction. Esquivel fired his revolver several times, wounded defendant, and arrested him.

Defendant's cousin or half-brother, Steven Martinez, was found hiding in the bathtub and was also taken into custody. A six-year-old girl and defendant's two-month-old son were discovered in a back bedroom. There were narcotics paraphernalia (lactose, syringes, needles, a carbon-stained spoon, empty balloons cut in a characteristic manner) throughout the house. A .22-caliber automatic pistol was also retrieved from the residence. No controlled substances were found.

As defendant was taken by gurney to an ambulance, several officers observed him raise his left fist and say "Viva Puente." This was considered a defiant salute to the local street gang known as "Puente." Deputy Araujo also heard defendant hurl the epithet "puto," meaning "fag," at nearby officers.

Two deputies interviewed defendant in the hospital the next day. Defendant was alert and congenial. He claimed the shooting was a "freak accident" caused by mistaken identity. He had thought the house was under attack by the "Bassetts," a street gang from a rival neighborhood. At one point, defendant explained he was outside watering the lawn, but ran inside when he saw "the cops" coming. Asked to repeat what he did when he saw "the cops," defendant insisted, "I didn't say that. You must be confused."

Defendant then gave the officers the following account: He was *inside* talking to Martinez when he heard squealing tires and saw several cars full of men surround the house. He shouted, "Stevie, Bassett. Trucha, trucha," street language for "beware" or "watch out." He retrieved his shotgun, loaded it, and stationed himself opposite the front door. He heard pounding and indistinct shouts. Two mustachioed men—one "Mexican" and one White—burst in with guns. He knew the Bassetts sometimes attacked with "white dudes." He fired and ran.

William Acker, a fellow jail inmate, testified that defendant approached him with legal questions. At first, Acker was reluctant to get involved. However, defendant eventually explained the facts, illustrating his narrative by drawing a map of the scene. Defendant confided he had been "tipped" and suspected a police narcotics raid was imminent. He wanted to "bag a cop" and protect his "pad" because there was heroin. When the officers

approached, defendant ran inside and told Martinez, "Juda," meaning "the cops, police." Martinez was supposed to remove the children and dump the narcotics, then get a gun and help. Defendant had a shotgun, and "anyone coming in that door was getting it." The officers "announced theirselves," but defendant did not answer. The deputies burst in so fast that his shot hit the second man through the door, a "white dude." Defendant thought the officers would retreat after his first shot, giving him time to escape, but he found out "it didn't work that way." He was "pissed" that Martinez did not help.

Acker told defendant, "they got you," but defendant replied, "No way. I got aces." Defendant said he planned to claim, or had claimed, that he thought the officers were Bassetts. Acker asked who the Bassetts were, and defendant explained they were a street gang currently at war with his neighborhood. Defendant said the Bassetts wanted peace and would be willing to testify there had been "chaos" in the area. Defendant also thought he could get neighbors to say the officers entered unannounced and shot first.

In his testimony, Acker revealed he was in jail awaiting sentence on his own conviction for "felony murder." On cross-examination, Acker said he had voluntarily approached the authorities with his information. He claimed he was target because he hated prison gangs, and he hoped his testimony would gain him a protective transfer to an out-of-state facility. Acker insisted he had received no promises and expected no other consideration. He admitted informing about his wife's role in his own case and about two jailhouse incidents, but he denied he was an established police informant.

B. *Defense.*

James Noble, another jail inmate, testified defendant asked him to read the police reports in defendant's case, since defendant cannot read. Their conversations could have been overheard from Acker's cell. According to Noble, Acker approached defendant with an offer of reading assistance. Defendant spoke to few inmates. He never discussed case details with Noble and never told Noble he knew the raiders were police.

A neighbor, Nectli Garcia, testified that the Bassett gang had been shooting up the area recently. Steven Rodriguez, who lived three miles from Abbey Street, testified the Bassetts had attacked his home four times, once breaking the windows. Rodriguez said that Bassett "warriors" were both "Mexican and white" and ranged in age from 14 to 24. Rodriguez agreed he could tell whether "kids" were gang members just by looking at them.

There was evidence that Martinez, not defendant, was the focus of the drug raid. Several deputies testified they knew of no reason defendant might

have been "tipped." A warrant informant, they said, would seldom be advised of the time a raid was to occur.

Deputy Mace testified that in the ambulance after the shooting, defendant said, "Sorry, man," and asserted that he thought the raiders were Bassetts. Mace then told defendant his wounds "looked bad and that [defendant] might not make it." Defendant replied he knew he was going to die or lose his arms.

Defendant testified in his own behalf. With minor variations, he recounted the version of events he had given the police in the hospital. He admitted he asked Acker about the "no knock" law, but he denied telling Acker the details of his case. He also denied telling the police he saw "the cops" coming.

Defendant said he had been staying at the Abbey Street house, which was his parents' residence, for only two weeks before the shooting. Martinez also lived there. Martinez had used heroin in the past, but as far as defendant knew the premises were drug free on May 29, 1979.

Defendant acknowledged he was a veteran gang leader, but said he had not been involved since about 1970. He knew the Bassetts from the 1960's and understood they had become more violent. As of May 29, 1979, he had not heard of the shooting incidents related by Garcia and Rodriguez. Even if there had been no recent incidents, however, he was always alert. If any unknown group drove up to his house, his first thought would be Bassetts. Martinez had clashed with the Bassetts in the past, and defendant "guessed" that Martinez, despite his advanced age (28), was involved in gang warfare.

Defendant testified that on May 29, 1979, his 31st birthday, he returned from work, showered, watered the lawn, and went back inside. When the police cars approached, defendant thought a "Chicano" was riding "shotgun" (the right front passenger seat) in one of the cars. In gangs, this was where the person giving orders sat. Defendant shouted to Martinez, "Trucha, Bassett's here." He saw no badges, heard shouts but no announcement, and never clearly observed the officers. A "Mexican" burst in; then a White man, still mostly hidden, aimed a pistol through the doorway. Defendant fired but never really saw the man he hit.

When defendant realized he had shot an officer, he closed his eyes and asked, "Why? Why? Why? Why? Why?" As he lay wounded, the police cursed and kicked him. This is why he said "puto" as he was carried from

the house. He also said, "Que rifa mi barrio," which means, "hurray for the neighborhood."

Defendant knew gang warriors were usually younger than 18. However, he had heard of participation by older men. Occasionally the Bassetts had White "helpers." Other than distinct "Townecraft" T-shirts, their clothing was not uniform. They formerly drove "low-rider" vehicles but now used borrowed cars or vehicles owned by their parents. Though the Bassetts were "chickens" or "broads" who would scatter if challenged, on May 29 defendant thought they were "finally" attacking with "balls."

### C. Rebuttal.

A sheriff's officer familiar with area gangs testified about the characteristic ages (16 to 20), ethnic background (Mexican), appearance (oversized khaki pants; heavy, sleeved T-shirts; short hair combed back), language (an English-Spanish mixture called "Calo"), vehicles (beat-up "low-rider type" pickup trucks and full-sized General Motors cars), weapons (rifles), and tactics (drive-by or hit-and-run shootings) of attacking Bassett warriors.

Over objection, the jury heard live testimony about the circumstances leading to the search warrant. Deputy Lira testified that six days before the raid, he observed an informant make a "controlled buy" of heroin from "Indio" (a name used by Martinez) in the yard of 16123 Abbey Street. The warrant and its supporting affidavit were also admitted in evidence.

## II. Penalty Retrial

### A. Prosecution's case-in-chief.

With minor variations, the prosecution represented its evidence of the circumstances of the warrant, the raid, and the shooting. Officer Lira testified that as defendant was placed in the ambulance, Lira heard him say, "Rifa Puente, putos." Lira believed this meant, "long live the Puente gang, queers." The epithet seemed directed at police personnel who were standing nearby.

Acker essentially restated his prior version of defendant's jailhouse admissions. Acker said defendant pestered him for legal help; Acker finally acquiesced and asked defendant what happened. Their conversations extended over a two-week period. Acker sometimes initiated the discussions. Defendant explained he hated the sheriff's "narcs," who were "sweating" (harassing) the neighborhood. Defendant wanted to "bag a cop" and show he could protect his narcotics business. On May 29, which was defendant's

birthday, defendant anticipated a raid. The "women" (his and Martinez's wives) were sent outside to watch and signal. Defendant was "on the point" (alert and ready).

Acker again explained his motives for giving evidence. He said that after he was sentenced, he approached the authorities through Detective Ahn, who had investigated his own case. Acker hoped to arrange an out-of-state transfer because of his conflict with prison gangs. He also wanted to restore a "moral balance" for his own crimes. Acker confirmed he had given information in his own case and two jailhouse incidents before meeting defendant. "Since this case," he acknowledged, he had testified in two other cases and had given information in six or seven. He denied he was an established police agent.

Acker revealed that a tattoo bearing the word "Paramount" had recently been surgically removed from his back. He denied the tattoo had indicated his own gang membership. He said he got the tattoo in prison as a form of protection against gangs. By calling attention to his home city, Paramount, the tattoo was intended to convey that he was not alone in prison. Acker denied knowing of a gang named "Paramount."

For the first time, Acker admitted he had been promised "removal of tattoos and perhaps other types of plastic surgery" for protection in light of his overall cooperation with the authorities. Acker denied requesting a change of identity solely in return for his testimony against defendant.

Deputy Araujo, a gang expert who knew the raiding officers, testified they did not resemble Bassett warriors. The officers were too old (mid-30's and older), mostly Anglo, and not dressed in gang style. Araujo had never heard of gangs going inside an enemy's house. He believed the Abbey Street neighborhood was "very quiet" in May 1979.

The parties stipulated that defendant had previously been convicted of two misdemeanors, forcible assault (former § 245; now § 245, subd. (a)(1)) in 1966 and battery (§ 242) in 1972.

B. *Defense.*

Defendant did not testify. He presented his version of the shooting through Deputy Overlease, one of the officers who interviewed him in the hospital. Overlease included defendant's slip of the tongue about seeing "the cops" coming. Testimony about defendant's remorseful statement during his ambulance ride was read to the jury.

Defendant introduced time records suggesting he worked a normal day on May 29. Defendant's sister, Patricia De Jesus, testified he was not home during that day, which was his birthday. De Jesus never saw "hype kits" in the house; her diabetic father used needles and syringes to inject insulin. Matilda Gonzalez, defendant's mother, confirmed her husband's use of syringes for diabetes, but she conceded she did not recognize the needles and paraphernalia introduced by the prosecution.

Martin Ybarra testified that he was a member of the Bassett gang. Despite Acker's denial, Ybarra said he had met Acker in jail before May 1979. They discussed the Bassett-Puente rivalry. Acker told Ybarra he "belonged to Paramount." Ybarra knew of a gang by that name.

Ybarra had heard of defendant as "the" leader of Puente and an important enemy of the Bassetts. He recounted that Puente warriors had recently shot at two Bassett "home boys." If an enemy was important enough, Ybarra said, Bassett warriors would break down doors and enter his house.

## C. Rebuttal.

Deputy Araujo testified that defendant was considered an older "guy" with possible gang involvement in the past. Araujo said the Abbey Street neighborhood was not the focus of gang activity and the Puente gang had no single leader.

### III. ISSUES ON APPEAL

## A. Guilt issues.

### 1. Validity of warrant.

■ Defendant first claims the fruits of the warrant search—the narcotics paraphernalia and pistol—should have been suppressed because the warrant affidavit did not disclose probable cause to search the Abbey Street house. The contention lacks merit.

The affidavit by Officer Lira disclosed that on May 23, 1979, an untested informant told a narcotics officer that the informant could purchase heroin from "Steve," also known as "Indio," who resided at 16123 Abbey Street. The informant described "Indio" (Latin male, age twenty-seven, five feet seven to five feet nine inches, one hundred and thirty to one hundred and sixty pounds, short hair, goatee) and said "Indio" was dealing large quantities of heroin from the address. The police learned from official records (1) that a car was registered to Steven Martinez, Jr., at 16123 Abbey Street and

(2) that Steven Martinez of that address, who was also known as "Indio," had numerous arrests. The same day, Lira watched the informant make a "controlled buy" of one balloon of heroin in the backyard of the Abbey Street address.[2] The seller fit "Indio's" description, and the informant confirmed he was "Indio." On the basis of this information, Lira, a trained narcotics officer, expressed the opinion that heroin was stored on the premises at 16123 Abbey Street.

Defendant asserts that even if the affidavit justified "Indio's" *arrest*, it did not support a search of the *residence*. Apart from the claims of an untested informant, defendant suggests, the circumstances recited in the affidavit did not indicate contraband was stored inside the house. We disagree.

Mere evidence of a suspect's guilt provides no cause to search his residence. (See *People* v. *Cook* (1978) 22 Cal.3d 67, 84, fn. 6 [148 Cal.Rptr. 605, 583 P.2d 130].) However, "[a] number of California cases have recognized that from the nature of the crimes and the items sought, a magistrate can reasonably conclude that a suspect's residence is a logical place to look for specific incriminating items. [Citations.]" (*People* v. *Miller* (1978) 85 Cal.App.3d 194, 204 [149 Cal.Rptr. 204]; see also *People* v. *Superior Court* (*Brown*) (1975) 49 Cal.App.3d 160, 167-168 [122 Cal.Rptr. 459].)

The informant had asserted that one "Indio" was "selling large quantities of heroin *from his residence* in La Puente." (Italics added.) In corroboration of this claim, the police independently knew that "Indio" lived at the Abbey Street address *and that a "controlled buy" from "Indio" had taken place on the property*. These facts permitted a logical inference that narcotics were probably being kept on the premises. Defendant cites no cases suggesting otherwise. ██ ██ By any applicable standard, the warrant was valid.[3]

---

[2] Lira declared that he drove the informant to 16123 Abbey Street. Lira saw the informant speak briefly in the backyard to a man meeting "Indio's" description, after which the informant returned to the car, removed a balloon from his mouth, and handed it to Lira. Lira saw that the balloon contained a tan, powdery substance which later proved to be heroin. Lira's affidavit attached and incorporated by reference a police report by Officer Markey. Markey stated in the report that, before the "buy," the informant was "fully searched by myself" at the police station and given $25 in premarked bills. Markey's report further advised that he and another officer followed Lira and the informant to the Abbey Street residence and back to the station. There, Markey reported, "a thorough search was again completed on [the informant] by myself." The informant told Markey he had given "Indio" the premarked $25.

[3] Because this is a pre-Proposition 8 case (see *People* v. *Smith* (1983) 34 Cal.3d 251, 262 [193 Cal.Rptr. 692, 667 P.2d 149]), we apply the California rule that an untested noncitizen informant's claims must be independently corroborated (see *People* v. *Cooks* (1983) 141 Cal.App.3d 224, 293 [190 Cal.Rptr. 211]; cf. *Aguilar* v. *Texas* (1964) 378 U.S. 108, 114 [12 L.Ed.2d 723, 728-729, 84 S.Ct. 1509]), even if that standard differs from the "totality of

## 2. *Failure to exclude narcotics evidence.*

■ Defendant argues that both the circumstances leading to the warrant and the paraphernalia and pistol found in the search should also have been excluded as irrelevant and prejudicial. He claims the warrant and the seized items were never directly connected to him, and were thus pertinent only for the improper purpose of suggesting he was a "bad person" who associated with narcotics traffickers. (See Evid. Code, § 352; *People* v. *Cardenas* (1982) 31 Cal.3d 897, 906-907 [184 Cal.Rptr. 165, 647 P.2d 569]; cf. Evid. Code, § 1101, subd. (a).)[4]

The warrant affidavit, which detailed the facts supporting the search, was received without objection at the conclusion of the prosecution's case-in-chief. The court then inquired *on its own motion* whether the affidavit contained any material more prejudicial than probative. The following colloquy ensued: "MR. BOWERS [the prosecutor]: I don't think there is any mention about Mr. [Gonzalez] in the search warrant at all. His name is not mentioned and it's entirely revolving around Stevie Martinez; is that correct? [¶] MR. BENCANGEY [defense counsel]: Yes. [¶] THE COURT: All right. [¶] *So I assume for that purpose you would want it in also, then, Mr. Bencangey?* [¶] MR. BENCANGEY: *Yes.* I don't think it harms my client at

circumstances" test currently required under the federal Constitution (see *Illinois* v. *Gates* (1983) 462 U.S. 213, 236-239 [76 L.Ed.2d 527, 546-549, 103 S.Ct. 2317]).

Though defendant does not raise the point, we note that the warrant affidavit implies the police did not independently confirm either "Indio's" description as given by the informant or the informant's representation that "Indio" was the seller in the "controlled buy." However, the authorities need only confirm the untested informant's *reliability* "in essential respects"; they need not establish *every element* of probable cause by independent means. (E.g., *People* v. *Lara* (1967) 67 Cal.2d 365, 374-375 [62 Cal.Rptr. 586, 432 P.2d 202]; *Cooks, supra,* 141 Cal.App.3d at p. 293.) That the "controlled buy" took place on property which the police had independently linked to "Indio" was sufficient confirmation of the informant's reliability.

In his trial court suppression motion, defendant additionally claimed the affidavit was deficient because (1) affiant Lira relied on Officer Markey's "hearsay" information that the informant was searched before and after the "buy," (2) Markey's description of the pre-"buy" search did not expressly say the informant's *mouth cavity* was inspected, and (3) Lira did not actually see a sale transaction. However, a fellow officer's observations, reported by the affiant as hearsay, are competent and presumptively reliable in a warrant affidavit. (E.g., *United States* v. *Ventresca* (1965) 380 U.S. 102, 110 [13 L.Ed.2d 684, 690, 85 S.Ct. 741]; *People* v. *Hill* (1974) 12 Cal.3d 731, 761 [117 Cal.Rptr. 393, 528 P.2d 1]; *Price* v. *Superior Court* (1970) 1 Cal.3d 836, 840 [83 Cal.Rptr. 369, 463 P.2d 721].) Markey's report adequately established that "full" and "thorough" control searches occurred before and after the "buy." (See fn. 2, *ante.*) There was ample basis for the logical inference that "Indio" had sold narcotics to the informant immediately outside 16123 Abbey Street.

[4] Defendant apparently wants to have his cake and eat it, too. Here he argues that the warrant affidavit and related testimony should have been excluded as unduly prejudicial. Elsewhere, however, he claims that the jury should have been permitted to determine the warrant's validity as a necessary ingredient of the charges of peace-officer assault and peace-officer murder. (See part A.10., *post.*)

all." (Italics added.) With the agreement of both counsel, the court admonished the jury that the affidavit was admitted not for its truth, but only to explain the officers' presence and conduct at the time of the shooting.

Defendant later objected under Evidence Code section 352 when, in its rebuttal case, the prosecution proffered testimony by Officer Lira about the "controlled buy" leading to the search warrant. The prosecutor urged that the evidence was pertinent to rebut defendant's professed ignorance of narcotics activity on the premises. Defense counsel responded that the warrant evidence showed at most an ambiguous transaction *outside* the house, and was highly prejudicial.

The court responded that similar evidence was already before the jury in the affidavit, and was relevant to rebut defendant's apparent claim that the police had "dreamed up" an excuse to raid the house. The court asked if the defense would stipulate that the May 29 raid was legal. Apparently intending to preserve his objection to the validity of the warrant, counsel responded, "No."

Accordingly, the court overruled defendant's objection to Lira's testimony, but again warned the jury to consider the proffered evidence only for its bearing on why the officers raided the house. Lira then briefly described the controlled buy.

Defendant *never* objected below that the *fruits* of the search were irrelevant. Nor did he ask the trial court to exclude the fruits as more prejudicial than probative. Assuming he may nonetheless raise the "fruits" issue on appeal as one of ineffective assistance of counsel, we find no basis for reversal in any of these related contentions.

First, any error in admitting the warrant affidavit was invited. In response to the trial court's pointed inquiry, defense counsel indicated he "want[ed the affidavit] in" because it tended to show that suspicion of narcotics activity was focused on Martinez, not on defendant. This was a plausible tactic, given defendant's central claim that he had no reason to expect the police, and it is manifest on the record. (*People* v. *Avalos* (1984) 37 Cal.3d 216, 229 [207 Cal.Rptr. 549, 689 P.2d 121]; cf. *People* v. *Wickersham* (1982) 32 Cal.3d 307, 334-335 [185 Cal.Rptr. 436, 650 P.2d 311].) Even if counsel later changed his mind, the court did not abuse its discretion by concluding that brief live testimony about the controlled buy was not more useful than prejudicial.

In any event, evidence of narcotics activities on the premises was admissible under the circumstances of this case. Defendant cites *Cardenas, supra,*

31 Cal.3d 897, for the proposition that narcotics evidence must be excluded as unduly prejudicial unless it is directly pertinent to the charges. *Cardenas*, however, is inapposite.

There the issue was whether the accused was the perpetrator of a 7-Eleven robbery. To buttress its theory that Cardenas was the robber, the prosecution sought to prove he needed money to support his drug habit. We confirmed that because of its prejudicial impact, an accused's addiction to narcotics may not be admitted as remote evidence of his motive for stealing something other than drugs. (31 Cal.3d at pp. 906-907; see generally *People v. Davis* (1965) 233 Cal.App.2d 156, 161 [43 Cal.Rptr. 357].) Otherwise, every addict charged with robbery or theft would face exposure to the jury of his "loath[some]" character flaw.

Here, by contrast, defendant conceded he shot a police officer engaged in executing a search warrant. However, he claimed mistaken self-defense and denied having any reason to expect a visit from the police. He thereby placed his knowledge, intent, and motive in dispute. Evidence of narcotics activities in and around defendant's residence suggested, contrary to his claim, that the police raid may not have been a surprise. This is particularly so considering that Martinez, the actual narcotics suspect, was in the house at the time of the shooting. Thus, the narcotics evidence was more than "remotely" relevant to the issues of preparation, plan, knowledge, absence of mistake or accident, premeditation, deliberation, malice, and knowing murder of a peace officer. (Cf. Evid. Code, § 1101, subd. (b).)

Finally, admission of the narcotics evidence was clearly harmless. The court twice emphasized to the jury that it could consider the controlled-buy evidence only to explain the officers' presence. Moreover, the People's over-all case was strong and the defense weak. The surviving raiders insisted they knocked and announced themselves clearly, awaited admittance, forced entry only when the sounds within aroused their suspicions, and displayed their badges as they came through the door. There was convincing evidence that the officers did not resemble gang warriors in appearance or tactics. Counsel conceded in argument that the prosecution had probably disproven any reasonable basis for defendant's asserted belief in a gang attack. Moreover, defendant showed defiance even after he knew the officers' identity, and he later blurted out that he had seen "the cops" approach. It does not appear reasonably probable that any error affected the outcome. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

3. *Distrust of informant's testimony.*

■ Defendant argues the trial court erred by failing to instruct on its own motion that the testimony of a jailhouse informant should be viewed

with distrust. We have rejected the contention in other cases, concluding that jailhouse informants have no inherent motive to lie and that the standard instructions on credibility adequately guide the jury's assessment of a jailmate's testimony. (*People* v. *Morales* (1989) 48 Cal.3d 527, 553 [257 Cal.Rptr. 64, 770 P.2d 244]; *People* v. *Thompson* (1988) 45 Cal.3d 86, 118-119 [246 Cal.Rptr. 245, 753 P.2d 37]; *People* v. *Hovey* (1988) 44 Cal.3d 543, 565-566 [244 Cal.Rptr. 121, 749 P.2d 776]; see *People* v. *Alcala* (1984) 36 Cal.3d 604, 623-624 [205 Cal.Rptr. 775, 685 P.2d 1126].) We reach a similar conclusion here.

The jurors knew Acker was a convicted murderer with a motive to cooperate. They received standard instructions that they should consider a witness's bias or interest, that a witness false in part is to be distrusted, that the uncorroborated testimony of a single witness should be carefully evaluated, and that a defendant's oral admissions should be viewed with caution. Discrepancies in informant Acker's testimony, and his possible motives for giving testimony favorable to the prosecution, were explored at some length in cross-examination and in argument. The court's failure to give a further "jailhouse informant" instruction sua sponte is not reversible error.[5]

An assertion that counsel was ineffective for failing to request a cautionary instruction must also fail. For the reasons expressed above, the absence of the instruction does not undermine confidence in the trial outcome. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 694 [80 L.Ed.2d 674, 698, 104 S.Ct. 2052]; *People* v. *Fosselman* (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144].)[6]

4. *Substitution of judge; jury's malice question.*

Judge Cianchetti, who had presided throughout the trial, apparently became ill on Thursday, August 28, 1980, the day jury deliberations were to begin. Judge Miller was selected as a temporary replacement and presided during that day. Judge Miller read the concluding instructions prepared by Judge Cianchetti and submitted the case to the jury. He also dealt with a

[5]By statute effective *January 1, 1990*, the trial court must instruct on *request* that the testimony of an "in-custody informant" should be viewed with "caution and close scrutiny" in light of the possibility that the testimony was influenced by receipt or expectation of benefits. (§ 1127a, subds. (a), (b), added by Stats. 1989, ch. 901, § 1.)

[6]Defendant correctly notes the trial court erred by omitting reference to Acker's prior felony conviction from the standard instruction on witness bias (CALJIC No. 2.20). However, Acker openly admitted the conviction, and defense counsel explored the matter in considerable detail in an effort to show Acker's "bias, interest, or . . . motive" to lie for the prosecution. The jury cannot have failed to understand that Acker's conviction was a factor bearing on his credibility. The error was thus harmless. (*Watson, supra,* 46 Cal.2d 818, 836.)

subsequent jury request to elaborate upon the malice instructions that previously had been read and provided.

Neither defendant nor his counsel objected on the record to the temporary substitution. Judge Cianchetti returned on the next court day, Tuesday, September 2, before deliberations were completed.

■ Defendant first asserts that it was improper to substitute another trial judge without first obtaining defendant's affirmative consent. However, section 1053 provides that another judge of the court where the trial is proceeding may "proceed with and finish the trial" in the event of the original trial judge's death, illness, or inability to proceed. The section does not require the consent of the defendant or his counsel. The cases cited by defendant (e.g., *People* v. *Henderson* (1865) 28 Cal. 465, 473; *People* v. *Stuller* (1970) 10 Cal.App.3d 582, 590-591 [89 Cal.Rptr. 158, 41 A.L.R.3d 712]) hold only that consent waives any objection; they do not purport to require consent.

Defendant claims the substitution violated his due-process right (U.S. Const., Amends. V, XIV; Cal. Const., art. I, §§ 7, 15) to a judge who was expressly familiar with the proceedings. Absent his consent, he urges, he was also denied his jury-trial right (U.S. Const., art. III, § 2, cl. 3, & Amends. VI, XIV; Cal. Const., art. I, § 16) to *the same* judge and jury throughout the trial.

Some authorities provide abstract support for these assertions. (See, e.g., *Randel* v. *Beto* (5th Cir. 1965) 354 F.2d 496, 500, & fn. 5; *Freeman* v. *United States* (2d Cir. 1915) 227 Fed. 732, 759; *State* v. *Davis* (Mo. 1978) 564 S.W.2d 876, 878; 2 Wright, Federal Practice & Procedure: Crim.2d (1982) § 392, pp. 402-403; cf. Fed. Rules Crim.Proc., rule 25(a), 18 U.S.C.) However, when the original judge becomes unavailable during trial, prudent substitution may have no actual effect on fairness and is often manifestly preferable to a mistrial. For this reason, both California and federal courts have long possessed express substitution authority. (§ 1053; Fed. Rules Crim.Proc., rule 25, 18 U.S.C., both *supra.*)

As might be expected under the circumstances, many modern decisions reject the notion that reversal is always required when a midtrial substitution occurs without the defendant's affirmative consent. These cases confirm that a well-justified change of judges, even if technically erroneous, is no basis for reversal if the accused failed to object and no substantial prejudice resulted. (E.g., *United States* v. *LaSorsa* (2d Cir. 1973) 480 F.2d 522, 530-531; *State* v. *Amarillas* (1984) 141 Ariz. 620 [688 P.2d 628, 630]; *State* v. *McKinley* (1982) 7 Ohio App.3d 255 [455 N.E.2d 503, 507]; *Peterson* v.

*State* (1969) 203 Kan. 959 [457 P.2d 6, 11]; see *United States* v. *Lane* (9th Cir. 1983) 708 F.2d 1394, 1396-1398 [Fed. Rules Crim.Proc.]; *United States* v. *Santos* (9th Cir. 1979) 588 F.2d 1300, 1303-1304 [same].)

Here we see no unfairness and no substantial infringement on the right to jury trial.[7] Judge Cianchetti's absence was for good cause, and Judge Miller presided only for one court day. Judge Miller's tenure comprised a period of jury deliberations and, with one exception, his judicial acts were essentially ministerial. Judge Cianchetti resumed his duties before deliberations were completed.

█ Defendant claims the substitution caused substantial prejudice because Judge Miller mishandled the jury's request to clarify the malice instructions. We disagree.

Judge Cianchetti had given the standard malice, murder, and manslaughter instructions. (See CALJIC Nos. 8.11, 8.20, 8.30, 8.37, 8.40, 8.50.) The jury was provided a written copy of the instructions. During the first day's deliberations, the jury asked Judge Miller to clarify the legal definition of malice. Judge Miller explained that he doubted he could improve on the standard definition contained in the instructions previously read and furnished. He urged the jurors to reread the instructional definition (CALJIC No. 8.11) in the context of the preceding and subsequent instructions regarding the definitions and degrees of murder. The jury foreman replied, "Thank you, your Honor. I think that clarifies it."

Neither Judge Miller, nor Judge Cianchetti upon his return, received any further inquiry on the malice issue, though Judge Miller had asked the foreman if he had any specific questions on the matter. Defense counsel neither objected to Judge Miller's actions nor offered his own clarifying instructions.

Defendant urges that Judge Miller's refusal to give additional malice instructions violated section 1138, which requires the court to provide the jury any desired information "on any point of law arising in the case." As defendant observes, the statute imposes a "mandatory" duty to clear up any instructional confusion expressed by the jury. (See *People* v. *Gavin* (1971) 21 Cal.App.3d 408, 418 [98 Cal.Rptr. 518]; *People* v. *Malone* (1959) 173 Cal.App.2d 234, 244 [343 P.2d 333].)

---

[7] Since we see no *substantial* denial of jury-trial rights under either the federal or state Constitutions, we need not confront the California rule that the accused must personally and explicitly waive such rights on the record. (Cal. Const., art. I, § 16; *People* v. *Holmes* (1960) 54 Cal.2d 442 [5 Cal.Rptr. 871, 353 P.2d 583]; *People* v. *Maes* (1965) 236 Cal.App.2d 147 [45 Cal.Rptr. 903].)

However, Judge Miller obviously did resolve the jury's questions by advising them to reread the malice and homicide instructions in context. Where, as here, the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information. (See *People* v. *Rigney* (1961) 55 Cal.2d 236, 246 [10 Cal.Rptr. 625, 359 P.2d 23, 98 A.L.R.2d 186].) Judge Miller fulfilled that duty, and no error or prejudice appears.

### 5. *Use of false testimony.*

■ Defendant asserts the prosecutor knowingly made use of false testimony at the guilt phase by allowing jailhouse informant Acker to testify untruthfully that he "didn't like gangs" and that he merely desired a transfer to an out-of-state prison in return for his testimony. Defendant points to evidence elicited at the second penalty trial that Acker was a gang member. Defendant also stresses Acker's penalty phase admission that an identifying tattoo had recently been removed from his back in prison. Defendant argues that the tattoo removal shows Acker was promised a change of identity in return for his testimony, contrary to Acker's insistence that he received no definite promises or benefits.

The record discloses no material discrepancy in Acker's testimony. Acker's gang membership was never established. At the penalty phase, defense witness Ybarra testified Acker had admitted membership in the "Paramount" gang, but Acker consistently denied it. He claimed his "Paramount" tattoo referred only to his hometown. Thus, we cannot assume on this record that Acker lied about the matter, or that the prosecution countenanced lying.

Similarly, the record of the second penalty trial does not show Acker lied at the guilt phase about benefits promised or received for his testimony. Although Acker had the "Paramount" tattoo removed, apparently to protect his identity, no proof was made that this act was done by the authorities in return for his testimony in defendant's case.

Even if the authorities did assist in the tattoo removal for purposes of protecting Acker's identity, this was but a logical extension of the protective prison transfer he had always acknowledged he hoped to receive. Moreover, any inference that Acker had received benefits for his cooperation in this

and other cases *by the time of the second penalty trial* does not establish that his contrary guilt phase testimony was false *when given*.[8]

In any event, considering the information the jurors already had about Acker, additional revelations that he might be a gang member, and might have accepted protective help from the authorities, would not likely have lessened his credibility in their eyes to any substantial degree. No basis for reversal appears.

### 6. *Failure to disclose informant.*

■■ Defendant asserts that the prosecutor "apparently" failed to disclose the identity of the search warrant informant in compliance with a pretrial discovery order. The record does not support the claim that disclosure was withheld. In September 1979, the trial court granted defendant's broad discovery request for the names and addresses of all "witnesses" having knowledge of the crime or events leading up to it, as well as all persons interviewed by the district attorney or his agents in connection with the case. The court set a compliance deadline of October 25, 1979, and advised defense counsel to seek relief for noncompliance on or before that date. The record includes no later compliance motion. On January 30, 1980, counsel represented in open court that pending discovery matters were "resolved."

Even if the informant was not disclosed, defendant waived the issue on appeal by failing to seek timely relief for the prosecutor's noncompliance. Moreover, an ineffective-assistance claim must fail on this record. We cannot discern whether counsel adequately pursued the informant's identity, and we do not know whether the informant would have furnished information that undermines confidence in the outcome.

### 7. *Argument regarding burden of reasonable doubt.*

■■ Though he failed to object at trial, defendant now claims the prosecutor misstated the law during his closing argument by asserting that "[t]he defense has to create a reasonable doubt . . . . The reasonable doubt has to be created by the defense. They have not created any reasonable doubt. Confusion, yes, but reasonable doubt, no."

■■ As defendant suggests, the *prosecution* must prove every element of a charged offense *beyond* a reasonable doubt. The accused has *no* burden of

---

[8] For similar reasons, defendant's claim that material impeaching evidence was *concealed* by the prosecution at the guilt phase must be rejected on this record.

*proof* or *persuasion*, even as to his defenses. (§ 1096; see *In re Winship* (1970) 397 U.S. 358, 364 [25 L.Ed.2d 368, 375, 90 S.Ct. 1068]; *Mullaney* v. *Wilbur* (1975) 421 U.S. 684 [44 L.Ed.2d 508, 95 S.Ct. 1881]; *People* v. *Dillon* (1983) 34 Cal.3d 441, 472-474 [194 Cal.Rptr. 390, 668 P.2d 697].) However, once the prosecution *has* submitted proof that permits a finding beyond reasonable doubt on every element of a charge, the accused may obviously be obliged to respond with evidence that "raises" or permits a reasonable doubt that he is guilty as charged. (See § 189.5, subd. (a) [formerly § 1105, subd. (a)]; *People* v. *Cornett* (1948) 33 Cal.2d 33, 42-43 [198 P.2d 877]; *People* v. *Hyde* (1985) 166 Cal.App.3d 463, 474-475 [212 Cal.Rptr. 440]; see *People* v. *Loggins* (1972) 23 Cal.App.3d 597, 601-602 [100 Cal.Rptr. 528].)

 In this context, the prosecutor's remark was ambiguous. The remark was proper if it meant only that the prosecution had proved premeditated murder of a peace officer beyond a reasonable doubt, and that the weakness of the defense response had left the record devoid of any basis for reasonable doubt. The remark was improper if meant to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements. Because timely objection, admonition, and instruction would have cured any prejudicial confusion, defendant's failure to intervene below waives a direct claim of misconduct. (*People* v. *Green* (1980) 27 Cal.3d 1, 27 [164 Cal.Rptr. 1, 609 P.2d 468]; *People* v. *Scott* (1982) 129 Cal.App.3d 301, 306-307 [180 Cal.Rptr. 891].)

Nor is the point persuasive when phrased as ineffective assistance of counsel. The prosecutor's remark was brief and mild. The jury received accurate standard instructions that the People bore the burden of proving defendant guilty beyond a reasonable doubt, and that he was presumed innocent until proven guilty. (CALJIC No. 2.90; see also CALJIC Nos. 2.01, 5.15, 8.71, 8.72, 8.80.) No instruction stated or implied that defendant bore any burden of proof or persuasion. Defense counsel in his closing argument reread CALJIC No. 2.90 and repeatedly emphasized the People's "very, very, very high burden." The evidence that defendant was guilty as charged was highly persuasive. Hence, counsel's failure to object to the prosecutor's "reasonable doubt" argument does not undermine confidence in the guilt verdict.

8. *Argument regarding failure to call witness.*

 Defendant claims it was misconduct for the prosecutor to argue that, "We didn't hear from Steve Martinez. We didn't hear from the six-year-old girl. We didn't hear from the neighbors. We only heard—the only witness present was [defendant] that you heard from." Defendant concedes

that the prosecutor may comment upon the defendant's failure to introduce logical evidence or call logical witnesses. (*People* v. *Ford* (1988) 45 Cal.3d 431, 442-449 [247 Cal.Rptr. 121, 754 P.2d 168, 76 A.L.R.4th 785]; *People* v. *Szeto* (1981) 29 Cal.3d 20, 34 [171 Cal.Rptr. 652, 623 P.2d 213].) However, defendant deems it "ludicrous" to suggest that a six-year-old child, even if present at the time of the shooting, was a logical percipient witness.

Absent an objection below, the assertion of misconduct is waived. (*Green*, *supra*, 27 Cal.3d at p. 27.) Nor does counsel's failure to object warrant reversal on a theory of ineffective assistance. Despite the prosecutor's brief remark, the jury was capable of deciding, as a matter of common sense, whether such a young child was a logical or reliable witness.

The issue was tangential in any event. Far more damaging was defendant's conceded failure to call Martinez, whom defendant said he warned of a Bassett attack.[9] Hence, the prosecutor's unchallenged reference to the absence of a child witness does not undermine confidence in the outcome.

9. *Argument regarding narcotics paraphernalia.*

 In his closing argument, the prosecutor referred to the narcotics paraphernalia found in the Abbey Street residence. He urged the inference that the sale of narcotics from the premises was a motive for the shooting which eventually took place. Defendant claims this reference to narcotics was unduly prejudicial, since he was never directly linked to illegal activities on the premises.

However, defendant waived the assertion of misconduct by his failure to object. A claim of ineffective assistance must also fail. As previously discussed, even if no conclusive "nexus" was established between defendant and narcotics, the presence of narcotics evidence throughout the house permitted an inference that its occupants, including defendant, had reason to anticipate a police raid. Hence, the prosecutor's argument constituted

---

[9]The prosecutor was not precluded from commenting on defendant's failure to call Martinez simply because Martinez might have asserted his right against self-incrimination. A witness becomes "unavailable" on self-incrimination grounds, and thus immune from comment on his absence for that reason, only when his actual sworn assertion of the privilege has been upheld by the trial court, or the parties stipulate to his unavailability, or the defendant otherwise "satisf[ies] the court that the witness cannot be called or that in the circumstances of the case an adverse inference should not be drawn from the failure to call [the] witness." (*Ford*, *supra*, 45 Cal.3d at pp. 447-448.) " . . . When the defendant has taken the stand . . . and offered a . . . defense in which he identifies other persons who could support his testimony, and those witnesses are available and subject to subpoena, there should be no question but that comment is appropriate and permissible." (*Id*., at p. 447.)

fair comment on the evidence and the reasonable inferences to be drawn therefrom.

10. *Validity of warrant as jury "element" of peace-officer assault and peace-officer murder.*

 Only one special circumstance was alleged and found true, i.e., that defendant knowingly and intentionally killed a peace officer "engaged in . . . the performance of . . . duties." (§ 190.2, subd. (a)(7).)[10] Defendant was also convicted of aggravated assault against a peace officer "engaged in the performance of . . . duties." (§ 245, subd. (c).)[11] Both the assault charge and the special circumstance finding must be reversed, he urges, because in both cases he was wrongly denied a jury determination of the engaged-in-duty element.

Defendant invokes the long-standing rule in California and other jurisdictions that although one is not immune from criminal liability for his resistance to an invalid police action, he cannot be convicted of an offense *against a peace officer "engaged in . . . the performance of . . . duties"* unless the *officer* was acting lawfully at the time. (E.g., *People* v. *Curtis* (1969) 70 Cal.2d 347, 354-356 [74 Cal.Rptr. 713, 450 P.2d 33]; *People* v. *Henderson* (1976) 58 Cal.App.3d 349, 357 [129 Cal.Rptr. 844]; *Jackson* v. *Superior Court* (1950) 98 Cal.App.2d 183, 188-189 [219 P.2d 879]; *Sparks* v. *United States* (6th Cir. 1937) 90 F.2d 61, 63-65.) The rule flows from the premise that because an officer has no duty to take illegal action, he or she is not engaged in "duties," for purposes of an offense defined in such terms, if the officer's conduct is unlawful. (E.g., *Curtis, supra,* 70 Cal.2d at pp. 354-355; *Jackson, supra,* at p. 189.)

California cases hold that although the court, not the jury, usually decides whether police action was supported by legal cause, disputed facts bearing on the issue of legal cause must be submitted to the jury considering an engaged-in-duty element, since the lawfulness of the victim's conduct forms part of the corpus delicti of the offense. (*Henderson, supra,* 58 Cal.App.3d at pp. 358-359; *People* v. *Jones* (1970) 8 Cal.App.3d 710, 716 [87 Cal.Rptr. 625]; *People* v. *Muniz* (1970) 4 Cal.App.3d 562, 568 [84

---

[10] Section 190.2, subdivision (a)(7), provides as a special circumstance that "[t]he [murder] victim was a peace officer . . . who, *while engaged in the course of the performance of . . . duties,* was intentionally killed, and [the] defendant knew or reasonably should have known that such victim was a peace officer engaged in the performance of . . . duties; . . ." (Italics added.)

[11] Section 245, subdivision (c), establishes the offense, inter alia, of assault by means likely to produce great bodily injury "upon the person of a peace officer . . . *engaged in the performance of . . . duties,*" with actual or constructive knowledge that the victim is an officer so engaged. (Italics added.)

Cal.Rptr. 501]; *People* v. *Soto* (1969) 276 Cal.App.2d 81, 86-87 [80 Cal.Rptr. 627]; but see *Curtis, supra,* 70 Cal.2d at pp. 358-359.) Defendant claims the trial court thus erred by stating "for purposes of these instructions" that an officer " . . . serving . . . a search warrant" is acting "lawful[ly]," and is thus engaged "in the performance of his duties."[12] This instruction, defendant urges, wrongly withdrew the issue of the warrant's *validity* from the jury's consideration.

We disagree. Squarely faced with the issue for the first time, we conclude that if a warrant is valid on its face, an officer carrying out its command to search or arrest is lawfully engaged in duty, and his or her attacker may be convicted and punished on that basis, even if the facts disclosed to the magistrate in support of the warrant were not legally sufficient to establish probable cause.

A contrary construction of the engaged-in-duty requirement would defy reason. By overlooking the traditional statutory *authority and duty* of peace officers to execute facially regular warrants, such an interpretation would misapply the premise that an officer has no "duty" to take "illegal" action. It would ignore the historic preference for warrants. And it would undermine the Legislature's efforts to deter and punish violence upon peace officers acting in that capacity.

The law has long been concerned with the treatment of a citizen who resists or obstructs the assertion of police authority. Since 1872, section 148 has made it a misdemeanor to resist, delay, or obstruct an officer engaged in discharging "any duty of his office." Unjustified violence against an officer, as against any other citizen, was also punishable under the general statutes defining assault, battery, attempted murder, and homicide.

On the other hand, most American jurisdictions, including California, recognized a traditional privilege to resist *unlawful* police conduct with "reasonable" force. (*People* v. *Curtis, supra,* 70 Cal.2d at p. 351.) Many early cases applied this common law principle to limit the application of section 148. They reasoned that because the offense described by section 148 could be committed only against an officer engaged in "duty," and because an officer has no "duty" to take "illegal" action, the statute did not prohibit resistance to an unlawful arrest. (E.g., *Jackson* v. *Superior Court, supra,* 98

---

[12] At the prosecutor's request, the court gave a modified version of a portion of CALJIC, former No. 8.81.8 (4th ed. 1979), as follows [modification in brackets]: "The phrase 'in the performance of his duties,' as used in these instructions, means: [¶] Any lawful act or conduct while engaged in the maintenance of the peace and security of the community or in the investigation or prevention of crime; [to wit, the serving of a search warrant]."

Cal.App.2d at p. 189; see also *People* v. *Craig* (1881) 59 Cal. 370; *People* v. *Perry* (1947) 79 Cal.App.2d Supp. 906 [180 P.2d 465].)

However, the 1957 Legislature enacted section 834a, which imposes a "duty" on citizens to refrain from forcible resistance to arrest.[13] In *People* v. *Curtis, supra,* we held that section 834a applies to unlawful as well as lawful arrests, so long as the officer has not used excessive force. (70 Cal.2d at pp. 351-354.) The statute's purpose, we said, was to eliminate the "anachronistic" privilege of violent self-help against police conduct undertaken without sufficient cause or authority, and to remove disputes about legality from the streets to the courts. (*Id.,* at pp. 352-353.) As a result of section 834a, any violent resistance to the humane assertion of police authority is punishable under the criminal laws, even if the officer's action lacked legal cause or otherwise exceeded his or her authority.

In 1961, the Legislature took another important step toward the protection of peace officers who face violent resistance in the field. It created special new crimes of battery and aggravated assault against "peace officer[s] . . . engaged in the performance of . . . duties." (See now §§ 243, subd. (b), 245, subd. (c).) In *Curtis, supra,* we held that by requiring the officer-victim's engagement in "duties," the new statutes implicitly incorporated prior judicial limitations on the term "duty" as construed in connection with section 148. Hence, we held, one could not be convicted of assault or battery "against a peace officer . . . engaged in the performance of . . . duties" unless the officer-victim's performance was lawful. (70 Cal.2d at p. 355.)

We further concluded that our limiting construction of the new peace-officer offenses should not be affected by the intervening enactment of section 834a. "[S]ection 834a," we said, "was meant at most to eliminate the common law defense of resistance to unlawful arrest, and not to make such resistance a new substantive crime." (70 Cal.2d at pp. 354-355.) Thus, *Curtis* reasoned, while violent resistance to an illegal arrest may be a crime, it is not a crime against a peace officer engaged in duties. (*Id.,* at pp. 355-356.)[14]

---

[13] Section 834a, derived from the Uniform Arrest Act, provides: "If a person has knowledge, or by the exercise of reasonable care, should have knowledge, that he is being arrested by a peace officer, it is the duty of such person to refrain from using force or any weapon to resist such arrest."

[14] After *Curtis* was decided, peace-officer special circumstances containing similar engaged-in-duty requirements were included in the Legislature's 1977 death penalty statute (see former § 190.2, subd. (c)(l); Stats. 1977, ch. 316, § 9, pp. 1257-1258) and in the 1978 death penalty initiative law at issue here. At the same time they adopted the 1978 capital punishment law, the voters also enhanced the punishment for second degree murder committed upon a peace officer "engaged in the performance of . . . duties." (§ 190, subd. (b).)

*Curtis* contains dictum suggesting that an officer acts illegally, and thus is not "engaged in . . . duties" for purposes of a peace-officer offense or enhancement, if a warrant he is attempting to execute is invalid. (70 Cal.2d at p. 354, fn. 4; see also discussion, *post*.) However, we have found no California decision which directly confronts that issue. On their facts, the California cases hold at most that the validity of an officer's *decisions in the field* bear on whether he or she was acting lawfully, and thus was engaged in duty, at the time the officer encountered violent resistance.[15]

This is an understandable result given the statutory language, the sensitive realities of police-citizen contacts, and the complicated development of the law governing resistance. By its terms, the engaged-in-duty element focuses on the *officer's* "performance" of duties. Under this language, it is pertinent to inquire whether the *officer's* judgment that led to violence was correct or incorrect.

Moreover, unilateral decisions by officers in the field are rife with the dangerous potential for overreaching, arbitrary harassment, and the violation of individual rights. (See, e.g., *Jackson* v. *Superior Court, supra*, 98 Cal.App.2d at p. 186.) Misunderstandings may arise in the heat of the moment about the officer's intentions, motives, good faith, and authority. A citizen confronted in such circumstances may have a colorable basis for belief that the unilateral police attempt to restrict his freedom or invade his privacy is arbitrary and wrongful.

The cases imply that the law thus intends the officer to accept some responsibility for his or her own error. Even if the citizen is not privileged to resist a police misjudgment, they reason, the statutes nonetheless withhold from the officer any special protection that might arise from the officer's engagement in "duty."

No similar considerations apply, however, when the officer's authority to act is premised on a facially valid warrant. When the police submit their suspicions for judicial evaluation, obtain a warrant regular on its face, and

---

[15] For example, in *Jackson* v. *Superior Court, supra*, the Court of Appeal reversed a resisting-arrest conviction on grounds that the officer had failed to obtain a warrant before arresting the defendant for a misdemeanor not committed in the officer's presence. (98 Cal.App.2d at pp. 186-189.) Many other pre-*Curtis* cases are to similar effect. *Curtis* itself reversed a conviction of battery upon a peace officer because the warrantless arrest of the defendant lacked probable cause. (70 Cal.2d at p. 358; see also *People* v. *Soto, supra*, 276 Cal.App.2d 81, 86-87; *People* v. *Muniz, supra*, 4 Cal.App.3d 562, 567-568.) *People* v. *Jones, supra*, 8 Cal.App.3d 710, involved a warrantless field detention. (Pp. 716-717.) In *People* v. *Henderson, supra*, 58 Cal.App.3d 349, the defendant prevailed on a claim that the officer he attacked had not complied with knock-and-notice requirements when serving a search warrant. (P. 357.)

act only as it *expressly authorizes and commands*,[16] no issue of fault in the *serving officer's* "performance of . . . duties" arises. The officer and his or her colleagues have done everything possible to perform their "duty," and to do so lawfully.

Indeed, California's law of arrest so provides. Section 836 specifies limits on an officer's authority to arrest *without* a warrant but states simply that he "may make an arrest in obedience to a warrant."[17] Civil Code section 43.55 (formerly Civ. Code, § 43.5(a)) immunizes a peace officer from liability for nonnegligent execution of an arrest warrant regular on its face, regardless of any underlying deficiency.[18] Cases consistently explain that this statutory immunity stems from the *duty* of peace officers to carry out judicial orders according to their terms without considering whether they are void or erroneous. (E.g., *Vallindras v. Massachusetts etc. Ins. Co.* (1954) 42 Cal.2d 149, 153-154 [265 P.2d 907]; *Herndon v. County of Marin* (1972) 25 Cal.App.3d 933, 936-937 [102 Cal.Rptr. 221].)

■ Whenever possible, courts must construe statutes harmoniously and avoid absurd or anomalous results. (E.g., *People v. Comingore* (1977) 20 Cal.3d 142, 147 [141 Cal. Rptr 542, 570 P.2d 723]; *People v. Daniels* (1969) 71 Cal.2d 1119, 1130 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677]; *Select Base Materials v. Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672].) ■ Nothing in the language or history of the engaged-in-duty requirement suggests a legislative intent to depart from the well-established statutory principle that official duty includes the execution of facially regular warrants.

Nor can we perceive any policy that would have persuaded the Legislature or the voters to make an officer's special protection against violent resistance dependent on the underlying validity of a warrant. The law harbors a strong preference for warrants precisely because the "detached scrutiny of a neutral magistrate" is a more reliable safeguard against overreaching than "the hurried judgment of a law enforcement officer 'engaged in the

---

[16] In standard form, the warrant Deputies Williams and Esquivel were executing stated that "[y]ou are commanded to search" the premises at 16123 Abbey Street.

[17] Section 836 provides in pertinent part: "A peace officer may make an arrest in obedience to a warrant, or may, . . . without a warrant, arrest a person: [¶] 1. Whenever he has reasonable cause to believe that the person to be arrested has committed a public offense in his presence. [¶] 2. When a person arrested has committed a felony although not in his presence. [¶] 3. Whenever he has reasonable cause to believe that the person to be arrested has committed a felony, whether or not a felony has in fact been committed."

[18] In its current form, Civil Code section 43.55 provides: "There shall be no liability on the part of, and no cause of action shall arise against, any peace officer who makes an arrest pursuant to a warrant of arrest regular on its face if the peace officer in making the arrest acts without malice and in the reasonable belief that the person arrested is the one referred to in the warrant."

often competitive enterprise of ferreting out crime,' . . ." (*United States* v. *Chadwick* (1977) 433 U.S. 1, 9 [53 L.Ed.2d 538, 547, 97 S.Ct. 2476], quoting *Johnson* v. *United States* (1948) 333 U.S. 10, 14 [92 L.Ed. 436, 440, 68 S.Ct. 367].)

This preference for resort to the warrant process is honored by according particular deference to the *magistrate's* determination of probable cause. (E.g., *Illinois* v. *Gates, supra*, 462 U.S. 213, 236 [76 L.Ed.2d at pp. 546-547].) That being so, judicial reappraisal of the *magistrate's* decision to issue a warrant should not strip the *serving officer* of the special statutory protection against violent resistance. Any such rule would not likely deter misconduct either by the police or by judicial officers. (Cf. *United States* v. *Leon* (1984) 468 U.S. 897, 915-921 [82 L.Ed.2d 677, 693-697, 104 S.Ct. 3405].)

By the same token, a warrant removes all colorable basis for on-the-spot disputes about the officer's authority. That a citizen might have reason to suspect a warrant's underlying support, or that he might later prevail in a judicial attack on the warrant, has no rational relationship to the degree of his culpability for violent resistance at the moment the warrant is served.

Forcible resistance to a warrant invokes society's particular "abhor[rence]" of violence against persons whose official roles as defenders of public safety place them at special risk. (See *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 781 [230 Cal.Rptr. 667, 726 P.2d 113].) By its nature, violence of this kind " . . . hinder[s] the completion of vital public safety tasks; . . . evince[s] a particular contempt for law and government; and . . . strike[s] at the heart of a system of ordered liberty . . . ." (*Ibid.*) Such resistance thus justifies the special treatment our statutes accord to those who attack peace officers lawfully "performing [their] duties." (*Ibid.*)

Under these circumstances, we cannot imagine the Legislature or the voters intended to divest a peace officer of special statutory protection simply because the warrant the officer was serving when attacked is later found lacking in probable cause. We decline to extend the reasoning of *Curtis* and its progeny to such a case.

We hold that whenever a criminal statute accords special treatment to violence against a peace officer "engaged in . . . duties," such "duties" include the correct service of a facially valid search or arrest warrant, regardless of the legal sufficiency of the facts shown in support of the warrant. Dictum to the contrary in *Curtis* is disapproved.[19] Accordingly, we

---

[19] *Curtis* cited with apparent approval three federal decisions holding that one is not guilty of resisting or assaulting an officer engaged in "duty" if the officer was serving or executing an invalid warrant. (70 Cal.2d at p. 354, fn. 21, citing *Sparks* v. *United States, supra*, 90 F.2d

reject defendant's contention that the instructions on peace-officer assault and the peace-officer special circumstance improperly eliminated the "probable cause" issue from the jury's consideration.

█ Defendant argues that the court's instruction also eliminated from the jury's engaged-in-duty analysis the issue whether the warrant was lawfully *executed*. We agree that the proper *service* of a warrant is a jury issue under the engaged-in-duty requirement. (*Henderson, supra*, 58 Cal.App.3d at p. 357.) We conclude, however, that the instant instruction properly presented the service issue for the jury's consideration.

The court instructed that an officer executing a warrant upon a house may break and enter "if, after announcing notice of his authority and purpose, he is refused admittance." In deciding whether there was a refusal of admittance after an announcement, the court advised, the jury could consider various factors.[20]

Defendant claims this instruction *assumed* that Deputy Williams and his colleagues had announced their authority and purpose, an issue in dispute. However, the instruction manifestly made no such assumption. It advised that forced entry was lawful only "*if*, after announcing notice of . . . authority and purpose," the officers were denied admittance. (Italics added.) The issue whether the officers *did* announce their identity and purpose was thus left to the jury.

---

61, 63; *United States* v. *Dentice* (E.D.Wis. 1968) 289 F.Supp. 799, 800; *United States* v. *Pitotto* (D.Ore. 1920) 267 Fed. 603, 604.) Our research discloses only one other federal authority on point. (*Dovel* v. *United States* (7th Cir. 1924) 299 Fed. 948, 949.) Though *Curtis* suggested that such a rule "prevails in most jurisdictions," the single state case cited for the proposition is to the contrary. (*State* v. *Cesero* (1959) 146 Conn. 375 [151 A.2d 338, 351-352] [officer has authority and duty to execute facially valid warrant despite underlying deficiency, but may lose protection against unlawful resistance if he or she delays unreasonably in serving the warrant].) The federal decisions provide little analysis and appear to apply the traditional premise, discredited by statute in California since 1957, that resistance to an unlawful arrest "is not illegal." (E.g., *Sparks, supra*.) Defendant cites no authority addressing the warrant issue as such in a jurisdiction where the common law privilege of resistance has been abrogated. Under these circumstances, we are unwilling to infer that our Legislature or the voters uncritically intended to adopt the federal "warrant" rule when they enacted peace-officer offenses and enhancements.

[20] The court instructed as follows: "The law permits a peace officer to break open any outer or inner door or window of a house or any part of a house or anything therein to execute the warrant, if, after notice of his authority and purpose, he is refused admittance. [¶] In determining if there was a refusal of admittance, you may consider the length of time of announcement of authority and purpose; the hearing of footsteps inside; the reasonable belief that persons are inside."

11. *Peace-officer murder: constructive knowledge standard.*

 The special circumstance of peace-officer murder requires that defendant intentionally killed a person he "knew *or should have known* was a peace officer engaged in the performance of . . . duties." (§ 190.2, subd. (a)(7), italics added.) Defendant asserts that a standard of mere constructive-knowledge violates the Eighth and Fourteenth Amendments because it is vague and overbroad, and because it fails to draw a rational distinction, based on relative culpability, between intentional murderers who are and are not eligible for the death penalty. We have previously upheld the constructive-knowledge standard of the peace-officer special circumstance against a similar challenge. (*People* v. *Rodriguez, supra,* 42 Cal.3d at pp. 780-783.) We do so here.

B. *Penalty issues.*

1. *Sentencing instructions and argument.*

a. *Mitigating evidence/factor (k)/sympathy.*

 Defendant objects that the penalty jury was prevented from considering constitutionally relevant mitigating evidence of his character and background because the sentencing factors included in the 1978 death penalty statute (§ 190.3, factors (a)-(k)), and in the formerly applicable standard instructions (see CALJIC, former No. 8.84.1, factors (a)-(k)), focused only on his criminal history and the circumstances of the capital offense. Moreover, defendant asserts, the court improperly instructed the jury not to be swayed by "mere . . . sympathy." (CALJIC No. 1.00.) This, defendant urges, permitted the prosecutor to mislead the jury by arguing that the presence of defendant's sister and children in court was not entitled to sympathetic consideration by the jury.[21]

---

[21] With respect to the effect of argument, we note at the outset the United State Supreme Court's recent comments in *Boyde* v. *California* (1990) 494 U.S. 370 [108 L.Ed.2d 316, 110 S.Ct. 1190]. As the court there observed, prosecutorial commentary should not be given undue weight in analyzing how a reasonable jury understood capital sentencing instructions. Juries are warned in advance that counsel's remarks are mere argument, missteps can be challenged when they occur, and juries generally understand that counsel's assertions are the "statements of advocates." Thus, argument should "not be judged as having the same force as an instruction from the court. And the arguments of counsel, like the instructions of the court, must be judged in the context in which they are made. [Citations.]" (P. __ [108 L.Ed.2d at p. 332, 110 S.Ct. at p. 1200.] "[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." (*Donnelly* v. *DeChristoforo* (1974) 416 U.S. 637, 647 [40 L.Ed.2d 431, 439, 94 S.Ct. 1868], quoted in *Boyde* v. *California, supra.*) We agree, and we analyze defendant's numerous assertions of prosecutorial misargument accordingly.

These contentions lack merit for several reasons. First, contrary to defendant's suggestion, the statute and the instructions given here include a "catch-all" factor which directs consideration of "any . . . circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." (§ 190.3, factor (k); CALJIC, former No. 8.84.1, factor (k).) Unless misled, a reasonable jury should understand that this phraseology includes consideration of mitigating character and background evidence introduced at trial. (*Boyde* v. *California, supra,* 494 U.S. at pp. __-__ [108 L.Ed.2d at pp. 329-330, 110 S.Ct. at pp. 1198-1199].)[22]

Here the jury was instructed to consider "all of the evidence," and the prosecutor never suggested that any evidence presented in mitigation by defendant was irrelevant. Hence, we see no "reasonable likelihood" that the jury misconstrued the relevant scope of such evidence. (*Boyde* v. *California, supra,* 494 U.S. at p. __ [108 L.Ed.2d at p. 329, 110 S.Ct. at p. 1198]; *People* v. *Brown, supra,* 40 Cal.3d 512, 544, fn. 17.)[23]

The court's instruction against "*mere* sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling" (italics added) does not alter our analysis. Unless misled, a reasonable jury will understand that this instruction does not foreclose compassionate evaluation of the mitigating evidence, but warns only against "factually untethered" emotion, bias, or outside pressure. (*California* v. *Brown* (1987) 479 U.S. 538, 542-543 [93 L.Ed.2d 934, 941, 107 S.Ct. 837]; see also conc. opn. of O'Connor, J., *id.,* at pp. 544-545 [93 L.Ed.2d at pp. 941-942].)

The prosecutor did assert that "His Honor said . . . you are not supposed to consider sympathy or compassion." Defense counsel raised no

---

[22] We so construed factor (k) in *People* v. *Easley* (1983) 34 Cal.3d 858, at pages 877-878 [196 Cal.Rptr. 309, 671 P.2d 813]. (See also *People* v. *Brown* (1985) 40 Cal.3d 512, 541 [220 Cal.Rptr. 637, 709 P.2d 440].) To avoid any potential confusion in future cases, *Easley* directed that in subsequent penalty trials, the factor (k) instruction be modified to include reference to "any other 'aspect of [the] defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death.' . . ." (34 Cal.3d at p. 878, fn. 10, quoting *Lockett* v. *Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 990, 98 S.Ct. 2954] [plur. opn.]; see now CALJIC No. 8.85 (5th ed. 1988 bound vol.).)

[23] *Boyde* expressly addressed the appropriate standard for evaluating a *federal constitutional* claim that ambiguous instructions impermissibly restricted the jury's consideration of relevant mitigating evidence. After reviewing various past expressions of the standard, *Boyde* held that constitutional difficulties arise only if "there is a *reasonable likelihood* [i.e., more than a mere "possibility"] that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence . . . ." (494 U.S. at p. __ [108 L.Ed.2d at p. 329, 110 S.Ct. at p. 1198], italics added.) We thus adopt the "reasonable likelihood" test for defendant's claims that the ambiguous standard sentencing instruction and the "no sympathy" instruction, as exploited by the prosecutor, prevented the jury from considering all relevant evidence in mitigation.

objection. In any event, the context of the remark clearly indicates it was intended only to focus the jury on the evidence, rather than on vague pity for persons forced to defend against criminal charges.[24] There appears no reasonable likelihood that the jury misinterpreted the standard "antisympathy" instruction.

■ Nor did the prosecutor mislead the jury with his brief admonition, unchallenged by the defense, that the jurors must not "weigh" or "consider" the presence of defendant's family members in court.[25] As noted above, the jury could properly be cautioned against free-floating emotional responses that were extraneous to the statutory sentencing factors and the aggravating and mitigating *evidence*. (See *California v. Brown, supra,* 479 U.S. at pp. 542-543 [93 L.Ed.2d at pp. 940-941]; conc. opn. of O'Connor, J., *id.,* at pp. 544-545 [93 L.Ed.2d at pp. 941-942]; see also *People v. Brown, supra,* 40 Cal.3d at p. 544.)[26]

b. *"Extreme" mental or emotional condition.*

■ Defendant notes that the statute, and the conforming instructions given here, suggest that mental or emotional disturbance is mitigating only

---

[24] In the course of an argument that the jury should not be distracted by extraneous factors, the prosecutor said, "Let me go to the . . . ones that may come up. [¶] The one that there can be a derailment, which is the emotional one. [¶] His Honor said that you are not supposed to consider sympathy or compassion. You are supposed to weigh the facts that you heard from the witness stand and the physical exhibits we are talking about. [¶] Those are evidence. *Sympathy for the defendant, if you are a person who says, well, you know, I always take the position of the underdog—the defendant's the underdog in this case, therefore, I am going to be his advocate, I am going to stand up for the defendant.*" (Italics added.)

[25] The prosecutor argued that "you saw the defendant's sister testify [briefly on matters unrelated to defendant's character and background], and children in and out of court. That's something that you are not to—to weigh and consider, and should be put aside. It can—it can grab somebody, grab somebody on the jury. If you do that, you're not doing your job, you're being distracted . . . ."

[26] We have suggested on occasion that pertinent courtroom "observation[s]" by the jury could be considered even if not reflected in the formal record. (*People v. Adcox* (1988) 47 Cal.3d 207, 258 [253 Cal.Rptr. 55, 763 P.2d 906] [prosecutor may argue that defendant's cold demeanor shows absence of remorse]; *People v. Williams* (1988) 44 Cal.3d 883, 971-972 [245 Cal.Rptr. 336, 751 P.2d 395] [trial judge may cite defendant's "calm" trial demeanor as weighing against modification of death judgment]; *People v. Brown, supra,* 40 Cal.3d at p. 540 [jury must be free to reject death on basis of any relevant "evidence or observation"].) However, mere presence of family members as trial observers is not a pertinent mitigating circumstance as such. Insofar as the mere presence of relatives might invoke the jury's "factually untethered" compassion for defendant's family, the prosecutor may properly argue against such an unsupported influence on the penalty determination. (See *Adcox, supra,* at p. 259 [prosecutor urged jury to decide defendant's fate on the evidence, "not . . . on untethered compassion for him or his mother alone"]; *People v. Gates* (1987) 43 Cal.3d 1168, 1201 [240 Cal.Rptr. 666, 743 P.2d 301] [prosecutor reviewed family and background *evidence* but argued that "the time now is not for . . . [feeling] sorry for the family . . . ."].) Such is the import of the prosecutor's remarks here.

if the condition is "extreme." (§ 190.3, factor (d); CALJIC, former No. 8.84.1, factor (d).) He urges that the prosecutor's argument reinforced this inference. On the contrary, he asserts, the Constitution requires consideration of *any* pertinent mitigating factor, including mental impairment that is less than extreme.

As we have noted, however, the catch-all provision, factor (k) (§ 190.3, factor (k); CALJIC, former No. 8.84.1, factor (k)), by drawing the sentencer's attention to "[a]ny other circumstance which extenuates the gravity of the crime," allows consideration of "nonextreme" mental or emotional conditions. (See, e.g., *People v. Ghent* (1987) 43 Cal.3d 739, 776 [239 Cal.Rptr. 82, 739 P.2d 1250].) Moreover, we find no basis for reversal in the prosecutor's argument on the subject.

Addressing factor (d), "extreme mental or emotional disturbance," the prosecutor simply noted there was no evidence of such "extreme" disturbance. Moments later, the prosecutor turned to factor (h), diminished capacity from "mental disease" or "intoxication." This he described as involving a situation where there was something "mentally wrong . . . or the person was so intoxicated . . . that he somehow was beside himself, he wasn't a normal person." The prosecutor then noted, however, that there was "absolutely *no* evidence" (italics added) of *any* intoxication or mental disease or disturbance.

Again, defendant failed to object and request clarification. In any event, since the prosecutor accurately characterized the state of the evidence, there is no reasonable likelihood the jury was moved to ignore mental or emotional conditions that were less than "extreme." (See *Boyde* v. *California, supra,* 494 U.S. at p. ___ [108 L.Ed.2d at p. 329, 110 S.Ct. at p. 1198]; see also fn., *ante.*)

c. *Sentencing discretion.*

██ Defendant urges vigorously that the prosecutor manipulated ambiguous statutory language in the standard sentencing instructions to suggest the jury could not determine the "appropriate" penalty, but must impose death despite contrary beliefs on the basis of a mechanical assessment of aggravation and mitigation. We are not persuaded.

In *People* v. *Brown*, *supra*, 40 Cal.3d 512, we construed the 1978 death penalty law's provision that the penalty imposed "shall" depend on the sentencer's decision whether aggravating factors in the case "outweigh" those in mitigation. (§ 190.3.) We suggested, among other things, that a capital penalty scheme would not "pass [constitutional] muster" if it required a death judgment despite the sentencer's belief that death was not appropriate under all the relevant circumstances. (40 Cal.3d at p. 540.) We held, however, that the 1978 statute's "weighing" language, properly construed, neither imposes a "mandatory" sentencing formula nor limits the sentencer's discretion to decide for itself which available penalty is morally appropriate for the individual offense and offender.

"Weighing," we said, connotes a *subjective* mental balancing process; it does not suggest either the "mechanical *counting* of factors on each side" (italics added) or the "arbitrary" assignment of relative values. Rather, we observed, "the [sentencer], *by* weighing the various factors, simply determines under the relevant evidence which penalty [it believes] is appropriate in the particular case. [Fn. omitted.]" (40 Cal.3d at p. 541, italics added; see also conc. & dis. opn. of Lucas, J., *id.*, at p. 546.)

We acknowledged the possibility that, in particular circumstances, instructions phrased in the "unadorned" statutory language might mislead the sentencer about the nature of its task. We endorsed explanatory instructions for use in future cases. (See now CALJIC No. 8.88 (1989 rev.) (5th ed. pocket pt.).) We also undertook to examine each pre-*Brown* trial such as defendant's to determine "whether, in context, the sentencer may have been misled to defendant's prejudice about the scope of its . . . discretion." (*People* v. *Brown*, *supra*, 40 Cal.3d at p. 544, fn. 17, p. 545, fn. 19.) Serious prosecutorial misargument has occasionally led us to conclude that a pre-*Brown* jury was misled. (E.g., *People* v. *Milner* (1988) 45 Cal.3d 227, 253-258 [246 Cal.Rptr. 713, 753 P.2d 669].)

Here, we reject defendant's contention that the prosecutor misled the jury about its sentencing duties. Defendant contends that by using a homemade scale to illustrate aggravating and mitigating factors, and by assigning arbitrary arithmetic values to each factor, the prosecutor created the impression that the weighing process was sterile and mechanical. Further, defendant points out, the prosecutor asserted that the penalty process was automatic and urged that the jury was not to decide whether death was appropriate. In context, a reasonable jury would not have misunderstood its task.

The penalty phase essentially retried whether the shooting of Deputy Williams was a calculated murder or an unfortunate panic response.

Beyond stipulations that defendant had suffered two prior violent misdemeanor convictions, no other aggravating or mitigating evidence was introduced.

The jury was instructed that the arguments of counsel are not evidence. And the arguments of both counsel centered around which penalty defendant deserved for his crime. The prosecutor's strategy was to portray defendant as a "malicious cop-killer." The prosecutor urged that the killing of Williams was a "calculated" act motivated by defendant's desire to protect his narcotics business. By gunning down an officer he neither knew nor disliked, the prosecutor argued, defendant was shooting at the badge itself, and thus at the core of civilized society. Conduct this serious, said the prosecutor, called for the law's most extreme penalty.

Defense counsel, on the other hand, sought to create "lingering doubt" about the prosecution's theory of a planned killing. He urged that defendant's claims of concern about the Bassetts, and of his remorse for the killing, were valid, and that the crime did not compare with those for which death was appropriate.

At several points in his various penalty arguments (opening, closing, and rebuttal), the prosecutor did suggest that "it's just a matter of weighing," and that once weighing was completed, there was no "alternative" or "option" and the penalty determination was "automatic." Moreover, in his closing argument-in-chief, the prosecutor illustrated his concept of weighing by placing the various factors on one or the other side of a garage-built scale. In rebuttal, he assigned numerical values to each factor as on a fictional "balance sheet," ultimately reaching a "score" of 22 aggravating points against 3 points in mitigation.

But the jury cannot have been confused. At the outset of his closing argument-in-chief, the prosecutor reiterated that "what the attorneys say is not evidence." He emphasized that his scale illustration, and his assigned values, were mere argument which defense counsel would undoubtedly dispute. Moreover, the prosecutor acknowledged at every turn that the balance of aggravation against mitigation was subjective, involved "weighing" rather than "counting," and was entirely up to the jury. He stressed that death was the "just and fair" penalty, which defendant had "earned and deserved" by the cold-blooded killing of a police officer.[27] In his own

---

[27] In his closing argument-in-chief, the prosecutor informed the jurors that their job was to listen to the evidence on the various factors, "decide [whether] they go in the aggravating side or . . . in the mitigating side," then determine "how much weight am I going to give it? . . .

closing argument, and in reply to the prosecutor's rebuttal, defense counsel responded vigorously that the appropriate penalty must be determined not by mechanical procedures, but by the overall circumstances.[28]

We have expressed concern that jurors understand both the subjective nature of the weighing process and their discretion to determine the appropriate penalty. However, contrary to the dissent's apparent assumption, the "weighing" and "appropriateness" functions are *not* separate and independent. Rather, we have made clear that "when jurors are informed they have discretion to assign whatever value they deem appropriate to the factors listed, they necessarily understand they have discretion to determine the appropriate penalty . . . ." (*People* v. *Boyde* (1988) 46 Cal.3d 212, 253 [250 Cal.Rptr. 83, 758 P.2d 25].) The reason is that the subjective assignment of weights "is the very means by which the jury arrives at its qualitative and normative decision" about the proper punishment in the particular case. (*Ibid.*; see *People* v. *Brown, supra,* 40 Cal.3d at p. 541.)

Defendant urges that the prosecutor nullified this logic by declaring specifically in his rebuttal argument that the jury was *not* to decide the "appropriate" penalty. The prosecutor's brief remark on "appropriateness," however, was made in a limited context. It addressed only a dispute between counsel as to whether *a comparison to other well-publicized murders* was relevant. In effect, the prosecutor properly urged the jury to decide the penalty on the basis of the aggravating and mitigating evidence presented *in*

---

[¶] That is your job. You have got to give the weight to them. A little weight, a lot of weight. That's your decision . . . ." He anticipated that the defense would consider his manipulation of the scales unfair and inaccurate, and "will most likely debate where [the factors] belong, [but] let me give you the People's position, our argument on it. You may disagree with it." In conclusion, the prosecutor expressed confidence that "after you weigh the evidence and decide what factors are involved and how they should be weighted, . . . you will impose a just and fair verdict . . . ." Later, in rebuttal, the prosecutor shifted to a numerical-weight analogy, but he admonished that "I'm giving you an example. I'm not telling you that these are numerical, that this is the way you're going to do it . . . . [¶] Your numbers may be entirely different. You may approach it differently . . . ." The prosecutor ultimately urged that "this defendant has earned and he now deserves the maximum sentence."

[28] In his closing argument-in-chief, defense counsel declared that the jury's penalty choice involved "stakes [that] are very, very high" and an "extremely serious" responsibility. He reminded the jury that "all of you have said that . . . there are cases where the death penalty is appropriate and there are cases where it's not appropriate . . . . [¶] We have a death penalty and we have an alternative. If ever there was a reason to give the alternative, it would be in a case like this one . . . . [¶] That's what the mitigating and aggravating factors are for, for weighing them." In his reply, after paying a sarcastic compliment to the prosecutor's "well done" charts, defense counsel observed that "the danger to the laying out of factors in that way makes it seem as if . . . you are to divorce yourself from the serious consideration of the most important factor and the serious consideration of what you're facing by, in a sense, copping out and going into a balance-sheet type logic . . . . [¶] But I don't think that's what we're talking about, what we should be talking about."

*defendant's trial.* Under all the circumstances, a reasonable jury would not have assumed it lacked power to determine the appropriate penalty for *this offense and offender.*[29] We see no basis for reversal.[30]

### d. *Remorse.*

■ Defendant challenges the prosecutor's claim that defendant's absence of remorse was aggravating. Defendant notes that absence of remorse is not a statutory aggravating factor (see *People* v. *Boyd* (1985) 38 Cal.3d 762, 771-776 [215 Cal.Rptr. 1, 700 P.2d 782]) and urges that the issue of remorse can only be mitigating (see *People* v. *Davenport* (1985) 41 Cal.3d 247, 288-290 [221 Cal.Rptr. 794, 710 P.2d 861]). Though the prosecutor's argument was incorrect in certain respects, a reasonable jury would not have been misled, and there appears no reasonable possibility the penalty verdict was affected. (*People* v. *Brown* (1988) 46 Cal.3d 432, 448 [250 Cal.Rptr. 604, 758 P.2d 1135].)

In his closing argument-in-chief, the prosecutor did suggest as an aggravating consideration that defendant had shown lack of remorse by his defiant behavior when captured, by his boasts to jailmate Acker about "bagging a cop" who "had it coming," and by "stick[ing] to" his gang-attack defense.[31] Insofar as the prosecutor was urging defendant's *overt*

---

[29] Throughout his arguments, the prosecutor urged the jury not to be influenced by assertions, for example, that defendant's conduct "really isn't as bad as the Manson case" or the "Bittaker case." The prosecutor advanced the view that the law does not limit imposition of death to the most "atrocious" cases. In his closing argument-in-chief, defense counsel responded as follows: "Mr. Bowers [the prosecutor] has added . . . that, my goodness, don't be comparing this with the Manson case; don't be comparing this with some other horrible case. [¶] Naturally he doesn't want you to compare it with some other horrible case. Naturally he doesn't." Counsel then argued at length that defendant's case did not exhibit the exceptionally egregious circumstances that might warrant death. In his rebuttal, the prosecutor rejoined, "What did I tell you? *He uses the example of other brutal, vicious crimes,* talks about the death penalty, when is the death penalty appropriate? [¶] You didn't hear His Honor say anything about when is it appropriate. [¶] His Honor said your job is a weighing process. It's not for you to think, 'Well, I think this is an appropriate-type case; no, this is not an appropriate-type case.' [¶] That is not for you to decide. Not really. It's kind of misleading. That's misleading *because if it's an appropriateness-type of situation then it becomes a comparison issue.* [¶] *Are you here to compare this with the Bittaker case, to other atrocious crimes?* [¶] *No, you are not.*" (Italics added.)

[30] Because the penalty judgment may be affirmed under our traditional *Brown* analysis, we decline the People's request that we reconsider *Brown* in light of two recent United States Supreme Court decisions, *Blystone* v. *Pennsylvania* (1990) 494 U.S. 299 [108 L.Ed.2d 255, 110 S.Ct. 1078] and *Boyde* v. *California, supra,* 494 U.S. 370 [108 L.Ed.2d 316, 110 S.Ct. 1190].

[31] The prosecutor argued: "You know, bagging a cop or downing a cop, . . . the type of words that he used, . . . if that isn't inhuman or insensitive, then I don't know what really is. [¶] His statement to Mr. Acker was, 'They had it coming. Those narcs had it coming. They have been sweating us in this area. They sweat us. The sheriffs deserve it.' [¶] It was inhuman; it was insensitive, and lastly, if these different words and the facts don't make aggravation, we

remorselessness *at the immediate scene of the crime*, the claim of aggravation was proper. Overt remorselessness *is* a *statutory* sentencing factor in that context, because factor (a) of section 190.3 allows the sentencer to evaluate *all aggravating and mitigating aspects* of the *capital crime itself.* Moreover, there is nothing inherent in the issue of remorse which makes it mitigating only. The defendant's overt indifference or callousness toward his misdeed bears significantly on the moral decision whether a greater punishment, rather than a lesser, should be imposed. (Cf. *People* v. *Mitchell* (1966) 63 Cal.2d 805, 817 [48 Cal.Rptr. 371, 409 P.2d 211].)

On the other hand, *postcrime* evidence of remorselessness does not fit within any statutory sentencing factor, and thus should not be urged as aggravating. (*Boyd, supra,* 38 Cal.3d at pp. 771-776.) Moreover, the prosecutor here may have overstepped by suggesting that defendant's claim of mistaken identity showed lack of remorse. We have noted the unfairness of citing a proffered defense as proof of remorselessness. (*People* v. *Coleman* (1969) 71 Cal.2d 1159, 1168-1169 [80 Cal.Rptr. 920, 459 P.2d 248]; but see *People* v. *Miranda* (1987) 44 Cal.3d 57, 112 [241 Cal.Rptr. 594, 744 P.2d 1127].)

However, defendant raised no objection. In any event, a reasonable jury would not have been misled. The prosecutor tempered his "aggravating remorselessness" theory in his rebuttal, where he asserted only that defendant had failed to show remorse *in mitigation.*[32] It is proper for the prosecution to stress that remorse is not available as a mitigating factor. (E.g., *People* v. *Walker* (1988) 47 Cal.3d 605, 649-650 [253 Cal.Rptr. 863, 765 P.2d 70].) For the most part, the prosecutor's arguments focused on *overt* evidence of defendant's defiance, not his mere failure to confess guilt or express remorse. With or without argument, jurors can be expected to react strongly to evidence of overt callousness. (See *Williams, supra,* 44 Cal.3d at pp. 966-967.) Their response is unlikely to be influenced by whether the prosecutor brands such evidence "aggravating" or merely "nonmitigating." No basis for reversal appears.

---

certainly have the lack of remorse, and Mr. Bencangey [defense counsel] is going to say, 'Well, but he told Deputy Mace he was sorry. He was sorry.' [¶] When he is telling his Bassettstory, he is saying, 'I'm sorry. I didn't know who it was. I thought it was Bassett,' and he sticks to that. Total lack of remorse as to what he's done. [¶] And what does he do at the crowd when he goes out and the crowd outside—he yells, 'Viva Puente,' and there was another—rifa something or other. [¶] My goodness, he think's he's some type of hero for what he did. [¶] Ladies and gentlemen, if that doesn't prove aggravation to you, I don't know what else we could have done to persuade you. [¶] The nature of the crime, the circumstances of the crime are aggravating."

[32] In rebuttal, the prosecutor said, "Has he—there is—there is no remorse that has been presented as far as mitigation. There was no remorse shown on the part—as a matter of fact, just the contrary to remorse, 'Viva Puente.' [¶] He's a hero for what he's done."

e. *Age.*

 The prosecutor urged that defendant's age at the time of the offense was aggravating. He also suggested that defendant was not a youth "who may have regressed to childhood and done something foolish," but rather a "mature" and "sophisticated" person who, according to defense evidence, had been a gang leader.

Defendant asserts the argument was improper because under factor (i) of the 1978 statute (§ 190.3, factor (i) ["[t]he defendant's age at the time of the crime"]), age can only be mitigating. As we have explained, however, the "age" factor in the sentencing formula is "a metonym for any age-related matter suggested by the evidence or by common experience or morality that might reasonably inform the choice of penalty. Accordingly, either counsel may argue any such age-related inference in every case." (*People* v. *Lucky* (1988) 45 Cal.3d 259, 302 [247 Cal.Rptr. 1, 753 P.2d 1052].) The prosecutor did not err by suggesting that defendant's maturity and experience were aggravating.

f. *Gang reputation.*

 Defendant urges it was misconduct for the prosecutor to assign aggravating weight to testimony by *defense* witness Ybarra that defendant, as a reputed leader of the Puente gang, was a high-priority target of the Bassetts. The prosecutor suggested that if credible, this evidence "[cut] both ways," since defendant's leadership of a "very, very violent" street gang should be deemed aggravating.

Defendant's failure to object and request an admonition waived any direct claim of misconduct. Nor is reversal warranted on any other theory. We held in *Boyd, supra*, 38 Cal.3d 762, that a *reputation* for violence is not a statutory sentencing factor, and thus may not be considered as aggravating. (P. 778.) Here, however, the prosecutor ultimately discounted the credibility of Ybarra's testimony, and he advised the jury to give it no substantial weight. Hence, his argument could not have caused substantial harm.

g. *Aggravation versus mitigation.*

 Defendant cites the prosecutor for urging that the absence of certain other mitigating factors was aggravating. It does appear that the prosecutor placed on the aggravating side of his "scale" and "balance sheet" the *absence* of such factors as "extreme" mental or emotional disturbance (§ 190.3, factor (d)); victim participation or consent (*id.*, factor (e)); belief in moral justification (*id.*, factor (f)); extreme duress (*id.*, factor (g)); mental

disease or intoxication (*id.*, factor (h)); mere minor participation (*id.*, factor (j)); and other mitigating evidence (*id.*, factor (k)). In his rebuttal argument, the prosecutor's "score" of 22 aggravating points to 3 mitigating points was based on his assumption that the absence of prior felony convictions (*id.*, factor (c)) was the only mitigating factor; he deemed all other statutory factors to be aggravating.

The prosecutor thus misrepresented the sentencing formula. The mere absence of extenuating circumstances in the case cannot weigh in favor of death. (E.g., *Ghent, supra,* 43 Cal.3d at p. 775; *Davenport, supra,* 41 Cal.3d at pp. 288-290.)

However, defense counsel raised no objection. In any event, a reasonable jury would not have been misled, and there is no reasonable possibility the penalty verdict was affected. The jury was instructed to consider each sentencing factor only "if applicable," and was not misled about the basic nature of its sentencing task. (See discussion *ante,* at pp. 1227-1231.) In his argument, the prosecutor assigned the bulk of his proposed aggravating values to the brutal circumstances of the shooting, and only nominal weights to the absent extenuating factors. He cautioned frequently that his characterizations of aggravation and mitigation, and of relative weights, were mere advocacy which the jurors were free to reject. Defense counsel strongly urged the jury to decide penalty by evaluating the overall circumstances. Given such freedom, a reasonable jury would not assign substantial aggravating weight to the absence of unusual extenuating factors. (See *People v. Hamilton* (1989) 48 Cal.3d 1142, 1184-1185 [259 Cal.Rptr. 701, 774 P.2d 730].) Defendant fails to persuade us that the prosecutor's misstatements justify reversal.

h. *Premeditation/lingering doubt.*

 Defendant urges that the instructions and argument precluded the jury from considering its "lingering doubt" about his guilt for purposes of deciding the appropriate penalty. (See *People v. Terry* (1964) 61 Cal.2d 137, 145-147 [37 Cal.Rptr. 605, 390 P.2d 381].) We disagree.

As defendant notes, in its opening remarks at the second penalty trial, the court gave the standard admonition that a previous jury had already found true the charges in the information, and that the instant jury's function was only to decide the appropriate punishment. Hence, the court said, "this jury will not be concerned with the issue of innocence or guilt *in the sense of making that determination.*" (Italics added.)

Thereafter, defendant observes, both counsel, in voir dire and in argument, agreed that defendant's guilt of premeditated murder, with actual or

constructive knowledge that the victim was a peace officer engaged in duty, had already been decided. At most, defendant complains, defense counsel sought only to create doubt whether the premeditation found by the guilt jury was a calculated plan, as the prosecution suggested, or a less serious misjudgment under stress. The prosecutor undermined even this limited strategy, defendant asserts, by arguing that the jury should not "speculate" on why the guilt jury had found premeditation.

However, the record does not bear out defendant's concerns. In the first place, the trial court never ruled or instructed that the jurors were precluded from considering "lingering doubt" *as a factor in the penalty determination.* (Compare *Terry, supra,* 61 Cal.2d at pp. 146-147.) The court merely indicated, and correctly so, that the penalty jury was not charged with making a guilt or innocence determination "in [that] sense."[33]

Moreover, the penalty trial reexamined all aspects of the killing of Deputy Williams. The defense sought to discredit jailmate Acker's claims of a planned killing, to show defendant's expressions of remorse and mistake, and to demonstrate why defendant had plausible fears that the rival Bassett gang might attack his house.

Defense counsel argued to the jury that the guilt verdicts, though final, were wrong. He stressed that the prosecution's theories "are extremely shaky" and "open to some question, especially . . . when brought into juxtaposition with the fact that the People are asking for the death penalty." "Our theory of the case," he stated at one point, "will be . . . what Mr. Gonzalez' defense was to the charge . . . in the guilt phase."

At certain points in his argument, counsel suggested he would not "argue" about the prior finding of premeditation, and he focused on the possibility that the guilt jury might still have rejected Acker's claims of a carefully planned killing. In doing so, counsel obviously sought to cope with a manifest tactical problem—the evidence that defendant realized his victim was a police officer was extremely persuasive. Counsel reasonably sought to preserve his credibility by exploiting the weakest link in a strong prosecution case—the "planned killing" testimony of a dubious jailhouse informant.

On the other hand, the prosecutor predictably argued that the People should not be required to reprove what they had already proved at the guilt

---

[33] Defendant notes that during the *Hovey* voir dire (see *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1, 69-81 [168 Cal.Rptr. 128, 616 P.2d 1301]) of one juror who was finally seated, even *defense* counsel stressed that the guilt jury's determination of premeditated murder of a peace officer must be "accept[ed]." Again, this would have been understood only to mean that defendant's conviction of peace-officer murder was final as such.

trial. This case was "three-quarters over," said the prosecutor, and the jury should not "speculate' on such matters as why the prior jurors found premeditation when "you don't know the evidence they heard."

Under all these circumstances, we see no basis for a conclusion that the jury was misled to ignore any lingering doubts about the People's case when deciding which penalty was appropriate. Defendant's contention to that effect must be rejected.

i. *Failure to delete inapplicable mitigating factors.*

■ Defendant claims the trial court erred by failing to delete from the sentencing instructions those factors in mitigation that were not presented by the evidence. However, the jury was instructed to consider each factor only "if applicable," and it is not improper to inform the sentencer of all the factors the state deems relevant to aggravation and mitigation. We have consistently rejected defendant's argument. (E.g., *People* v. *Melton* (1988) 44 Cal.3d 713, 770 [244 Cal.Rptr. 867, 750 P.2d 741]; *Miranda, supra,* 44 Cal.3d at pp. 104-105; *Ghent, supra,* 43 Cal.3d at pp. 776-777.)

j. *Failure to give beyond-reasonable-doubt instructions on issues of aggravation versus mitigation and appropriate penalty.*

■ Defendant advances the claim that under the state and federal Constitutions, a jury must be instructed not to impose death unless convinced beyond a reasonable doubt that aggravating circumstances outweigh mitigating circumstances and that death is the appropriate penalty. The contention lacks merit. (E.g., *Miranda, supra,* 44 Cal.3d at p. 107; *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 777-779.)

2. *Autopsy photograph.*

■ Over defendant's objection that prejudice outweighed probative value (Evid. Code, § 352), the trial court admitted an autopsy photo depicting the shotgun wound in the victim's chest. The court agreed with the prosecution that the brutal manner of killing, as demonstrated by the photo, was relevant to malice, premeditation, and aggravation. The court also found the photo helpful with respect to prior cross-examination of the medical examiner about how soon the victim died of his wound.

Before us, defendant renews his contention that the photo was inflammatory and had no substantial evidentiary purpose. The claim of insufficient relevance has considerable merit. Medical Examiner Schnittker had testified in straightforward detail about the size, nature, and location of

the wound, and had acknowledged it was much larger than a bullet would have inflicted. The testimony produced no serious dispute that the wound certainly caused unconsciousness and death within moments. The photo thus had little independent pertinence. (See, e.g., *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1137 [240 Cal.Rptr. 585, 742 P.2d 1306].)

Even if the photo's admission was therefore an abuse of discretion, however, the error was harmless. Our independent examination of the challenged exhibit discloses that it was not unduly grisly or inflammatory. (E.g., *People* v. *Turner* (1990) 50 Cal.3d 668, 707 [268 Cal.Rptr. 706, 789 P.2d 887].)

### 3. *"Expert" gang testimony.*

█ Sergeant Araujo was called in rebuttal by the People to provide expert testimony about gang activities and methods in the La Puente area. The prosecutor also briefly elicited testimony that, so far as Araujo knew from his training, experience, and information, defense witness Ybarra was not an active member of the Bassett gang. Defense counsel objected and moved to strike. During voir dire examination, Araujo conceded his opinion was based only on the fact that Ybarra's name was unknown to sheriff's investigators and did not appear in the department's files. The court concluded that such "negative inference" community-reputation evidence was incompetent to impeach Ybarra. Therefore, the court sustained the objection, granted the motion to strike, and admonished the jury to disregard Araujo's testimony on the subject of Ybarra.

Defendant now urges that because "gang" evidence is so inflammatory, the admonition was insufficient to "unring the bell," and a mistrial was warranted. However, no motion for a mistrial was made, the issue was tangential, the court struck evidence that someone was *not* a gang member, and the admonition was fully sufficient. Defendant's claim is patently unpersuasive.

### 4. *Automatic motion for modification of verdict.*

█ Defendant argues that the trial judge improperly considered a probation report not in evidence before denying the automatic motion for modification of the death verdict. (§ 190.4, subd. (e) (hereafter section 190.4(e)).) The judge also erred, defendant claims, by citing the absence of mitigating factors as aggravating circumstances; by failing to note the absence of prior felonies as a mitigating factor; and by failing to exercise his independent judgment whether the evidence supported the penalty verdict. We find no basis for overturning the judge's refusal to modify the verdict.

The court and both counsel assumed consideration of a probation report would be proper for purposes of the section 190.4(e) motion. With defense counsel's assent, hearing on the motion was continued for preparation of such a report. The judge read and considered the report prior to the hearing.

In so doing, the judge erred. On a motion under section 190.4(e), the trial judge is limited to the evidence presented to the penalty jury. Thus, he should not consider an outside report until his capital sentencing responsibilities are complete. (*People* v. *Lewis* (1990) 50 Cal.3d 262, 286-287 [266 Cal.Rptr. 834, 786 P.2d 892]; *People* v. *Williams* (1988) 45 Cal.3d 1268, 1329 [248 Cal.Rptr. 834, 756 P.2d 221].)

Defendant may have waived the error by agreeing to consideration of the report. In any event, a new modification hearing is not necessary. There appears no reasonable possibility that the court's improper consideration of the report affected the section 190.4(e) ruling. (*People* v. *Ramirez* (1990) 50 Cal.3d 1158, 1201-1202 [270 Cal.Rptr. 286, 791 P.2d 965]; *Williams*, *supra*, 45 Cal.3d at pp. 1329-1330.)

Defendant stresses that the report contained some prejudicial and inaccurate material beyond the trial evidence. However, in his oral ruling, the judge referred only briefly to the report, noting that it contained no significant new mitigation.[34] For his conclusion that aggravation outweighed mitigation beyond a reasonable doubt, the judge relied almost exclusively on his views about the capital crime itself. As he explained, the trial evidence convinced him that defendant had committed a "senseless, brutal-type murder," that a mistake about the officers' identity was "inconceivable," that defendant acted "calm[ly] and "callous[ly]," and that the homicide amounted to a savage "assassination" of Deputy Williams. Thus, in contrast with *Lewis*, *supra*, 50 Cal.3d 262, the judge's comments in this case make clear that he was not influenced by information not presented at the penalty trial.[35]

 Defendant's claims that the judge confused the absence of mitigation with aggravation, and found "no mitigating evidence" despite

---

[34] Defense counsel conceded at the hearing that the absence of mitigating background information in the report stemmed from defendant's refusal to cooperate.

[35] Defendant claims the judge erroneously considered defendant's guilt phase testimony, which was not before the second penalty jury, when he remarked that defendant was "not being truthful with the Court or with the jury when he stated that he thought that [the raiding officers] were gang members." Even though defendant did not testify at the penalty trial, however, his claim of mistaken identity formed the basis of his penalty defense. It was presented through the testimony of Deputy Overlease, who interviewed him in the hospital, and of Deputy Mace, to whom he made remorseful statements in the ambulance. The defense also presented circumstantial evidence, through witness Ybarra, that defendant's fears of attack by the Bassett gang had some foundation.

defendant's clean felony record, apparently stem from statements to that effect in the unsigned minute order entered by the court clerk and included in the clerk's transcript. By contrast, the judge's oral ruling simply noted the absence of various mitigating factors; the judge never stated that he found such absence to be aggravating. Moreover, in his oral remarks, the judge expressly agreed with defense counsel's assertion of mitigation that "there was no evidence of any prior felony conviction that was introduced."

In conflicts like these, the oral ruling must prevail. Section 190.4(e) provides that the judge "shall *state* on the record the reasons for his findings" and shall "*direct* that they be entered on the Clerk's minutes." (Italics added.) The minutes typically represent the clerk's summary impression of the court's ruling. Absent evidence that the judge himself reviewed and approved the wording of the minutes, we must assume that his actual reasoning is that which he stated personally on the oral record.

Finally, the record does not support defendant's claim that the judge failed to reweigh aggravation and mitigation independently. (See *People* v. *Bonillas* (1989) 48 Cal.3d 757, 801 [257 Cal.Rptr. 895, 771 P.2d 844]; *Rodriguez, supra*, 42 Cal.3d at pp. 793-794.) The judge expressly stated that the aggravating circumstances "do, in fact" outweigh the mitigating by "all of the standards that are applicable in a criminal case," including beyond a reasonable doubt. The judge further declared at length his personal belief that the killing of Deputy Williams was particularly brutal, calculated, and cold-blooded, and that the defense was weak and contrived. He found no mitigating evidence beyond the lack of prior felony convictions.

These indicia of independent weighing are adequate to uphold the ruling on the motion for modification of the verdict. The judge's comments make clear his determination that the penalty balance was not close, a conclusion amply supported by the record. (*Hamilton, supra,* 48 Cal.3d at p. 1187.) Thus, even if one or more of defendant's claims of error had merit, there is no reasonable possibility that the errors affected the outcome of the motion. (*People* v. *Heishman* (1988) 45 Cal.3d 147, 201 [246 Cal.Rptr. 673, 753 P.2d 629].) No basis for reversal appears.

## IV. HABEAS CORPUS

While the appeal was pending, defendant filed original and supplemental petitions for habeas corpus. The petitions asserted that trial counsel's guilt and penalty phase representation was constitutionally defective in several other respects, and that the prosecution wrongly withheld pertinent

evidence.[36] We issued an order to show cause (O.S.C.) and consolidated the habeas corpus matter with the appeal. We now find no basis for disturbing the guilt or penalty judgments.

### A. *Massiah/Henry issue; credibility of informant Acker.*

 Defendant criticizes counsel's failure to pursue a *"Massiah/Henry"* claim that informant Acker's testimony should be excluded because Acker was a government agent through whom the police deliberately elicited incriminating admissions in violation of defendant's right to counsel. (See *Maine v. Moulton* (1985) 474 U.S. 159 [88 L.Ed.2d 481, 106 S.Ct. 477]; *United States v. Henry* (1980) 447 U.S. 264 [65 L.Ed.2d 115, 100 S.Ct. 2183]; *Massiah v. United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199]; *People v. Whitt* (1984) 36 Cal.3d 724, 740-743 [205 Cal.Rptr. 810, 685 P.2d 1161].) Alternatively, defendant suggests that counsel's lapses prevented a successful motion to exclude Acker's testimony as unreliable, or at least undermined impeachment of his credibility, at both the guilt and penalty phases. Defendant also accuses the prosecution of violating its duty to disclose material evidence about Acker's agency and veracity. (See *People v. Morris* (1988) 46 Cal.3d 1, 30 [249 Cal.Rptr. 119, 756 P.2d 843]; *People v. Ruthford* (1975) 14 Cal.3d 399, 405-408 [121 Cal.Rptr. 261, 534 P.2d 1341].)

We amended the original show-cause order to eliminate these issues. We thus implicitly determined that the petitions failed to state a prima facie case with respect to Acker. (*People v. Bloyd* (1987) 43 Cal.3d 333, 363 [233 Cal.Rptr. 368, 729 P.2d 802]; see *In re Hochberg* (1970) 2 Cal.3d 870, 873-874, fn. 2, 875-876, fn. 4 [87 Cal.Rptr. 681, 471 P.2d 1].) As in *Bloyd, supra,* we briefly explain that conclusion here.

The critical issue for *Massiah/Henry* purposes is the government's "knowing exploitation" of an opportunity to coax information from a formally charged suspect in the absence of his lawyer. (*Maine v. Moulton, supra,* 474 U.S. at p. 176 [88 L.Ed.2d at p. 496]; see *Whitt, supra,* 36 Cal.3d at p. 742 ["whether the state has created a situation likely to provide it with incriminating statements"].) The accused's rights are not infringed by the government's mere acceptance of information gathered by an inmate on his own initiative, even if the authorities have a general policy of encouraging inmates to listen and report. (*People v. Williams, supra,* 44 Cal.3d 1127, 1140-1141; *Whitt, supra*; see also *Kuhlmann v. Wilson* (1986) 477 U.S. 436,

---

[36] Similar arguments are raised in the direct appeal. However, defendant virtually concedes that the appellate record provides an inadequate basis for evaluating the claims, and that they are most appropriately considered on habeas corpus. We therefore treat them in that context, referring to pertinent trial evidence where appropriate.

459 [91 L.Ed.2d 364, 364-365, 106 S.Ct. 2616] [police action must go beyond "merely listening"]; *Moulton, supra*, at p. 176 [no violation if government obtains information by mere "luck or happenstance"].)

Acker insisted on the stand that he elicited information from defendant entirely on his own initiative, and without official knowledge, promises, or encouragement. Neither the trial record nor the results of appellate counsel's exhaustive habeas corpus investigation undermines this claim. There are, to be sure, ample indications that in the months and years *after* Acker's July 1979 conversations with defendant, Acker frequently informed and testified for the authorities, and that he received substantial benefits for his cooperation. However, neither the record at trial nor counsel's investigation discloses evidence that Acker's history of cooperation began *before* July 1979.[37]

Absent evidence of direct motivation by the police in this case, or of a *prior* "working relationship" between Acker and the authorities from which such encouragement might be inferred, there is no basis to hold the police accountable for Acker's decision to question defendant. (See *Whitt, supra*, 36 Cal.3d at p. 744.) Thus, defendant has failed to state a prima facie case that evidence of a potentially meritorious *Massiah/Henry* claim was overlooked or withheld. (See *Fosselman, supra*, 33 Cal.3d at pp. 583-584.)[38]

■ Nor are we persuaded by defendant's claims that incompetence and prosecutorial misconduct materially impeded the defense effort to impeach Acker's credibility. At both trials, Acker disclosed he was under sentence for one murder, was implicated in other serious crimes, and expected protective custody in return for his cooperation. At the penalty retrial, Acker further conceded that *by that time*, he had informed and testified in several cases in return for protective benefits. Defense counsel's cross-examination on both occasions exposed evasiveness and inconsistencies in Acker's claims about the exact nature of his relationship with the authorities.

The habeas corpus petitions disclose some information about Acker's criminal history that might have been but was not presented at defendant's

---

[37] Acker apparently had provided information in isolated instances before July 1979, including at least one murder case pending against him and his wife. The available evidence, most of which was presented at trial, supports his claim that he had previously informed only where he felt personally implicated or involved.

[38] Defendant suggests that even if no concrete evidence of Acker's government agency has yet surfaced, counsel's postjudgment investigation has aroused enough suspicion to justify an order to show cause, discovery, and a reference to determine the true facts. However, as we discuss more fully below, habeas corpus is not a device for obtaining postjudgment discovery on speculative claims.

trials. However, these additional details do not paint a significantly different picture of Acker's character and motives than appears on the record. (Cf. *Delaware* v. *Van Arsdall* (1986) 475 U.S. 673, 680 [89 L.Ed.2d 674, 683-684, 106 S.Ct. 1431].) Even if this information was overlooked by trial counsel or should have been proffered by the prosecution, its omission was harmless beyond a reasonable doubt and does not undermine confidence in the guilt or penalty verdicts. (*United States* v. *Bagley* (1985) 473 U.S. 667, 674-678 [87 L.Ed.2d 481, 488-492, 105 S.Ct. 3375]; *Strickland* v. *Washington, supra,* 466 U.S. 668, 694 [80 L.Ed.2d 674, 697-698]; *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *Ruthford, supra,* 14 Cal.3d at pp. 408-409.)

The petitions also present information that, *long after* defendant's trials, Acker testified against his wife in return for reduced charges on Hawaii crimes in which the two were allegedly involved. Of course, neither defense counsel nor the prosecutor can be faulted for failing to foresee this development. Nor, again, was the jury substantially misled in the absence of such information.[39]

█ Finally, to the extent defendant claims Acker perjured himself with the prosecution's knowledge and approval, his allegations are also deficient. The petitions point to a number of contradictions in Acker's statements on the stand in this and other cases. However, one cannot state a prima facie case of perjury or concealment simply by showing inconsistencies in the witness's testimony. (*In re Waltreus* (1965) 62 Cal.2d 218, 221 [42 Cal.Rptr. 9, 397 P.2d 1001].) Defendant's challenges to Acker's testimony thus assert no grounds for reversal or collateral relief.

B. *Mental defenses.*

█ Defendent claims trial counsel erred by failing to investigate and present evidence of organic brain damage at both the guilt and penalty trials. As support for the existence of an impaired mental state, the original petition proffered a report, dated September 25, 1981, of the psychiatric evaluation performed upon defendant's posttrial admission to San Quentin. The report indicated that defendant, though illiterate, displayed normal-range intelligence and did not exhibit "either psychosis or severe neurosis." On the basis of certain test results, however, the report diagnosed "atypical personality disorder, . . . with neurological impairment." "Such

---

[39] Defense counsel and the jury were aware at the guilt phase of Acker's involvement in crimes other than the California murder Acker had disclosed. Counsel asked Acker if he had informed on his wife in the "Hawaii murder." Acker gave an evasive answer that essentially conceded the point. At the penalty phase, Acker admitted he had "done wrong" and "there's been two murders."

neurological damage," the report opined, "may result in concrete thinking and impaired judgment."

The supplemental petition presented a declaration, dated June 4, 1986, by Dr. David Stein, a private neuropsychologist. Confirming the prison diagnosis, Dr. Stein asserted that his own testing indicated an organic, possibly prenatal, defect in defendant's cerebral cortex.[40] This condition, Dr. Stein suggested, causes highly literal thinking, limits defendant's attention span, impairs his ability to perceive unfamiliar or fast-moving events accurately, and reduces his capacity to evaluate options and make good judgments under stress. Specifically, Dr. Stein opined that "once [defendant] believed himself or others" to be in danger from the officers' approach, he could not have responded accurately as the situation developed and could not have engaged in calculation or premeditation.

Defendant urges that if counsel had conducted an adequate pretrial investigation, he would have learned from defendant's family that defendant's mother was seriously ill during her pregnancy, that defendant himself had lifelong medical problems, and that he suffered from severe learning disabilities. This, defendant asserts, should have led counsel to seek a pretrial psychiatric evaluation and to obtain available records of defendant's medical and psychological history.

We concluded defendant had stated a prima facie case on this issue, and we therefore included it in our amended O.S.C. The original and supplemental returns include trial counsel's response to the petitions' claims of incompetence. Trial counsel asserted that although he knew mental defenses could be raised, his observations of defendant and his conversations with family members disclosed no hint of mental impairment. On the contrary, counsel asserts, defendant seemed normal and alert, and he participated knowledgeably in strategy discussions. Counsel indicates he attached little significance to defendant's illiteracy, because poor reading skills are common in low-income communities for reasons unrelated to mental ability. Finally, trial counsel declared, defendant adamantly refused to raise a mental defense or to submit to a psychiatric evaluation.

Trial counsel's declarations in this regard are uncontroverted, and we find them dispositive without need for a reference. The constitutional standard of performance by counsel is "reasonableness," viewed from counsel's perspective at the time of his challenged act or omission. (*Burger* v. *Kemp*

---

[40] Dr. Stein's declaration does not describe the tests given in detail. He does specifically mention tests of reading skill and attention span, and also refers to the Rorschach test administered to defendant at San Quentin. Considering Dr. Stein's nonmedical training, we assume no medical tests were administered.

(1987) 483 U.S. 776, 789 [97 L.Ed.2d 638, 654, 107 S.Ct. 3114]; *Strickland* v. *Washington, supra,* 466 U.S. at pp. 688-690 [80 L.Ed.2d at pp. 647, 693-695].) To establish that investigative omissions were constitutionally ineffective assistance, defendant must show at the outset that "counsel knew or should have known" further investigation might turn up materially favorable evidence. (*People* v. *Williams, supra,* 44 Cal.3d 883, 937.)

Criminal trial counsel have no blanket obligation to investigate possible "mental" defenses, even in a capital case. (*People* v. *Williams, supra,* 44 Cal.3d at p. 943; see *People* v. *Frierson* (1979) 25 Cal.3d 142, 164 [158 Cal.Rptr. 281, 599 P.2d 587].) All our cases finding culpably deficient investigation of diminished capacity have involved initial facts *known to counsel* from which he reasonably should have suspected that a meritorious defense was available. (E.g., *In re Sixto* (1989) 48 Cal.3d 1247, 1257-1262 [259 Cal.Rptr. 491, 774 P.2d 164] [defendant claimed unconsciousness caused by alcohol and PCP intoxication; entire defense theory based thereon]; *People* v. *Ledesma* (1987) 43 Cal.3d 171, 193 [233 Cal.Rptr. 404, 729 P.2d 839] [counsel knew of defendant's long history of PCP and methamphetamine abuse]; *People* v. *Mozingo* (1983) 34 Cal.3d 926, 934 [196 Cal.Rptr. 212, 671 P.2d 363] [reports furnished to counsel pretrial contained "significant" indications of psychiatric problems]; *Frierson, supra,* 25 Cal.3d at pp. 162-164 [pretrial information of PCP ingestion and long-term drug use; this was sole possible defense]; *In re Saunders* (1970) 2 Cal.3d 1033, 1036-1037 [88 Cal.Rptr. 633, 472 P.2d 921] [pretrial awareness from defendant's mother of his organic brain damage and long-standing psychological problems].)

Though artfully drafted, the supplemental petition and its attached declarations do not indicate that the possibility of convincing "mental" evidence should have been *reasonably apparent* to a competent attorney. They do not recite a history of drug abuse; indeed, according to trial counsel's uncontroverted representation, defendant discounted such abuse as a basis for defense. They do not claim that defendant's alleged mental disabilities were obvious from his demeanor or conversation.[41] Nor do they suggest that family members volunteered any specific information about his history of learning difficulties which might trigger trial counsel's suspicion. Trial counsel was presumably aware, as evidence at the guilt and penalty trials

---

[41] Passing reference to "demeanor" is made in the declaration of defendant's older brother, George Gonzalez. Recalling his observation of defendant's trial, George states: "Another thing was when my brother testified. He has always been slow and speaks differently than most people. I think because of his brain problem he always explains things very slowly and carefully, so it sounds like it took a long time to happen . . . ." But a tendency to "[explain] things slowly and carefully," even if apparent to counsel, hardly suggests mental impairment. Though we acknowledge the difficulty of discerning demeanor from the cold record, our own review of defendant's testimony triggers no such suspicion.

implied, that defendant was respected in the neighborhood as a former youth gang leader.[42] Under the circumstances, we see no basis to conclude that any failure by trial counsel to pursue an investigation of mental defenses was *unreasonable*.

Moreover, though trial counsel states he did consider such defenses in an abundance of caution, it is undisputed that defendant affirmatively refused to cooperate. Trial counsel cannot be faulted for failing to take steps that require cooperation his client declines to give. (*People* v. *Haskett* (1982) 30 Cal.3d 841, 853 [180 Cal.Rptr. 640, 640 P.2d 776].)[43]

Of course, where trial counsel has reason to believe that mental defenses may be available and advisable, the client's initial opposition does not excuse counsel from an investigation sufficient to present the client with an *informed* tactical choice. (*People* v. *Mozingo, supra*, 34 Cal.3d 926, 934.) However, the instant petitions fail to show what reasonable steps trial counsel in this case could have taken without defendant's cooperation to determine the feasibility of the intricate organic-brain-damage theory now asserted. (See *Burger* v. *Kemp, supra*, 483 U.S. at pp. 794-795 [97 L.Ed.2d at p. 657].)

The supplemental petition alludes vaguely to available "records" but does not attach or describe them. And the available family information about defendant's lifelong "slowness," illiteracy, and medical problems such as asthma hardly seems an adequate basis for a professional opinion that a defense of organic mental impairment might succeed. Under all the circumstances, the pleadings fail to establish grounds for an inference that trial counsel rendered constitutionally ineffective assistance on this issue.

 We also reject any notion that the posttrial mental evaluations constitute "newly discovered evidence" warranting relief on habeas corpus. At the outset, defendant's refusal to undergo mental evaluation prior to trial prejudices any collateral attack based on posttrial evaluations. There are

---

[42] The declaration of George Gonzalez, attached to the supplemental petition, confirms that "[defendant was] involved in gang activity when [he was] younger and . . . was looked up to by many people in the neighborhood."

[43] The supplemental petition attaches the declaration of Brenda Gonzalez, defendant's sister-in-law, which states that counsel asked if defendant would "plead insanity." "We all thought this was strange," Brenda recounts, "since [defendant] isn't crazy. [Defendant] was very upset about this and said he isn't crazy." Even assuming the truth of this version of events, we reject the implied speculation that defendant's response might have been different if trial counsel's question had been more precise. We consider it highly unlikely that defendant opposed a defense based on his mental deficiencies simply because it was labeled "insanity." We note also that by conceding the subject of mental defenses was raised in the family's presence, Brenda's declaration casts doubt on the credibility of the claims by other close family members that trial counsel never explored such defenses with them.

obvious difficulties with a claim that a defendant is entitled to a new trial because *he himself* prevented the diligent pretrial discovery of critical evidence.

In any event, the proffered mental evidence does not meet the requirements for collateral relief based on "newly discovered evidence." In contrast with ineffective assistance claims, "[t]he high standard for newly discovered evidence claims presupposes that all the essential elements of a presumptively accurate and fair proceeding were present in the proceeding whose result is challenged. [Citation.] . . ." (*Strickland* v. *Washington, supra,* 466 U.S. at p. 694 [80 L.Ed.2d at p. 697].)

Thus, a criminal judgment may be collaterally attacked on the basis of "newly discovered" evidence only if the "new" evidence casts fundamental doubt on the accuracy and reliability of the proceedings. At the guilt phase, such evidence, if credited, must undermine the entire prosecution case and point unerringly to innocence or reduced culpability. (*In re Hall* (1981) 30 Cal.3d 408, 417 [179 Cal.Rptr. 223, 637 P.2d 690]; *In re Weber* (1974) 11 Cal.3d 703, 724 [114 Cal.Rptr. 429, 523 P.2d 229].) By analogy, "new" evidence should not disturb a penalty judgment unless the evidence, if true, so clearly changes the balance of aggravation against mitigation that its omission "more likely than not" altered the outcome. (See *Strickland* v. *Washington, supra,* 466 U.S. at pp. 693-694 [80 L.Ed.2d at p. 697].) For several reasons, the posttrial evaluations here at issue do not rise to that level.

First, general assertions that defendant exhibits concrete and distorted perception, naivete, bad memory, limited attention span, and poor ability to cope under stress do not conclusively and unerringly negate the elements of malice or premeditation. Nor, standing alone, are they compelling evidence in mitigation. They do not directly explain or extenuate the homicide. While they may arouse some general sympathy, the sentencer might also conclude that many nonmurderers have similar difficulties.

Second, Dr. Stein's conclusion that defendant probably could not react properly "once [he] believed himself or others to be physically threatened" assumes the truth of defendant's disputed claim of honest fear. Thus, this evaluation cannot be deemed crucial to guilt or penalty.

■ Third, under the law applicable to any guilt retrial, Dr. Stein's opinion that defendant's brain damage rendered him "incapable of making the reasoned cold and calculated judgment required for a finding of premeditated first degree murder" is incompetent. The Penal Code now precludes an expert witness from testifying at the guilt phase "as to whether the

defendant had or did not have" specific required mental states. (§ 29.) This prohibition is procedural only, affects no due process or ex post facto rights, and thus applies to crimes committed before it was adopted. (*People* v. *Whitler* (1985) 171 Cal.App.3d 337, 342 [214 Cal.Rptr. 610]; see *People* v. *Jackson* (1984) 152 Cal.App.3d 961, 968-970 [199 Cal.Rptr. 848].)

Fourth, at both the guilt and penalty phases the prosecution presented *direct* evidence through Acker, and substantial *circumstantial* evidence through a number of other witnesses, that defendant did act with malice, premeditation, and the intent to kill a police officer. Acker said defendant admitted that, in order to protect his narcotics business, he deliberately "bag[ged] a cop" who "had it coming." There were strong indications that defendant, an experienced gang leader, could not have believed he was under gang attack as he claimed.

On their face, Dr. Stein's declarations do not *eliminate* or *negate* this evidence. The claim that "organic brain damage" prevented defendant from responding properly to the police raid states no concrete fact that can be verified by an assessment of Dr. Stein's credibility or by other objective means. However sincere and well-considered, Dr. Stein's assertions are but professional opinions of the kind which inherently generate expert debate. (See Evid. Code, § 801 et seq.; *People* v. *Stoll* (1989) 49 Cal.3d 1136, 1141, 1155-1159 [265 Cal.Rptr. 111, 783 P.2d 698].) Even if unrebutted by prosecution experts, they merely sharpen the existing dispute about defendant's state of mind. At most, they conflict with the trial evidence on that issue. While they might thus have presented more difficult questions for the guilt and penalty juries, they do not qualify as "new evidence" that fundamentally undermines the judgment. (*In re Wright* (1978) 78 Cal.App.3d 788, 802 [144 Cal.Rptr. 535].)

### C. *Character and background.*

Defendant claims trial counsel failed to investigate and present substantial mitigating evidence of his character and background at the penalty phase. Because the petitions suggested an inadequate investigation, we preserved the issue in our amended O.S.C. After receiving a supplemental return and traverse, we referred the matter to Judge Richard P. Kalustian of the Los Angeles Superior Court,[44] to report

---

[44] Defendant sought to disqualify Judge Kalustian by filing a motion and affidavit of prejudice under the "one-time peremptory challenge" statute, Code of Civil Procedure section 170.6. We ordered the motion stricken from the record on grounds that it was not statutorily authorized. By its terms, section 170.6 applies only to a "judge, court commissioner, or referee *of [a] superior, municipal, or justice court.*" (Italics added.) The wording of companion

on the following questions: (1) What kind of character and background evidence (other than mental and emotional evidence) was omitted from the trial? (2) What investigative steps would have led to discovery of such evidence? (3) What financial or tactical constraints, if any, weighed against any such investigation or presentation? (4) What damaging rebuttal evidence, if any, "would likely have been presented" if a character and background defense had been proffered?

 The referee took extensive evidence and made numerous findings and conclusions. In answer to question (1), the referee found that defendant was "slow" as a child; had a special tutor in school; read only at the third grade level when he was in the seventh and eighth grades; was generally employed as an adult; "had jobs of a 'remedial' type;" enjoyed a loving, caring, nonaggressive relationship with his own child and other children; was family oriented and respectful of his parents; and was not known by relatives to be a gang member or involved in narcotics. In answer to question (2), the referee found that this information about defendant's background and character "could have been easily obtained by talking to family members and the school authorities."

In answer to questions (3) and (4), the referee found there were no financial or tactical constraints against *investigation* of mitigating character and background evidence. However, he concluded, there "seems to be a sound tactical reason" not to have *presented* such evidence in light of the potential for damaging rebuttal.

The referee noted that "other crimes" evidence at the penalty trial consisted only of stipulations to defendant's misdemeanor convictions for assault in 1966, and battery in 1972. However, according to evidence at the reference hearing, defendant had been charged in a bizarre 1969 drive-by shooting incident that led to the mistaken killing of one of the participants by his own father. Moreover, the reference evidence revealed, the 1972 battery conviction stemmed from a gang-rape incident in which defendant was initially accused as one of the rapists.

If defendant had introduced mitigating character evidence, the referee found, he faced exposure to the underlying circumstances of the 1966, 1969, and 1972 incidents in rebuttal. The referee concluded the 1966 and 1969

statutes suggests that section 170.6's limitation to trial court judges and referees was intentional. (Compare Code Civ. Proc., § 170.3 [word "judges" for purposes of §§ 170-170.5 means "judges of the justice, municipal, and superior courts, *and court commissioners and referees*" (italics added)].) One appointed by an *appellate* court as *its* referee is not acting in any of the capacities included in section 170.6, even if he or she also happens to be a trial court judge.

matters probably did not present tactical dilemmas because it was not likely the prosecution could have produced live witnesses to prove the nature of defendant's involvement in those cases.[45]

However, the referee observed, the 1972 incident presented more serious tactical problems. Both complainants, Irma N. and Mona P., told the police defendant had beaten Irma and was one of several men who gang-raped Mona. The referee noted Irma's statement at the time that her fear of the suspects made her reluctant to testify. No trial occurred, and the case was resolved on defendant's plea to a reduced charge.

Mona appeared at the reference hearing and retracted her initial accusation. Nonetheless, the referee concluded, the likelihood that the prosecution would have presented damaging rebuttal evidence about the incident was strong enough to be "a cause of concern to trial counsel."

The referee found that Mona was available to testify at the 1981 penalty trial, though not then under subpoena. Even if she had withdrawn her rape accusation there, the referee determined, the jury might have believed the retraction arose only from fear. According to the referee, the incident was aggravated, and it "added a new dimension of violence unrelated to the protection of the gang's turf from other gangs." The evidence would be damaging, the referee concluded, even if the prosecution was unable to prove defendant's guilt of the rape beyond a reasonable doubt. However, the referee expressly made "no finding of the weight to be given [defendant's] character evidence or [the People's] evidence of the 1972 rape."

■ A referee's findings and conclusions are, of course, subject to independent review. However, substantially supported findings of fact by a referee are entitled to great weight in view of the referee's opportunity to observe the witnesses. (E.g., *People* v. *Ledesma, supra,* 43 Cal.3d at p. 219.)

■ In all material respects, the record here persuades us to adopt Judge Kalustian's findings. We are convinced that counsel's decision not to present character and background evidence through family members was

---

[45] In any event, the referee observed, the facts of these incidents were not clearly aggravating, and defendant might even have been able to use them in mitigation. According to the police reports, in the 1966 case defendant claimed he was defending his younger brother from a schoolyard bully. In the 1969 case, defendant's involvement was uncertain, and charges of attempted murder were dropped. Moreover, the homicide victim in the 1969 case was killed when, following his participation in the drive-by shooting, he ran to his parents' house with the police in hot pursuit. The victim's father, believing he was under gang attack, opened the door and fired his shotgun, killing his son. The referee observed that defendant could argue this incident supported his own honest fear of gang attack in the same neighborhood 10 years later.

tactically motivated by plausible concerns that such evidence might be outweighed by damaging rebuttal. We further conclude that counsel's choice, though based on less than exhaustive investigation, was adequately informed and reasonable under the circumstances. We therefore find no basis for relief on habeas corpus.

The hearing produced character and background testimony from George Gonzalez, defendant's older brother; Patricia Espinosa, defendant's former sister-in-law; Raymond De Jesus, defendant's former brother-in-law; Maria Blanco, defendant's aunt by marriage; Martha Gonzalez, defendant's wife at the time of the Williams shooting; and Dr. Pauline Furth, defendant's girlfriend's pediatrician. These witnesses testified generally that defendant had often been sick as a child; that he struggled with learning disabilities and always went to special schools; that he was caring and gentle, especially with children; that he loved his own child; that he was respectful of his family and protective of the neighborhood; that he was a good husband; and that despite such obstacles as illiteracy, he struggled to assume adult responsibility. The witnesses generally professed ignorance of his involvement in serious drug or gang activities.

Trial counsel testified that he chose "lingering doubt" as his penalty defense because this tactic produced a "hung" first penalty jury, and because of reservations expressed by several guilt jurors. Counsel professed he was generally aware of defendant's background from conversations with defendant, his mother Matilda Gonzalez, and other family members. However, counsel conceded he did not "seriously" explore or consider a character and background defense at the penalty phase.

Counsel acknowledged that mitigating character and background evidence would not have conflicted substantially with his lingering-doubt strategy. However, counsel expressed concern about damaging rebuttal evidence. In particular, counsel noted he had achieved "damage control" by limiting the prosecution's case-in-chief to mere stipulations about defendant's prior misdemeanor convictions for battery and for assault. However, counsel knew defendant had an extensive record of drug arrests before moving to Mexico in 1972. Counsel had also read the police report on the 1972 incident, in which Mona P. and Irma N. named defendant as one of three men at a party who beat both women and gang-raped Mona. According to the report, both Mona and Irma reported to the police that they had been threatened with death if they prosecuted.

As noted, the 1972 case against defendant was ultimately charged and resolved as a misdemeanor battery upon Irma. Counsel stipulated to that conviction at the penalty phase, and no live testimony on the matter was

presented. At the reference hearing, however, counsel said he relied on "direct representations" by the prosecutor that the People "had . . . aggravating evidence" as indicated in the police report, and that "the witness" in the 1972 case (presumably Mona) was available to testify at the penalty trial.

According to counsel, family members had not given him any exceptionally sympathetic information about defendant's background, such as abuse or emotional trauma, and it appeared defendant had been raised in a loving and responsible family. Under these circumstances, counsel concluded that any mitigating effect of family testimonials would be outweighed by rebuttal evidence suggesting serious past violence.

This tactical choice was entirely reasonable in principle. The prosecution may rebut mitigating penalty evidence with unfavorable revelations about the defendant. In rebuttal, the prosecution is bound neither by its statutory pretrial notice of aggravating evidence (§ 190.3) nor by the aggravating factors set forth in the statute. (*Rodriguez, supra,* 42 Cal.3d at p. 791; *Boyd, supra,* 38 Cal.3d at pp. 775-776.) The possibility of damaging rebuttal is a necessary consideration in counsel's decision whether to present mitigating evidence about the defendant's character and background. (See *Burger* v. *Kemp, supra,* 483 U.S. at p. 789, fn. 7 [97 L.Ed.2d at p. 654].)

In recent years, we have cautioned that the scope of rebuttal "must relate directly to a particular incident or character trait defendant offers in his own behalf . . . ." (*Rodriguez, supra,* 42 Cal.3d at p. 792, fn. 24; see also *Boyd, supra,* 38 Cal.3d at p. 792.) However, that test can be difficult to apply; in any event, the limits of permissible rebuttal were not so clear at the time of defendant's trials in 1980 and 1981. Hence, a competent attorney in counsel's position could prudently conclude that the risk of damaging rebuttal weighed against presentation of character and background evidence in general.[46]

Defendant urges that counsel did not investigate sufficiently to make an "informed" tactical choice, and that a more complete inquiry might have

---

[46] Defendant claims counsel should have realized the prosecution was barred from offering rebuttal evidence of prior violence that had not been presented in its case-in-chief. Defendant cites the principle that the prosecution may not create "unfair surprise" by withholding crucial evidence of defendant's guilt, then presenting it in rebuttal. (See *People* v. *Bunyard* (1988) 45 Cal.3d 1189, 1210-1211 [249 Cal.Rptr. 71, 756 P.2d 795]; *People* v. *Carter* (1957) 48 Cal.2d 737, 753-754 [312 P.2d 665].) There is no evidence counsel failed to consider the *Carter* rule. Moreover, *Carter* has only been applied to *guilt* issues; its application to the penalty phase of a capital trial, and to the special problems of penalty phase aggravating and rebuttal evidence, have never been explored. There is no certainty counsel could have blocked rebuttal evidence based on the 1972 rape. In view of the unsettled state of the law, he cannot be faulted for any failure to consider that possibility.

altered counsel's assessment. Specifically, defendant asserts, the fact that a rape complaint had been reduced to a misdemeanor battery conviction should have alerted counsel to interview Mona P., the alleged victim, to determine whether she would in fact give damaging testimony.[47]

Mona testified at the reference hearing. She confirmed she was raped, conceded that defendant was among those present on the premises, and admitted "pointing out" defendant as one of the rapists. However, Mona said, she never meant to accuse defendant, who had always treated her with respect. She had advised an investigator in the 1972 case that she did not want to appear in court. She acknowledged she "might" have told the rape investigators that she was "afraid to testify or talk about this, that they might come after [her] or . . . kill [her]." Indeed, Mona conceded at the reference hearing that she was "afraid now." She declared she wanted to forget the event and now had only hazy recall. Mona said she now did not "really [think]" defendant had raped her but admitted she did not know.

Counsel's investigation arguably could have been more complete, but we conclude it was sufficient. Of course, the plausible fear of damaging rebuttal does not excuse all investigation of mitigating character and background evidence, or of the potential prosecution response. Only when counsel is reasonably informed about the available evidence can he or she make an informed tactical choice how to proceed. (See *People* v. *Frierson, supra*, 25 Cal.3d 142, 166.) Counsel would have been well advised to make some inquiry of defendant's background, and to conduct some investigation about the strength of damaging rebuttal, before rejecting a character and background defense.

 However, the range of constitutionally adequate assistance is broad, and a court must accord presumptive deference to counsel's choices about how to allocate available time and resources in his or her client's behalf. (*Strickland* v. *Washington, supra*, 466 U.S. at pp. 689-690 [80 L.Ed.2d at pp. 694-695].) Counsel may make reasonable and informed decisions about how far to pursue particular lines of investigation. Strategic choices based upon reasonable investigation are not incompetent simply because the investigation was less than exhaustive. (*Burger* v. *Kemp, supra*, 483 U.S. at pp. 788-794 [97 L.Ed.2d at pp. 653-657].)[48]

---

[47] Counsel conceded the sharply reduced charge and plea did not spur his curiosity. As he observed, the prosecution might have had any number of technical difficulties or proof problems. Counsel also suggested on the basis of his professional experience that lenient plea bargains were common at the time.

[48] Counsel was retained for a total fee of $15,000 for the three trials. Defendant suggests, however, that because counsel declined to hire an investigator or take advantage of court-furnished investigative funds which are available to indigent defendants in capital cases (§ 987.9), counsel's own investigative efforts must be presumed inadequate. We disagree. Counsel insisted that he personally performed all inquiries he would have assigned to an

Here, even if counsel should have done more preliminary investigation, his ultimate decision not to *present* a character and background defense is constitutionally supportable. Counsel could properly assume from the police report, and from subsequent direct assertions by the People's representative, that introduction of mitigating character and background evidence would expose defendant to damaging revelations about his involvement in a prior incident of rape. Indeed, it appears unlikely that a timely interview with Mona, or further investigation of available "sympathy" evidence, would have changed counsel's decision. After hearing Mona's testimony, our referee found that, as counsel feared, presentation of sympathetic character and background evidence would "likely" have resulted in damaging rebuttal testimony about the 1972 rape. We agree.

We also adopt the referee's conclusion that despite Mona's ambivalent retraction, there still appears "a sound tactical reason to [have avoided the rape issue]. While the victim now . . . believes [defendant] was not one of those involved [in the rape], she nonetheless identified [defendant] at the scene; both [victims] appeared to be afraid of the rapists; the gang rape was aggravated and the victims were visibly injured; [and defendant pled] guilty to an offense arising out of events closely associated with the rape. The penalty phase jury might well have believed the victim was afraid of [defendant] and others and for that reason was lying . . . . Even if the jury could not decide beyond a reasonable doubt that [defendant] committed the rape, [defendant's] connection to the people and location would be sufficient tactical reason to keep [the incident] out of the [penalty] trial."

Finally, we note that the mitigating evidence actually uncovered at the reference hearing, though not inconsequential, was not sharply different from what counsel assumed might be available. Indeed, the evidence suggested a stable, loving family whose members, other than defendant, were productive, law-abiding citizens. Juries can react badly to such evidence, concluding it isolates the defendant as a "bad apple."

Under all the circumstances, we conclude that counsel's decision to avoid damaging "rape" evidence by omitting available character and background evidence was within the range of reasonable competence. We reject defendant's claim that the omission warrants collateral relief against the penalty judgment.

---

investigator, and that he would not have done anything differently with an investigator. While counsel in a capital case is often best advised to make use of supportive funding for which the client is eligible, the decision not to do so does not render counsel's assistance constitutionally deficient per se.

D. *Other omissions.*

■■ Also omitted from our amended O.S.C. were defendant's claims on habeas corpus that trial counsel rendered ineffective assistance by (1) failing to seek corroboration of defense testimony on the prevalence of gang activity in the La Puente area, (2) omitting a forensic examination of the crime scene, and (3) failing to document interviews with each of the 20 or so nonpolice witnesses questioned by the sheriff's department. For the most part, the petitions fail to allege specific material facts, favorable to the defense and not presented at the trial, which diligent efforts would have uncovered. The new information that is supplied fails to undermine the verdicts.

The supplemental petition attaches declarations by defendant's mother and sister that a gang had attacked the Abbey Street house only two weeks before the police raid, that the attack heightened defendant's concern for the family's safety, that the murder weapon was purchased in self-defense after the most recent attack, that defendant was not living at Abbey Street on the day of the homicide, and that needles found on the premises were for diabetes suffered by defendant's father. But these revelations either directly contradict testimony given by defendant's mother at trial, or are cumulative to evidence that was presented through these or other witnesses. Defendant, who testified at the guilt trial, expressed no awareness of such a recent attack. Under these circumstances, defendant has stated no prima facie case for collateral relief.

## V. Miscellaneous Ineffective-assistance Claims

In his supplemental brief on appeal, defendant summarily cites some 34 alleged errors and omissions by counsel at the pretrial, guilt, and penalty phases. For the most part, defendant supplies no citations to the record, simply directing our attention to "all the information in the consolidated proceedings before this Court." Defendant repeats accusations that counsel's investigation of all aspects of the case was inadequate. He claims counsel incompetently failed to seek suppression of damaging evidence, explore weaknesses in the prosecution's case, expose prosecution witness Acker's police agency and motives to lie, proffer instructions pertinent to the theory of defense, and present mitigating penalty evidence. He asserts that counsel's tactical errors at the penalty phase affected the balance of aggravation. He points out that counsel prepared no surrebuttal at the penalty phase and admitted to the jury he had not realized he was entitled to such argument.

In the aggregate, defendant asserts, counsel's performance was so "shockingly deficient" that it "entirely fail[ed] to subject the prosecution's case to

meaningful adversarial testing." This caused a denial of Sixth Amendment rights so fundamental, he urges, as to raise a presumption of reversible prejudice even if specific cognizable harm cannot be identified (citing *United States* v. *Cronic* (1984) 466 U.S. 648, 659 [80 L.Ed.2d 657, 668, 104 S.Ct. 2039]).

We disagree. We have already rejected several of defendant's claims on the merits. Others exaggerate or misstate the record.[49] The remainder fail to support defendant's claim of pervasive incompetence.

Though counsel might have done more in several areas, the record indicates he did investigate the facts of the shooting; interpose appropriate motions; subject the prosecution witnesses, Acker in particular, to "meaningful" cross-examination; and present as strong a defense to guilt as the circumstances warranted. His hesitance to offer mitigating "character" evidence at the penalty phase was supported by plausible fears of damaging rebuttal.

Defendant, of course, was not constitutionally entitled to a perfect trial, or to ideal representation. He utterly fails to demonstrate a breakdown of the adversarial process so severe that reversal is presumptively warranted. Nor does his "shotgun" attack establish any specific new instance of incompetence that undermines confidence in the outcome. No basis appears for disturbing the judgment.

## VI. MANDATE

In August 1989, long after defendant's guilt and penalty trials had ended, he moved in the trial court to discover official file information about William Acker, the jailhouse informant who testified against him. Defendant based his motion on recent revelations that a yet-unknown number of

---

[49] For example, defendant claims counsel's successful but unjustified application for separate guilt and penalty juries left the penalty jury without sufficient evidence to harbor "lingering doubt" of defendant's guilt. But the separate jury which imposed the death penalty was the result of a mistrial, not counsel's application. Moreover, as previously noted, counsel presented a substantial "lingering doubt" defense.

Defendant also implies that counsel, "for no apparent tactical gain," failed at both trials to request crucial instructions on reasonable and unreasonable self-defense. However, complete instructions on both theories were given at the guilt trial. At the penalty trial, the jury was told to consider in mitigation defendant's reasonable belief in moral justification (factor (f)) and "any other [extenuating] circumstance" (factor (k)). No prejudice appears.

Defendant asserts that counsel failed to object to defendant's appearance before the jury in "jailhouse blues." Counsel did raise the issue, however. Apparently defendant wore jail clothing for two court days during the guilt trial because of a mix-up about the whereabouts of his street clothes. The court responded to the problem, and the record suggests no further difficulty.

informants from the Los Angeles County jail conspired to fabricate testimony in criminal cases during the period 1979-1988, and that the district attorney was alerted to the possibility of a perjury scheme by early 1979.

Defendant presented no specific information that Acker was among those involved in the informant scandal. Defendant simply urged, in effect, that the scandal casts doubt upon the veracity of all informants during the period, and raises suspicions that the prosecution concealed known or suspected perjury in particular cases. Though defendant had filed no petition for habeas corpus in the trial court, he suggested that the requested information, which the authorities had declined to provide voluntarily, was a necessary prerequisite to a collateral attack on the judgment.

The trial court apparently agreed. With minor exceptions, it ordered the Los Angeles County Counsel, District Attorney, and Sheriff, and the Attorney General, to produce all their file materials about Acker, "limited to discovery matters within the period commencing January 1, 1978 and ending upon the date of the completion of . . . Acker's testimony in [defendant's] second penalty trial . . . (on or about April 29, 1981) . . . ."

The People sought mandate in this court to overturn the discovery order. They also noticed an appeal from the order. While the appeal lies (§ 1238, subd. (a)(5)),[50] we determined that considerations of speed and judicial economy make the mandate proceeding the preferable vehicle for resolving a matter related to defendant's pending automatic appeal and habeas corpus petitions in this court.

We therefore notified the parties we were considering issuance of a peremptory writ in the first instance (see *Palma* v. *U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171, 180 [203 Cal.Rptr. 626, 681 P.2d 893]), and we received briefing on that issue from the parties and amici curiae.[51] We also transferred to this court the appeal from the discovery order (Cal. Rules of Court, rules 20, 27), deferred briefing on the appeal, and consolidated the mandate proceeding with defendant's automatic appeal and habeas corpus proceeding already pending here.

We now conclude that a peremptory writ should issue. The trial court lacked jurisdiction to order "free-floating" postjudgment discovery when no criminal proceeding was then pending before it.

---

[50] In pertinent part, section 1238, subdivision (a), provides: "An appeal may be taken by the people from any of the following: . . . [¶] (5) An order made after judgment, affecting the substantial rights of the people . . . ."

[51] Amicus curiae briefs were filed by the Criminal Justice Legal Foundation and California Attorneys for Criminal Justice/National Association of Criminal Defense Lawyers.

As recently explained in *People* v. *Ainsworth* (1990) 217 Cal.App.3d 247 [266 Cal.Rptr. 175], "a trial court [lacks authority] to entertain a postjudgment discovery motion which is unrelated to any proceeding then pending before [that] court . . . ." (P. 251.) As the Court of Appeal noted, "[t]he reason for such lack of authority is simple. As with any other motion, a discovery motion is not an independent right or remedy. It is ancillary to an ongoing action or proceeding. After the judgment has become final, there is nothing pending in the trial court to which a discovery motion may attach." (*Ibid.*; see also *People* v. *Burks* (1961) 189 Cal.App.2d 313, 317 [11 Cal.Rptr. 200]; *People* v. *Sparks* (1952) 112 Cal.App.2d 120 [246 P.2d 64]; cf. *Donald J.* v. *Evna M.* (1978) 81 Cal.App.3d 929, 934 [147 Cal.Rptr. 15].)

In *Ainsworth, supra*, 217 Cal.App.3d 247, the discovery motion was made after we had affirmed the criminal judgment on appeal and issued our remittitur. But *Ainsworth*'s reasoning applies equally where, as here, an appeal remains undecided. Once a criminal proceeding is final *in the trial court*, that court's subsequent direct jurisdiction over the case is strictly limited by statute and by the appellate remittitur. (See, e.g., §§ 1193, 1265; Code Civ. Proc., § 916, subd. (a); *People* v. *Rittger* (1961) 55 Cal.2d 849, 852 [13 Cal.Rptr. 406, 362 P.2d 38].) Nothing remains pending in the trial court to which its discovery authority may attach.

Defendant relies heavily on *Wisely* v. *Superior Court* (1985) 175 Cal.App.3d 267 [220 Cal. Rptr 893], but *Wisely*, whatever its merits, is inapposite. There the trial court granted the defendant a new trial; while the People's appeal was pending, the defendant moved for further discovery. The trial court denied the motion, citing lack of jurisdiction. The Court of Appeal reversed, deeming it fundamentally unfair to deny discovery "preparatory to an anticipated new trial." (P. 270; see also *Echavarria* v. *Superior Court* (1979) 94 Cal.App.3d 467, 469-470 [156 Cal.Rptr. 527] [court retains discovery jurisdiction during period of defendant's incompetency to stand trial].) Here, however, there was no new-trial order, or other pending matter, to which the court's discovery authority could attach.

Defendant invokes Code of Civil Procedure section 187, which grants every court all means necessary to carry its jurisdiction into effect.[52] By its terms, however, section 187 operates only where some other provision of law confers judicial authority *in the first instance*. (*Ainsworth, supra*, 217

[52] Code of Civil Procedure section 187, adopted in 1872, provides: "When jurisdiction is, by the constitution or this code, conferred on a court or judicial officer, all the means necessary to carry it into effect are also given; and in the exercise of this jurisdiction, if the course of proceeding be not specifically pointed out by the code or the statute, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of this code."

Cal.App.3d at pp. 254-255; see *Traffic Truck Sales Co.* v. *Justice's Court* (1923) 192 Cal. 377, 382 [220 P. 306].) Such is not the case here. (Compare *People* v. *Sequiera* (1981) 126 Cal.App.3d 1, 14 [179 Cal.Rptr. 249] [invoking § 1567, which arguably grants a superior court any "necessary" power to bring a prisoner before it from another jurisdiction].)

Defendant claims the superior court's jurisdiction arose from the inherent judicial power to order discovery in aid of fair criminal trials. However, as *Ainsworth* observed, nothing in cases addressing the right to pretrial discovery (see, e.g., *Brady* v. *Maryland* (1963) 373 U.S. 83, 87 [10 L.Ed.2d 215, 218, 83 S.Ct. 1194]; *People* v. *Memro* (1985) 38 Cal.3d 658, 677 [214 Cal.Rptr. 832, 700 P.2d 446]; *Ballard* v. *Superior Court* (1966) 64 Cal.2d 159, 167 [49 Cal.Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416]) suggests that similar rights continue *after* the opportunity for defense has been provided, the conviction has been entered, and the presumption of innocence has been overcome.

Indeed, the federal Constitution does not confer a general right to criminal discovery (*Weatherford* v. *Bursey* (1977) 429 U.S. 545, 549 [51 L.Ed.2d 30, 36, 97 S.Ct. 837]) and does not mandate the full panoply of pretrial rights in collateral efforts to overturn a final conviction (*Pennsylvania* v. *Finley* (1987) 481 U.S. 551, 556 [95 L.Ed.2d 539, 546, 107 S.Ct. 1990]). We see no justification for expanding our own holdings in this area, and we reject defendant's contention.

For similar reasons, we dismiss any suggestion that *we ourselves* should order or approve the requested discovery under current circumstances. On direct appeal, we may take evidence and find facts in limited circumstances. (Cal. Const., art VI, § 11; Code Civ. Proc., § 909; Cal. Rules of Court, rule 23.) However, our appellate function does not include providing a party with discovery that might undermine the judgment under review. (See *Cooper* v. *Leslie Salt Co.* (1969) 70 Cal.2d 627, 638 [75 Cal.Rptr. 766, 451 P.2d 406].)

 The related petitions for habeas corpus in this court also provide an inappropriate discovery vehicle. Whatever role court-ordered discovery might properly play in a habeas corpus proceeding, the bare filing of a claim for postconviction relief cannot trigger a right to unlimited discovery. A habeas corpus petition must be verified, and must state a "prima facie case" for relief. That is, it must set forth specific facts which, if true, would require issuance of the writ. Any petition that does not meet these standards must be summarily denied, and it creates no cause or proceeding which would confer discovery jurisdiction. (§§ 1474, subds. 2, 3, 1475; see *In re Hochberg, supra,* 2 Cal.3d 870, 875, fn. 4; *In re Swain* (1949) 34 Cal.2d 300,

304 [209 P.2d 793]; cf. *People* v. *Pacini* (1981) 120 Cal.App.3d 877, 882-887 [174 Cal.Rptr. 820].)

As we have explained, the pending habeas corpus petitions, most recently supplemented in 1986, do not state a prima facie case that Acker gave perjured testimony, or that the prosecution has material undisclosed evidence bearing on Acker's veracity or his status as a government agent. Even were we to treat the record in this mandate proceeding as an amendment or supplement to the petitions already on file, the result is the same.[53] At most, there are new indications that during the period 1979-1988, various residents of the Los Angeles County jail developed successful schemes for fabricating jailhouse confessions by other inmates, and that these practices were ignored or even encouraged by the authorities.[54] However, nothing in the materials before us identifies Acker as a participant in the schemes alleged. Nor is there any specific indication that the prosecution's files would yield information that substantially undermines Acker's testimony.

Defendant suggests that the general revelations of abuse cast doubt upon all informant testimony from the jail. However, given the size and complexity of that facility,[55] and of the county's criminal justice system, there is no current basis for such an all-inclusive inference.

Defendant urges that we create a "Catch-22" by requiring him to state the specific facts supporting his claim *before* he may invoke any right to postjudgment discovery. Information crucial to a prima facie case, he asserts, may be available only from a source unwilling to disclose it except by court order.

However, there is no postconviction right to "fish" through official files for belated grounds of attack on the judgment, or to confirm mere

---

[53] The exhibits attached to the People's petition for mandate constituted an incomplete record of the proceedings in the trial court on the discovery request. Defendant moved to augment the record to include all materials that were before the trial court, including proffered exhibits. (Cal. Rules of Court, rule 12(a).) Missing portions of the trial court record have now been transmitted to us, and we formally grant the motion to augment.

[54] The 1989-1990 Los Angeles County Grand Jury apparently has conducted the most extensive investigation so far. Defendant asks that we take judicial notice of the grand jury's 153-page report, and the People have posed no objection. We therefore grant the request for judicial notice. (Evid. Code, §§ 452, subds. (c), (d), 459.)

[55] The grand jury reports that the Los Angeles County jail "is believed to be the largest custodial facility of its type in the free world." Its 2 downtown branches house some 8,600 inmates on any given day. These persons are at various stages of their journey through the criminal justice system and are segregated according to a complex classification system. Informants, condemned prisoners, escape risks, violent or suicidal inmates, high-profile defendants, hostile gang affiliates, disciplinary cases, and others in need of protective custody are separated from the general population and from each other. Each day, some 2,000 inmates are transported to and from court appearances. (Rep. of the 1989-1990 L.A. County Grand Jury (hereafter Grand Jury Report), pp. 45-49.)

speculation or hope that a basis for collateral relief may exist. The initial burden of proving guilt beyond a reasonable doubt is on the prosecution, and the panoply of rights accorded an accused person prior to his conviction supports the presumption that he is innocent. Different considerations apply, however, to collateral review of a final criminal judgment. For purposes of collateral attack, all presumptions favor the truth, accuracy, and fairness of the conviction and sentence; *defendant* thus must undertake the burden of overturning them. Society's interest in the finality of criminal proceedings so demands, and due process is not thereby offended. (*People* v. *Ainsworth, supra,* 217 Cal.App.3d at p. 257; see *Pennsylvania* v. *Finley, supra,* 481 U.S. at pp. 555-558 [95 L.Ed.2d at pp. 545-547]; *Ross* v. *Moffitt* (1974) 417 U.S. 600, 610-611 [41 L.Ed.2d 341, 350-351, 94 S.Ct. 2437]; *In re Imbler* (1963) 60 Cal.2d 554, 560 [35 Cal.Rptr. 293, 387 P.2d 6]; *In re Berry* (1955) 43 Cal.2d 838, 846 [279 P.2d 18].) The state may properly require that a defendant obtain some concrete information on his own before he invokes collateral remedies against a final judgment.

Defendant urges that the informant scandal presents a unique situation that requires relaxation of the normal rules governing collateral proceedings. He notes indications that the authorities were long aware of credible claims that inmate testimony was being fabricated, but failed to investigate, and even decided not to centralize informant records because this might ease defense efforts to discover such perjury. (See, e.g., Grand Jury Rep., *supra,* at pp. 97-122.) Moreover, defendant asserts, the authorities have reneged on more recent promises to cooperate with the defense bar in "appropriate" proceedings to inspect informant records. In defendant's view, these facts suggest that the truth in individual cases will never come to light except through aggressive judicial intervention.

Even if defendant's accusations are true—a question we do not address—we are not persuaded that our discovery jurisdiction is properly invoked. As we have noted, habeas corpus is an extraordinary, limited remedy against a presumptively fair and valid final judgment. It is not a device for investigating possible claims, but a means for vindicating actual claims. Defendant has made no concrete allegations, supported by specific facts, that Acker was implicated in the informant scandal. Hence, he asserts no ground for habeas-corpus-based discovery.[56]

 Of course, the prosecution has a well-established duty to disclose information materially favorable to the defense, even absent a request

---

[56] Acceptance of defendant's contrary arguments would have enormous consequences. In effect, defendant proposes that the courts entertain *every* habeas corpus petition that challenges the use of an informant from the Los Angeles County jail during the period 1979-1988, and that discovery of prosecutorial and law enforcement files be ordered in *every* such case.

therefor. (E.g., *Giglio* v. *United States* (1972) 405 U.S. 150, 153 [31 L.Ed.2d 104, 108, 92 S.Ct. 763]; *Brady* v. *Maryland, supra,* 373 U.S. 83, 87 [10 L.Ed.2d 215, 218]; *People* v. *Morris, supra,* 46 Cal.3d 1, 30.) " . . . At trial this duty is enforced by the requirements of due process, but [even] after a conviction the prosecutor . . . is bound by the ethics of his office to inform the appropriate authority of . . . information that casts doubt upon the correctness of the conviction." (*Imbler* v. *Pachtman* (1976) 424 U.S. 409, 427, fn. 25 [47 L.Ed.2d 128, 141, 96 S.Ct. 984]; see also rule 5-220, Rules Prof. Conduct of State Bar; ABA Model Code Prof. Responsibility, DR 7-103(B), EC 7-13; ABA Model Rules Prof. Conduct, rule 3.8(d).)

We expect and assume that if the People's lawyers have such information in this or any other case, they will disclose it promptly and fully. Statutory procedures and remedies not employed in this case may also be of assistance in compelling official disclosure of pertinent information. (See, e.g., Gov. Code, § 6250 et seq.) And defendant retains all the usual extrajudicial means of investigating his suspicions.

We hold that the trial court exceeded its jurisdiction by ordering postconviction discovery in the absence of any proceeding pending before that court. We further conclude that we may not ourselves order or ratify the proposed discovery, either on direct appeal, or under auspices of the habeas corpus matter pending here. Discovery is not part of the appellate function. Moreover, discovery will not lie in habeas corpus with respect to issues upon which the petition fails to state a prima facie case for relief. Defendant has not stated prima facie grounds for new inquiry into the testimony of William Acker. The People are therefore entitled to the writ of mandamus they seek.

## VII. Disposition

The judgment on appeal is affirmed in its entirety. The petitions for habeas corpus are denied. Let a peremptory writ of mandate issue, directing the Superior Court of Los Angeles County to vacate its order, dated August 17, 1989, granting postjudgment discovery in the action entitled People v. Gonzalez, Action No. A524625.

Lucas, C. J., Panelli, J., Kennard, J., and Arabian, J., concurred.

**ARABIAN, J.,** Concurring.—Although I concur fully in Justice Eagleson's thorough and well reasoned majority opinion, I am constrained to state separately my views concerning the prosecutor's use of a homemade scale during penalty phase argument. This issue is the principal basis of a dissent by Justice Broussard.

I agree with the majority's conclusion that, viewed in context, the jury was not misled as to the scope of its sentencing discretion. (*People* v. *Brown* (1985) 40 Cal.3d 512, 544, fn. 17 [220 Cal.Rptr. 637, 709 P.2d 440].) The use of the scale and the prosecutor's accompanying remarks could not reasonably have confused a jury otherwise informed that counsel's remarks were not evidence, that the deliberative process involved a "weighing" rather than a "counting" of relevant factors, and that the jury itself was to assign values to those factors and to impose the sentence it deemed "just and fair."

It is not enough, however, simply to dismiss the scale illustration as harmless. The use of such demonstrative evidence, even in good faith, strikes at the core principles on which our system is founded. Fair play and substantial justice are the articles of faith to which all involved in the administration of criminal justice subscribe and to which all are constitutionally bound. Prosecutorial tactics such as those exhibited here push against the very limits of acceptable behavior under this rubric. While I am persuaded that the line was not crossed, I am equally certain that this court's tolerance for such tactics nears its brim.

**MOSK, J.,** Concurring and Dissenting.—Insofar as the majority affirm the judgment on appeal convicting defendant of the murder of Deputy Sheriff Jack Williams with the personal use of a firearm, I concur. After review, I have found no reversible error bearing on that issue.

In all other respects, I dissent. Less than persuasive is the majority's analysis as to the rest of the judgment on appeal, defendant's petitions in habeas corpus, and the People's petition in mandate. Especially problematic is their discussion of *Brown* error. (*People* v. *Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440], revd. on other grounds *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 941, 107 S.Ct. 837].) More problematic still is their treatment of postjudgment discovery—especially in light of the Los Angeles County jail scandal and the collusion between inmate informants and police and prosecutorial authorities. On both these points, I agree with Justice Broussard's dissent.

I write separately, however, to address only the question dealing with the elements of the offense of peace officer assault and the special circumstance of peace officer murder.

Defendant was charged with, and convicted of, the first degree murder of Deputy Sheriff Jack Williams, under Penal Code sections 187 and 189, and the peace officer assault of Deputy Sheriff Robert Esquivel, under former Penal Code section 245, subdivision (b) (Stats. 1976, ch. 1139, § 152.5,

p. 5106) (hereafter former section 245(b)). It was alleged and found true that in violation of Penal Code section 12022.5, he personally used a firearm in the commission of each offense. It was also alleged and found true, as the sole special circumstance establishing eligibility for the penalty of death, that he committed peace officer murder against Deputy Williams within the meaning of Penal Code section 190.2, subdivision (a)(7) (hereafter section 190.2(a)(7)). He was subsequently sentenced to death.

Defendant now attacks the validity of both the peace-officer-assault conviction and the peace-officer-murder special-circumstance finding. Having considered the matter closely, I am of the view that his attack is successful.

Former section 245(b) provided in relevant part that "Every person who commits an assault with a deadly weapon or instrument or by any means likely to produce great bodily injury upon the person of a peace officer . . . , and who knows or reasonably should know that such victim is a peace officer . . . engaged in the performance of his duties, *when such peace officer . . . is engaged in the performance of his duties* shall be punished by imprisonment in the state prison for" various terms. (Stats. 1976, ch. 1139, § 152.5, p. 5106, italics added.)

Section 190.2(a)(7) defines the following as a special circumstance establishing death eligibility: "The victim was a peace officer . . . , who, *while engaged in the course of the performance of his or her duties* was intentionally killed, and the defendant knew or reasonably should have known that the victim was a peace officer engaged in the performance of his or her duties . . . ." (Italics added.)

Both the offense of peace officer assault and the special circumstance of peace officer murder have as one of their elements that the officer is *lawfully* engaged in the performance of his duties.

As noted, both the offense and special circumstance contain language defining their scope to situations in which the officer is engaged in the performance of his duties. Both were enacted after our unanimous decision in *People* v. *Curtis* (1969) 70 Cal.2d 347 [74 Cal.Rptr. 713, 450 P.2d 33]. In *Curtis*, we expressly recognized that such language had long been construed by the courts of this state to require *lawful* conduct on the officer's part. (*Id.* at pp. 354-356.) And just as expressly, we adhered to that construction. (*Ibid.*) The basis for this interpretation—which is referred to as the "*Curtis* rule"—is the premise that an officer cannot be deemed to be engaged in the performance of his duties when he commits an act or omission that is in fact unlawful: his duties, obviously, require lawful conduct *and lawful conduct only.* (See *ibid.*) " '[T]he rule of law is well established that where the

[legislative body] uses terms already judicially construed, "the presumption is almost irresistible that it used them in the precise and technical sense which had been placed upon them by the courts." ' " (*Id.* at p. 355, quoting *City of Long Beach* v. *Marshall* (1938) 11 Cal.2d 609, 620 [82 P.2d 362], quoting in turn *City of Long Beach* v. *Payne* (1935) 3 Cal.2d 184, 191 [44 P.2d 305].) Here, the presumption is in fact "irresistible."

The majority severely limit the lawfully-engaged-in-duty element and as a consequence greatly expand criminal liability and punishment. Their reasoning is that the *Curtis* rule is too broad and at its boundary constitutes dictum. They hold that under the rule as redefined, a peace officer is lawfully engaged in the performance of his duties whenever he is "correct[ly] servi[ng]" a "facially valid" warrant—even if his conduct is in fact unlawful. (Maj. opn., *ante,* at p. 1222.)

The majority err. I cannot agree that the *Curtis* rule is too broad. In the past 21 years no court has so held; they have all respected stare decisis. It seems eminently sound to declare that a peace officer is not engaged in the performance of his duties when he goes beyond the law. Nor can I agree that at its boundary the rule constitutes dictum. Indeed, in *People* v. *Henderson* (1976) 58 Cal.App.3d 349, 353-359 [129 Cal.Rptr. 844], the court clearly, albeit impliedly, held—contrary to the majority's suggestion—that a peace officer is *not* lawfully engaged in the performance of his duties, even though correctly serving a facially valid warrant, if his conduct is in fact unlawful. There, the officers in question had correctly executed a facially valid warrant that authorized them to enter and search a residence without first complying with the so-called "knock-notice" requirements of Penal Code section 1531. (See 58 Cal.App.3d at pp. 353-356.) That, however, was simply insufficient. (See *id.* at p. 358.) Because the so-called "no knock" authorization was determined to be void, an exception to the "knock-notice" requirements was necessary. (*Ibid.*) The officers' conduct had to be lawful in actuality in order to be within the performance of their duties. (See *ibid.*)

For present purposes it is merely idle academic musing as to whether or not the majority's criticism of the *Curtis* rule has any theoretical merit. Until today, the rule was firmly established and unquestioned. (See generally 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Crimes Against the Person, §§ 438, 439, pp. 494-495; *id.* (1990 pocket supp.) p. 38 [surveying the state of the law on the point].) The majority themselves concede as much, describing the rule as "long-standing." (Maj. opn., *ante,* at p. 1217.) It must therefore be presumed—and the presumption is unrebutted—that the rule was recognized by those who drafted the statutory provisions defining the offense of peace officer assault and the special circumstance of

peace officer murder. It must also be presumed—and again, the presumption is unrebutted—that the rule was accepted by the drafters and consequently incorporated into their measures. Certainly, if it had in fact been rejected, a clear indication would have been given. But no indication, clear or otherwise, is anywhere apparent.

In any event, the majority's limitation of the lawfully-engaged-in-duty element and the consequent expansion of criminal liability and punishment—which, in view of the well-settled state of the law, could not have been foreseen—are without effect on acts or omissions, like defendant's, that were committed before today. "[A]n unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an *ex post facto* law, such as Art. I, § 10, of the Constitution forbids. An *ex post facto* law has been defined . . . as one 'that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action,' or 'that *aggravates* a *crime*, or makes it *greater* than it was, when committed.' [Citation.] If a state legislature is barred by the *Ex Post Facto* Clause from passing such a law, it must follow that a State Supreme Court is barred by the Due Process Clause from achieving the same result by judicial construction." (*Bouie* v. *City of Columbia* (1964) 378 U.S. 347, 353-354 [12 L.Ed.2d 894, 899-900, 84 S.Ct. 1697], fn. omitted, italics in original; accord *Marks* v. *United States* (1977) 430 U.S. 188, 192 [51 L.Ed.2d 260, 265, 97 S.Ct. 990].)

I turn now to the case at bar. Defendant contends that the instructions given by the court on the offense of peace officer assault and the special circumstance of peace officer murder were erroneous.

In its charge, the court declared: "Every person who commits an assault with a deadly weapon upon the person of a peace officer engaged in the performance of his duties and who knows or reasonably should know that such person is a peace officer and is engaged in the performance of his duties is guilty of a crime."

The court went on: "If you find the defendant guilty of murder of the first degree, you must then determine if the murder was committed under the following special circumstance, to wit, the killing of a peace officer, a Jack Williams, who, while engaged in the course of the performance of his duties was intentionally killed and said defendant knew or reasonably should have known that such victim, Jack Williams, was a peace officer engaged in the performance of his duties."

The court concluded: "The phrase 'in the performance of his duties,' as used in these instructions, means: [¶] Any lawful act or conduct while

engaged in the maintenance of the peace and security of the community or in the investigation or prevention of crime; to wit, the serving of a search warrant."

It is, of course, error for a court to remove any element of an offense (see, e.g., *Sandstrom* v. *Montana* (1979) 442 U.S. 510, 520-523 [61 L.Ed.2d 39, 48-50, 99 S.Ct. 2450]) or a special circumstance (see, e.g., *People* v. *Garcia* (1984) 36 Cal.3d 539, 547 [205 Cal.Rptr. 265, 684 P.2d 826]) from the jury's consideration by means of an instruction that either omits such element entirely or merely contains a mandatory conclusive presumption of its presence.

Defendant claims that by instructing the jury as it did, the court effectively removed the element whether the peace officer in question was *lawfully* engaged in the performance of his duties.

When we consider a point, such as the present, that turns on the meaning of an instruction defining the elements of an offense (e.g., *Sandstrom* v. *Montana, supra*, 442 U.S. at pp. 514, 517 [61 L.Ed.2d at pp. 44-47]) or special circumstance (e.g., *People* v. *Warren* (1988) 45 Cal.3d 471, 487 [247 Cal.Rptr. 172, 754 P.2d 218]), the crucial question is, could a juror have reasonably understood the words as the defendant asserts? To my mind, the answer here must be affirmative.

A juror would have reasonably understood the challenged instructions to declare that Deputies Williams and Esquivel and their colleagues were *lawfully* engaged in the performance of their duties *as a matter of law*: "The phrase 'in the performance of his duties,' as used in these instructions, means: [¶] Any lawful act or conduct while engaged in the maintenance of the peace and security of the community or in the investigation or prevention of crime; *to wit, the serving of a search warrant.*" (Italics added.)

So interpreted, the instructions must be deemed to have raised a mandatory conclusive presumption that the officers were acting lawfully at the time relevant here.

But the issue of the lawfulness *vel non* of the officers' conduct was in fact vigorously contested. Specifically, it was disputed whether the officers were acting lawfully when they broke into the Abbey Street residence to execute the warrant to search for narcotics. The People presented evidence and argument to the affirmative. Defendant presented evidence and argument to the negative.

Defendant next contends that the error undermines the validity of the conviction for peace officer assault and the special circumstance finding of peace officer murder.

An instructional error involving the mandatory conclusive presumption of an element does not automatically require the reversal of a conviction (e.g., *Rose* v. *Clark* (1986) 478 U.S. 570, 579-582 [92 L.Ed.2d 460, 471-474, 106 S.Ct. 3101]) or the setting aside of a special circumstance finding (see, e.g., *People* v. *Odle* (1988) 45 Cal.3d 386, 410-415 [247 Cal.Rptr. 137, 754 P.2d 184]), but is subject to harmless-error analysis under the test of *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].

Under *Chapman*, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (386 U.S. at p. 24 [17 L.Ed.2d at p. 711].) The "burden of proof" as to prejudice rests on the government. "Certainly error, constitutional error, . . . casts on someone other than the person prejudiced by it a burden to show that it was harmless . . . . [T]he beneficiary of a constitutional error [is required] to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Ibid.* [17 L.Ed.2d at p. 710].)

As Justice Scalia stated in his concurring opinion in *Carella* v. *California* (1989) 491 U.S. 263 [105 L.Ed.2d 218, 109 S.Ct. 2419], "the harmless-error analysis applicable in assessing a mandatory conclusive presumption is wholly unlike the typical form of such analysis. In the usual case the harmlessness determination requires consideration of 'the trial record as a whole,' [citation], in order to decide whether the fact supported by improperly admitted evidence was in any event overwhelmingly established by other evidence, [citations]. Such an expansive inquiry would be error here . . . .

"The Court has disapproved the use of mandatory conclusive presumptions not merely because it ' "conflict[s] with the overriding presumption of innocence with which the law endows the accused," ' [citation], but also because it ' "invade[s] [the] fact-finding function" which in a criminal case the law assigns solely to the jury,' [citation]. The constitutional right to a jury trial embodies 'a profound judgment about the way in which law should be enforced and justice administered.' [Citation.] It is a structural guarantee that 'reflect[s] a fundamental decision about the exercise of official power—a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges.' [Citation.] A defendant may assuredly insist upon observance of this guarantee even when the evidence against him is so overwhelming as to establish guilt beyond a reasonable doubt . . . . In other words, 'the question is not whether guilt may be spelt out of a record, but whether guilt has been found by a jury according to the procedure and standards appropriate for criminal

trials.' [Citation.] 'Findings made by a judge cannot cure deficiencies in the jury's findings as to the guilt or innocence of a defendant resulting from the court's failure to instruct it to find an element of the crime.' [Citation.]

"These principles necessarily circumscribe the availability of harmless-error analysis when a jury has been instructed to apply a conclusive presumption. . . . For nothing in [such an] instruction would have directed the jury, or even permitted it, to consider and apply th[e] evidence in reaching its verdict. And the problem would not be cured by an appellate court's determination that the record evidence *unmistakably* established guilt, for that would represent a finding of fact by judges, not by a jury . . . . '[T]he error in such a case is that the wrong entity judged the defendant guilty.' [Citation.]

"Four Members of the Court concluded as much in *Connecticut* v. *Johnson*, 460 U.S. 73 (1983) (plurality opinion), which considered whether it could be harmless error to instruct a jury that 'every person is conclusively presumed to intend the natural and necessary consequences of his act.' [Citation.] . . . 'An erroneous presumption on a disputed element of a crime renders irrelevant the evidence on the issue because the jury may have relied upon the presumption rather than upon that evidence. If the jury may have failed to consider evidence of intent, a reviewing court cannot hold that the error did not contribute to the verdict. The fact that the reviewing court may view the evidence of intent as overwhelming is then simply irrelevant. To allow a reviewing court to perform the jury's function of evaluating the evidence of intent, when the jury never may have performed that function, would give too much weight to society's interest in punishing the guilty and too little weight to the method by which decisions of guilt are to be made.' [Citation.] The plurality therefore determined . . . that the use of conclusive presumptions could be harmless error only in those 'rare situations' when 'the reviewing court can be confident that [such an] error did not play any role in the jury's verdict.' [Citation.] The opinion mentioned as among those 'rare situations' an instruction establishing a conclusive presumption on a charge of which the defendant was acquitted (and not affecting other charges), and an instruction establishing a conclusive presumption with regard to an element of the crime that the defendant in any case admitted. [Citation.]

"Another basis for finding a conclusive-presumption instruction harmless [could be found in the following situation] . . . : When the predicate facts relied upon in the instruction, or other facts necessarily found by the jury, are so closely related to the ultimate fact to be presumed that no rational jury could find those facts without also finding that ultimate fact, making those findings is functionally equivalent to finding the element required to

be presumed. The error is harmless because it is 'beyond a reasonable doubt,' [citation], that the jury found the facts necessary to support the conviction." (*Carella* v. *California, supra*, 491 U.S. 263, 267-273 [105 L.Ed.2d at pp. 223-227, 109 S.Ct. at pp. 2421-2423], italics in original (conc. opn. of Scalia, J.).)

Applying the principles stated above, I am compelled to conclude that the instructional error here was prejudicial. I simply cannot "declare a belief that it was harmless beyond a reasonable doubt." (*Chapman* v. *California, supra*, 386 U.S. at p. 24 [17 L.Ed.2d at p. 711].) Certainly, the People have not carried their "burden of proof" on the issue.

As stated, the instructions raised an impermissible mandatory conclusive presumption that Deputies Williams and Esquivel and their colleagues were *lawfully* engaged in the performance of their duties.

This is not one of "those 'rare situations' when 'the reviewing court can be confident that [such an] error did not play any role in the jury's verdict.'" (*Carella* v. *California, supra*, 491 U.S. at p. 270 [105 L.Ed.2d at p. 225, 109 S.Ct. at p. 2423] (conc. opn. of Scalia, J.).)

The "acquittal" rationale does not apply. Obviously, the jury found defendant guilty of the offense of peace officer assault and sustained the special circumstance of peace officer murder.

Nor is the "concession" rationale applicable. As noted, defendant disputed the lawfulness of the officers' conduct.

Finally, the "necessary implication" rationale does not apply. The jury did not find any facts that logically entailed the conclusion that the officers were *lawfully* engaged in the performance of their duties.

Accordingly, because the court's instructions were prejudicially erroneous, I would reverse the conviction for peace officer assault and set aside the special circumstance finding of peace officer murder. Having reversed the conviction, I would vacate the dependent personal-use-of-a-firearm finding. And having set aside the special circumstance finding, which is the sole basis for death eligibility in this case, I would also vacate the sentence of death.

In conclusion, although I concur in affirming the judgment on appeal convicting defendant of the murder of Deputy Williams with the personal use of a firearm, in all other respects I dissent.

**BROUSSARD, J.**—I dissent.

In my view, the majority opinion is indefensible in two respects. First, in *People* v. *Gonzalez* the majority improperly uphold the death penalty judgment in the face of a record demonstrating perhaps the clearest violation of the principles set out in *People* v. *Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440] that has ever come before this court. Second, the majority opinion in the consolidated matters of *People* v. *Superior Court (Gonzalez)* and *In re Gonzalez* effectively frustrate defendant's attempt to discover documents in the possession of the County of Los Angeles which may demonstrate that a key prosecution witness committed perjury.

I.

Defendant in *People* v. *Brown, supra,* 40 Cal.3d 512, challenged the constitutionality of the jury instructions under the 1978 law. Although we ultimately rejected his contention, we observed that an instruction tracking the language of the statute, such as that given here, was ambiguous, and "leave[s] room for some confusion as to the jury's role" in determining the appropriate penalty. (*Brown, supra,* 40 Cal.3d at p. 544, fn. 17.) In view of the dangers posed by this instructional ambiguity, we said that we would examine each case tried prior to *Brown* "on its own merits to determine whether, in context, the sentencer may have been misled to defendant's prejudice about the scope of its sentencing discretion under the 1978 law." (*Ibid.*) We have undertaken this review in numerous cases. In most, the only clue as to whether the jury may have been misled is the arguments of counsel, and our analysis, as it must in this case, has focused on whether counsel put before the jury an incorrect interpretation of the instruction. While prosecutorial arguments "are not to be judged as having the same force as an instruction from the court" (*Boyde* v. *California* (1990) 494 U.S. 370, __ [108 L.Ed.2d 316, 331, 110 S.Ct. 1190, 1200]), when the instruction from the court is ambiguous we may have no choice but to look to the argument to discern how that instruction was likely perceived by the jury.[1]

In *People* v. *Allen* (1986) 42 Cal.3d 1222, 1276-1277 [232 Cal.Rptr. 849, 729 P.2d 115], we explained that: "Our concern in *Brown* was that the

---

[1] The majority note that according to *Boyde* v. *California, supra,* 494 U.S. 370, "prosecutorial commentary should not be given *undue* weight in analyzing how a reasonable jury understood capital sentencing instructions" and "a 'court should not *lightly* infer that a prosecutor intends an ambiguous remark to have its most damaging meaning . . . .' " (Maj. opn., *ante,* p. 1224, fn. 21, italics added.) This kind of language is of no help in deciding cases. Courts should never give "undue" weight to anything, or, when matters of life and death are at issue, draw inferences "lightly." But the problem with the majority opinion is that, from among the possible interpretations of the prosecutor's statements, they consistently adopt the most innocuous one, even when in context that is the less reasonable interpretation.

unadorned statutory instruction might in two interrelated ways lead the jury to misapprehend its discretion and responsibility. [¶] First, we pointed out that the jury might be confused about the nature of the weighing process. As we observed: '[T]he word "weighing" is a metaphor for a process which by nature is incapable of precise description. The word connotes a mental balancing process, but certainly not one which calls for a mere mechanical counting of factors on each side of the imaginary "scale," or the arbitrary assignment of "weights" to any of them. Each juror is free to assign whatever moral or sympathetic value he deems appropriate to each and all of the various factors he is permitted to consider.' [Citation.] [¶] Second, we were concerned in *Brown* that the unadorned instruction's phrase, 'the trier of fact . . . *shall* impose a sentence of death if [it] concludes that the aggravating circumstances outweigh the mitigating circumstances,' could mislead the jury as to the ultimate question it was called on to answer in determining which sentence to impose. Although the quoted phrase could be understood to require a juror (i) to determine whether 'the aggravating circumstances outweigh the mitigating circumstances' without regard to the juror's personal view as to the appropriate sentence, and then (ii) to impose a sentence of death if aggravation outweighs mitigation even if the juror does not personally believe death is the appropriate sentence under all the circumstances, we concluded in *Brown* that the statute was not intended to, and should not, be interpreted in that fashion."[2]

Two recent five-to-four decisions of the United States Supreme Court, *Boyde* v. *California, supra,* 494 U.S. 370, and *Blystone* v. *Pennsylvania* (1990) 494 U.S. 299 [108 L.Ed.2d 255, 110 S.Ct. 1078], suggest that *Brown*'s interpretation of the 1978 law was not compelled by the United States Constitution. In light of those decisions, we requested the parties to brief and argue the question whether we should reconsider our decision in *People* v. *Brown, supra,* 40 Cal.3d 512. Upon further reflection, however, we decided it was not necessary to reconsider *Brown,* and both the majority and this dissenting opinion follow the *Brown* analysis.

*Brown* continues to serve an essential function in cases arising under the 1978 death penalty law. The ambiguous wording of that law permits prosecutors to weave a web of false logic designed to lead jurors to believe that the structure of the law requires a death verdict whether or not that punishment is appropriate. *Brown*'s interpretation of the 1978 law guards against such mistaken reasoning and helps to ensure that a penalty verdict under the law is the result of a considered moral determination, rather than a mechanical or arithmetical process devoid of moral considerations. Thus

---

[2] This is familiar language to this court, having been quoted, paraphrased, or endorsed in over 20 cases in the 5 years since *Brown* was filed.

the present jury instructions (CALJIC No. 8.88), based on *Brown*, continue to govern the trial of capital cases in California.

I do not believe that we can adhere to the principles established in *Brown, supra,* 40 Cal.3d 512, without reversing the penalty judgment in the case before us. In my opinion, this is one of the most flagrant examples of *Brown* error to come before this court. Interpreting the ambiguous instructions given by the trial court, the prosecutor told the jury: (1) they could determine the penalty by the arithmetical process of assigning arbitrary weights to aggravating and mitigating factors and then adding the weights in each column; (2) inapplicable mitigating factors must be placed in the column for aggravation and assigned weight; and (3) in weighing the factors, the jurors should not consider whether death is the appropriate penalty for defendant, or how his case compares to other cases in which death may have been more appropriate. If we are to preserve *Brown* as living doctrine instead of a museum exhibit, we must reverse this verdict.

*Brown* first warned of an interpretation which would call "for a mere mechanical counting of factors on each side of the imaginary 'scale,' *or the arbitrary assignment of 'weights' to any of them.*"[3] (*Brown, supra,* 40 Cal.3d at p. 541, italics added.) We have not yet encountered a case in which anyone suggested that the jury decide the penalty by "counting" the factors on each side, although the prosecutor in *People* v. *Hamilton* (1989) 48 Cal.3d 1142, 1181-1182 [259 Cal.Rptr. 701, 774 P.2d 730], came close. We have encountered one case in which the prosecutor suggested that a verdict could be reached by the arbitrary assignment of numerical weights to the factors on each side, and we unanimously condemned that argument. In *People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1108 [259 Cal.Rptr. 630, 774 P.2d 659], the prosecutor told the jury "if we were to give actual weight in pounds and ounces to the aggravating circumstances and the mitigating circumstances, if the aggravating circumstances weighed 10 pounds and one ounce and the mitigating circumstances weighed 10 pounds, then you would be duty bound to impose a death penalty . . . . [¶] If you were to give a percentage to it, if you said 50.1 percent of the evidence pointed to aggravating circumstances and 49.9 pointed to mitigating circumstances, then you'd still have to impose a sentence of death." We found this argument erroneous, and inconsistent with precedent, "because it depicts the weighing process as one involving the application of an arithmetical formula involving the assignment of weights to each of the factors, followed

---

[3] I note also *Brown*'s assertion that a statute would be unconstitutional if "it required jurors to render a death verdict on the basis of some arithmetical formula." (40 Cal.3d at p. 540.) Whether or not this statement is correct as a matter of constitutional law in light of the Supreme Court's recent decisions, it makes clear *Brown*'s view that the California statute should not be interpreted to base the penalty determination on an arithmetical formula.

by an addition of the entries in each column to determine the balance." (*Ibid.*)

Compare what the prosecutor said in the case at bar. After reviewing the facts of the case, he told the jury:

"I—I built a little scale. That's something I had in my garage. It's not very professional, as you can see, but the idea is to give you a concept, I'm giving you an idea . . . . [¶] You've got the first job, to take the evidence and decide which side does it go on? Is it aggravating or is it mitigating? [¶] After you decide that, then you have the next job, to decide how much weight am I going to give to it? . . . [¶] That is your job. You have got to give the weight to them. A little weight, a lot of weight. That's your decision. So schematically I couldn't do it without giving it equal weight."

After classifying the various factors as aggravating or mitigating—mislabeling many of them as will be seen later—the prosecutor in his closing argument turned to the weight to be assigned each factor:

"You have got one column for aggravation; you have got another column for mitigation and let's say you—you are doing your job as a juror. You are trying to decide where they fit and how much weight to give to them . . . . [¶] Let's do it this way. Let's say that you can give a number of 1 to 10, 1 to 10 for each one of these. 1 to 10.

"How about the killing? The nature of the crime? What are we going to consider that? I mean, that was cold. That was planned . . . . On a scale of 1 to 10, that would be, let's say, a number 9. Couldn't get much more aggravating than that, the manner in which it was done.

"Next, prior violence. As I have indicated, a conviction for great bodily injury, Mr. Bencangey [defense counsel] says, 'Well, but there's no evidence that he actually did great bodily injury.' Well, that's—that was not the point. He was convicted of the crime of. He was convicted of the crime of battery. I mean, how many of you or how many of your friends, how many of your relatives have been convicted of both those things? I mean, that does show that a person is a violent person and has had violent criminal activity. Now, on a scale of 1 to 10, maybe that would be a 5 . . . .

"Okay. Now, we have no evidence of mental disturbance. Let's give that a 1.

"No victim participation. Give it a 1.

"No moral justification. Now, Mr. Bencangey wants to argue that one and say, 'Well, there might be some extenuating circumstances,' but until he gives you some hard evidence of that, let's give that a 1.

"There is no distress. [*Sic* —He probably meant "duress."] Give that a 1.

"There is no evidence of intoxication. Give that a 1.

"The defendant is not of tender age, certainly doesn't fit on mitigation, it fits on aggravation. Give it a 1.

"All of these are the benefit of the doubt. I'm giving them the lowest possible.

"The defendant was a principal in this. He was not the accessory. Let's give that a 1.

"Now, this one [(apparently Pen. Code, § 190.3, factor (k))], we are still waiting on and maybe Mr. Bencangey can change all of this by indicating that that should be on this side, but there was no extenuating circumstances. We will give that a 1.

"And then we have, yeah, on the mitigation side, we have got prior felony. There is no prior felony. Let's say give that a 3.

"Okay, now, Mr. Bencangey is going to say afterward, 'Wait just a minute. How did Mr. Bowers [the prosecutor] arrive at these?' I'm giving you an example. I'm not telling you that these are numerical, that this is the way you're going to do it. I'm just trying to get across concepts and the only way I know how to do it is to give illustrations. Your numbers may be entirely different. You may approach it differently, but you have got to think of it in a logical, and I know that you will think of it in a logical manner, of what is aggravating and what is mitigating.

"When you total it up—"

Several jurors: "22."

Mr. Bowers: "Oops. Okay. I didn't say that I excelled in math. 22 versus 3. You change the numbers however you want to change them and you figure out how you can get it to come out so that the mitigation is greater than the aggravation. You will not. You will not."

I submit that it is clear that the prosecutor put before the jury an interpretation of the instructions which we have repeatedly said was incorrect.

He told them that the process was essentially an arithmetical process; that a logical, legitimate way to reach a verdict is to determine whether each factor is aggravating or mitigating, assign it a numerical value, total those values, and see which column is the larger. We should not hesitate to condemn this as a misleading description of the jury's role.[4]

The majority nevertheless assert that the jury could not have been misled. But they provide no explanation how they know that the jury did not, or could not, have decided the case by the means the prosecutor suggested. Instead, they advance arguments which miss the point.

First, the majority say, the jury was told that an attorney's argument is not evidence. Of course. Argument is never evidence, and if that fact precludes reversal, we could never reverse for *Brown* error, and the case-by-case examination we promised in *Brown* would be meaningless. Juries do not decide cases on the evidence alone; they decide them by applying the law to the evidence. It has never before been thought that a misunderstanding as to the applicable law is less important than an error in the admission or exclusion of evidence.

Next, they assert, the jury was told to "weigh," not "count," the factors. *Brown* spoke of *two* ways in which the instruction on weighing could be misunderstood: that the instruction could be read to call "for a mere mechanical counting of factors on each side of the imaginary 'scale,' *or* the arbitrary assignment of 'weights' to any of them." (*Brown, supra*, 40 Cal.3d at p. 541, italics added.) That the prosecutor avoided the first mistake does not mean that he avoided the second.

Finally, although the gist of the prosecutor's argument was misleading, the majority say that he did refer to normative judgment when, in the last sentence of his rebuttal argument, he told the jury that death was the "just and fair" penalty defendant had earned. Do the majority believe that by this single phrase, after hours of argument, the prosecutor rejected the idea which he had just explained at great length and illustrated with scales and a chart—that a verdict could be reached by assigning numerical values to the various factors and adding them? If we followed the prosecutor's methodology and placed on one side of a scale those remarks which support a

---

[4] Justice Arabian condemns the prosecutor for making this argument, stating that "[p]rosecutorial tactics such as those exhibited here push against the very limits of acceptable behavior . . . . " (Conc. opn., *ante*, p. 1262.) I respectfully suggest that he is shooting at the wrong target. This case was tried before we filed our opinion in *Brown, supra*, 40 Cal.3d 512. The prosecutor based his argument on one reasonable interpretation of the statutory language. He should not be criticized for failing to foresee that we would adopt a different interpretation in *Brown*.

mechanical, arithmetical process of reaching a verdict, and on the other those remarks supporting a normative approach, the first would far outweigh the second. Or if we simply listen for the essence of the prosecutor's message, that too is clear: if you put the factors in the columns, assign them relative numerical values, and add the columns—and do not concern yourself with such matters as sympathy and appropriateness—you cannot avoid arriving at a verdict of death. Whether defendant deserves that verdict or not, he does not deserve a verdict arrived at in that way.

*Brown, supra*, 40 Cal.3d 512, also warned of any interpretation that might mislead a juror "to impose a sentence of death if aggravation outweighs mitigation even if the juror does not personally believe death is the appropriate sentence under all the circumstances." (*People* v. *Allen, supra*, 42 Cal.3d 1222, 1277.) The majority appear to agree that if the jury is to decide penalty by simply balancing aggravation against mitigation, it is essential that they consider the appropriateness of the penalty in striking that balance. (Maj. opn., *ante*, p. 1230.)

Here is what the prosecutor had to say on this subject. In his closing argument, he proposed an arithmetical model for determining penalty, then said, "When all of these [factors] are added up, . . . you weigh them. If the aggravating factors outweigh the mitigating factors, the sentence is death. There's no—alternative for you. If they outweigh, it is automatically death. [¶] On the other hand, if mitigation outweighs aggravation, it is automatically life imprisonment without possibility of parole. [¶] So there is no option, once you do your calculations."

There is nothing here to suggest that the jury considered the appropriateness of the death penalty *at any stage of the analysis*.[5] And in rebuttal, the prosecutor made that clear: "[T]he defense claims that circumstances [were] not aggravated. [¶] What did I tell you? He uses the example of other brutal, vicious crimes, talks about the death penalty, when is the death penalty appropriate? [¶] You didn't hear His Honor say anything about

[5]The majority accuse me of assuming that the "weighing" and "appropriateness" functions are separate and independent. (Maj. opn., *ante*, p. 1230.) I make no such assumption. I agree with the majority that the jury may consider appropriateness when they are weighing the relevant factors. Actually, it is the prosecutor the majority should be criticizing, for he treated the two functions as separate, telling the jury, "your job is a weighing process. It's not for you to think, 'Well, I think this is an appropriate-type case; no, this is not an appropriate-type case.'"

I do disagree with the statement in *People* v. *Boyde* (1988) 46 Cal.3d 212, 253 [250 Cal.Rptr. 83, 758 P.2d 25], quoted by the majority, *ante*, at page 1230 that "when jurors are informed that they have discretion to assign whatever value they deem appropriate to the factors listed, they necessarily understand they have discretion to determine the appropriate penalty." This is not a statement of law, but of fact—of how jurors in fact reason in capital trials—and is unsupported by empirical evidence.

when it is appropriate. [¶] His Honor said your job is a weighing process. It's not for you to think, 'Well, I think this is an appropriate-type case; no, this is not an appropriate-type case.' [¶] That is not for you to decide. Not really. It's kind of misleading. That's misleading because if it's an appropriate-type of situation then it becomes a comparison issue. [¶] Are you here to compare this with the Manson case, the Bittaker case, to other atrocious crimes? [¶] No, you are not."

The majority generously suggest that the prosecutor's rebuttal remarks were addressing only a question whether comparison to other well-publicized murders was relevant.[6] But while that may be the context of his remarks, their scope was not so limited: "You didn't hear His Honor say anything about when it is appropriate." "It's not for you to think, 'Well, I think this is an appropriate-type case; no, this is not an appropriate-type case.' That's not for you to decide." The prosecutor never told the jury that his objection to considerations of appropriateness involved only the comparing of this case to other cases. He never said that in the case at hand, the jury should determine whether death was the appropriate penalty. Had he intended his remarks to be so construed, he would never have said without qualification that the jury is not supposed to decide whether this is "an appropriate-type case."

Having told the jury that they could decide the case by placing the factors in the aggravating and mitigating columns and assigning arbitrary weights, without any consideration of appropriateness, the prosecutor compounded the error by explaining erroneously how factors are classified and weighed. The majority recognize this error, noting that "[i]t does appear that the prosecutor placed on the aggravating side of his 'scale' and 'balance sheet' the *absence* of such factors as 'extreme' mental or emotional disturbance ([Pen. Code,] § 190.3, factor (d)); victim participation or consent (*id.*, factor (e)); belief in moral justification (*id.*, factor (f)); extreme duress (*id.*, factor (g)); mental disease or intoxication (*id.*, factor (h)); mere minor participation (*id.*, factor (j)); and other mitigating evidence (*id.*, factor (k)). In his rebuttal argument, the prosecutor's 'score' of 22 aggravating points to 3 mitigating points was based on the assumption that the absence of prior

---

[6] Even in the context of comparison with other cases, the prosecutor's remarks may be misleading. I know of no authority that a juror, in deciding the weight to be given to the circumstances of the crime, or whether death is the appropriate penalty, may not mentally compare the facts of the case to those of other cases.

We recently affirmed the penalty verdict in *People* v. *Frank, ante,* page 718 [274 Cal.Rptr. 372, 798 P.2d 1215]. The prosecutor in that case told the jury, "I think it's important for you to appreciate that not all murders are the same . . . . And in evaluating whether or not this murder . . . [is] an appropriate case for the death penalty, you are certainly, I think, free to determine where does this fall in the spectrum of murders and kidnappings." I think the *Frank* prosecutor was completely correct in this assertion.

felony convictions (*id.*, factor (c)) was the only mitigating factor; he deemed all other statutory factors to be aggravating. [¶] The prosecutor thus misrepresented the sentencing formula. The mere absence of extenuating circumstances in the case cannot weigh in favor of death." (Maj. opn., *ante*, pp. 1233-1234.)[7]

But even though the prosecutor misrepresented the sentencing formula, the majority assert that the jury was not misled. The jury, they say, was instructed to consider each sentencing factor only "if applicable"; they ignore that the prosecutor told the jury, incorrectly, that all factors were applicable and must be given weight. The majority also claim the prosecutor assigned only nominal weights to the seven absent extenuating factors. He actually assigned each a weight of "1." He assigned a weight of "5" to the prior violent misdemeanors, and a weight of "3" to the absence of prior felony convictions. Thus, under this arithmetical analysis the combined weight of the absent extenuating factors was more than the weight assigned to prior violent crimes, and more than twice the weight given the absence of prior felony convictions.

I cannot share the confidence of the majority that a jury, given ambiguous instructions and presented with an argument as completely and thoroughly misleading as the prosecutor's argument here, escaped unscathed. Not only is there a reasonable likelihood that the jury misunderstood the way in which it was to determine penalty, there is also a reasonable likelihood that this misunderstanding prejudiced defendant. While it is clear that defendant killed Deputy Williams, the appropriate punishment was a close and difficult decision. The first jury deadlocked at the penalty trial. Defense counsel at the habeas corpus hearing testified that jurors told him the deadlock resulted from doubts concerning the extent of defendant's culpability.

The record justifies such doubts. Defendant claimed that he thought the intruders were not police but members of a rival Hispanic gang. This story has some plausibility defendant was a gang leader and a likely target; the police were not in uniform and arrived in unmarked cars. It also has some weaknesses: the police were older than typical gang members, mostly White (although the first to enter was Hispanic), and announced their presence.

---

[7] The prosecutor's argument was erroneous in another respect. As the majority note, in his closing argument he incorrectly argued that defendant's lack of remorse was aggravating. (Maj. opn., *ante*, pp. 1231-1232.) They say that he tempered this theory in rebuttal when he only asserted that defendant had failed to show remorse as mitigation. But this is only half the story. Having asserted that defendant failed to prove remorse as mitigation under Penal Code section 190.3, factor (k), the prosecutor went on to assert that factor (k)—any circumstances which extenuate the gravity of the crime—belongs in the aggravating column. This is error under *People v. Boyd* (1985) 38 Cal.3d 762, 775-776 [215 Cal.Rptr. 1, 700 P.2d 782].

There was disputed testimony whether forcible entry into a residence was a common or conceivable gang tactic. But the prosecutor's theory that defendant was tipped off by someone in the police department and knew in advance of the police raid, that he hid the narcotics, and then waited for his chance to "bag" a police officer—also has weaknesses. We have no corroborating evidence that anyone in the police department has been giving suspects advance warnings of police raids. It also seems improbable that a drug dealer who had successfully concealed the incriminating evidence would still court a violent confrontation with the police, and incredible that he would do so armed with only a single-shot weapon.

In deciding whether to believe the prosecution's theory or the defendant's testimony, the critical evidence was the testimony of defendant's cellmate, William Acker. He said that defendant told him of defendant's plan to kill a policeman and get off by claiming he thought the man was a member of a rival gang. But as the prosecutor explained, Acker's testimony was credible not because of Acker's character, which was despicable, but because Acker knew details of the crime which he could learn only from defendant or police reports. As explained in part II of this opinion, however, we now know how easy it was for inmates of the Los Angeles County jail to obtain such detailed information about their cellmates' crimes from the police. Acker's testimony, suspect when defendant was tried, would be even more suspect today.

There was virtually no penalty phase evidence apart from that relating to the circumstances of the crime. The defense proved that defendant had no prior felony convictions. The prosecution proved two misdemeanor convictions involving violence, but did not introduce evidence of the conduct on which they were based. This was, in short, not a case in which a death verdict was obvious, but the kind of case in which the jury might be persuaded to vote for either life or death, and the instructions and argument could make the difference. In my judgment, the grossly misleading explanation of the penalty determination process which the prosecutor argued to the jury should compel us to reverse the penalty judgment.

## II.

In October 1988, after defendant was convicted and after his original and supplemental petition for habeas corpus were filed with this court, a newspaper article in the Los Angeles Times revealed a widespread practice of perjury by inmate informers held in the Los Angeles County jail. The inmates in question would manufacture false confessions by fellow inmates, report these confessions to law enforcement personnel, and in some cases testify to those confessions at trial. In return, they would receive some sort

of benefit in terms of reduced prosecution, reduced sentence, or better jail conditions. Acker was among those persons who on numerous occasions reported and testified to confessions by fellow prisoners, and received benefits in return.

Defendant has maintained from the date of trial that Acker's testimony was perjured, but he has not been able to present conclusive evidence to corroborate his claim. He now seeks discovery of Acker's law enforcement files. This is not what is sometimes referred to pejoratively as a "fishing expedition"; we know the files exist, and probably contain material evidence.[8] What defendant does not know is the nature of that evidence—that is why he needs to see the files.

The majority never dispute that defendant is entitled to the information. To the contrary, they suggest that the prosecutor has an ethical duty to disclose it. Neither do they dispute the contention that aggressive legal intervention is essential to redress a widespread fraud on the courts perpetrated by inmate informers with police and prosecutor complicity. But when it comes down to the nitty-gritty of finding a way to enforce the ethical obligation of disclosure or to conduct the inquiry into possible perjury, whatever defendant tries, the majority find a technical barrier.

Specifically, the majority conclude that (a) defendant cannot get discovery in connection with his automatic appeal because the appeal is limited to the appellate record; (b) he cannot get discovery in an independent trial court action because discovery must be ancillary to a pending proceeding; (c) he cannot get discovery in connection with his pending habeas corpus petition because the issue of Acker's perjury is not within the scope of the order to show cause; and, (d) even taking into account new allegations of Acker's perjury and new evidence which gives plausibility to those allegations, he cannot obtain discovery by filing a new habeas corpus proceeding alleging Acker's perjury because, without discovery, he cannot allege sufficient facts proving Acker's perjury to state a prima facie case. In short, the majority pose a perfect "Catch-22" logical conundrum, under which defendant cannot obtain discovery of the law enforcement records because without the information contained in those records he cannot file an action that would support discovery.

A. *Discovery in the Trial Court.*

The superior court granted defendant's motion for discovery of the records in question. The district attorney petitioned for mandate from this

---

[8]Defendant offered to drop his discovery request if a representative of the district attorney's office would swear under penalty of perjury that the files contain no material evidence relating to Acker's testimony. The district attorney did not accept the offer.

court. The majority hold that mandate should issue to nullify the superior court's order. To understand the blindness which afflicts the majority's view of this proceeding, one must appreciate the extraordinary circumstances which impelled the trial court to act as it did.

On October 27, 1988, a newspaper article appeared in which inmate Leslie White described how inmate-informers concocted false but convincing confessions implicating other prisoners, testified falsely against those prisoners, and in return received special benefits. As described in that article and on subsequent occasions, the inmate would arrange to be confined or transported with the suspect, so he could show he had the opportunity to hear a confession. (Sometimes the jail officials would facilitate this by deliberately housing the suspect in the portion of the facility where known informers are confined for their own protection.) The inmate informant would phone law enforcement personnel, pose as a fellow investigating officer, and learn details of the crime. Since those details were known only to law enforcement personnel (who presumably would not disclose them to a prisoner) and to the criminal himself, the informant, by including such details in a false confession, could give his story a spurious air of authenticity. The inmate would then report the false confession to the police and, if requested, testify to it in court. In some cases inmates bargained for specific benefits, but this was not an essential part of the system; the inmates knew that if they regularly came forward with useful information they would be rewarded.

When this system of perjury was exposed, the district attorney began an investigation of all cases in which a jailhouse informant was used. At the district attorney's request, the deputy who tried this case submitted a memorandum in which he noted that before the Gonzalez trial Acker had "testified previously once or twice in other cases," and since that trial he had testified in other cases.

On November 17, 1988, the district attorney issued special directive 88-14, which said: "We must also address those cases where jailhouse informants have been used in the past; the most objective way to do this is on a case by case basis before the court. This will insure an independent review on the merits of each case. Accordingly, we will begin immediately to notify the attorney of record in each case in which a jailhouse informant testified. The attorney will be advised of the information we have received and encouraged, where appropriate, to make a motion to bring the matter before the court . . . ."

Pursuant to this directive, the district attorney sent defense counsel in this case a letter which said that his office would undertake an investigation

of all jailhouse informant cases, and that the information would be "made available to defense counsel on individual cases" and "in appropriate cases . . . be thoroughly aired in open court." The letter went on to state: "We anticipate that review will be conducted by several judges listening to testimony elicited by the prosecution and the defense. That forum provides opportunity for the most effective method of getting at the facts: examination of witness under oath and the compulsory production through subpoena of documents . . . ."

Information revealed in the trial of this case, and subsequently, shows that Acker was an informant-witness in three cases before defendant's trial, that he was engaged in providing information to prosecutors in two other cases at the time of the trial, and thereafter continued regularly to provide testimony against fellow inmates. It also shows that Acker received benefits for providing information and testimony. But it does not show whether his testimony in this or any other case was false.

In January of 1989 the Honorable Otto M. Kaus, a former justice of this court, was appointed to head a grand jury investigation. The grand jury heard testimony from six informants, and investigators talked to nineteen others. Its report is replete with detail about the informant practices in question, but omits all names. We do not know, for example, whether Acker was among the informants who testified or were interviewed.

In the meantime, recognizing that trial counsel were under no duty to bring actions on behalf of defendants whose cases were on appeal, the district attorney and the defense bar requested the court to appoint counsel for that task. The trial court thereupon appointed defendant's appellate counsel to represent him in trial court proceedings to discover whether his conviction or sentence was the result of perjured informer testimony.

Counsel accordingly moved for discovery of law enforcement files relating to Acker. Although the district attorney had previously offered to make such information available to defense counsel, he opposed the motion. Noting the critical importance of Acker's testimony to the finding of special circumstance and the penalty judgment, Superior Court Judge Cianchetti granted the motion in part.

The district attorney then brought the present mandate petition, claiming that the trial court had no jurisdiction to grant discovery when no action was pending before that court. The majority endorse this position.

In choosing to analyze this proceeding by addressing only the narrow question whether the trial court ordinarily has jurisdiction in a case pending

on appeal, the majority miss the broad, extraordinary question posed by the facts of this case. That question is the authority of a trial court to inquire into charges that it has been the victim of widespread fraud, that an entire class of cases may have been tainted by a pattern of perjury, and to determine which cases have been so affected. The limiting rules cited by the majority are inadequate to this situation. They would compel the court to fragment its inquiry, depending upon whether a case was awaiting trial, on appeal, or already final, and in many instances bar inquiry at the threshold because the defendant does not already know the facts the inquiry might reveal.

I firmly believe that it is within the inherent power of any court to conduct an inquiry into well-founded charges that its proceedings in a large number of cases have been tainted by a pattern of perjury, and, to facilitate that inquiry, to order the prosecutor to disclose material information to likely victims of the perjury. "A court set up by the [California] Constitution has within it the power of self-preservation, indeed, the power to remove all obstructions to its successful and convenient operation. This arises from the fact that it is part of and belongs to one of the three independent departments set up by the Constitution." (*Millholen* v. *Riley* (1930) 211 Cal. 29, 33-34 [293 P. 69].) That power includes the power to "cure abuses or overreaching involving confidential information . . . ." (*Peat, Marwick, Mitchell & Co.* v. *Superior Court* (1988) 200 Cal.App.3d 272, 286-287 [245 Cal.Rptr. 873].) It includes the power "to prevent abuse of its process, and to create a remedy for a wrong even in the absence of specific statutory remedies." (*Western Steel & Ship Repair, Inc.* v. *RMI, Inc.* (1986) 176 Cal.App.3d 1108, 1116 [222 Cal.Rptr. 556].)

The decision of the Tenth Circuit in *Hopkinson* v. *Shillinger* (10th Cir. 1989) 866 F.2d 1185, 1220-1221, demonstrates the power of a court in somewhat similar circumstances to grant discovery despite the absence of a pending action. In that case the defendant had been convicted of murder; his conviction had been affirmed by the Wyoming Supreme Court, and was final. A grand jury, however, had continued to investigate the murder. The defendant asserted that it had heard evidence tending to exonerate him, but he could not point to any specific evidence. The circuit court ruled that since the defendant had shown a "particularized need" for the grand jury transcript (see *Dennis* v. *United States* (1966) 384 U.S. 855, 870 [16 L.Ed.2d 973, 984, 86 S.Ct. 1840]), he was entitled to an order directing the federal district court judge to review the transcript in camera and to reveal any exculpatory evidence—even though the defendant had no independent

proceeding pending.[9] This holding indicates that defendant Gonzalez is entitled to discover the evidence presented to the grand jury—which may be of some use—but it goes further: it suggests that if a defendant is entitled to discovery of evidence in the hands of the state, he can bring an independent action to enforce that right even if no appeal or habeas corpus proceeding is pending.

*People* v. *Ainsworth* (1990) 217 Cal.App.3d 247 [266 Cal.Rptr. 175], the case on which the majority rely, actually supports only the proposition that the trial court loses its jurisdiction to entertain a postjudgment discovery motion when remittitur has issued following an unsuccessful appeal and the defendant has not filed a petition for habeas corpus, so there is no pending proceeding which could result in a new trial. The majority approve of the *Ainsworth* court's reasoning that "a discovery motion is not an independent right or remedy. It is ancillary to an ongoing action or proceeding. After the judgment has become final, there is nothing pending in the trial court to which discovery may attach." (217 Cal.App.3d at p. 251.) But what the majority overlook is that the *Ainsworth* court stressed that it was the finality of the judgment and the lack of any pending "collateral attack" which robbed the trial court of its jurisdiction to entertain the discovery motion at issue. Here, no remittitur had issued; defendant's appeal and habeas corpus petition were both pending at the time he made his discovery request.

As the court held in *Wisely* v. *Superior Court* (1985) 175 Cal.App.3d 267, 269 [220 Cal. Rptr 893], the fact that his appeal was pending in this court at the time defendant filed his discovery request would not deprive the trial court of its jurisdiction to hear the merits of the request. Under California Code of Civil Procedure section 916, subdivision (a), "the perfecting of an appeal stays proceedings in the trial court upon the judgment or order appealed from or upon the matters embraced therein or affected thereby, including enforcement of the judgment or order, *but the trial court may proceed upon any other matter embraced in the action and not affected by the judgment or order.*" (Italics added.) The purpose of section 916 is to "protect the jurisdiction of the appellate court; the rule prevents the trial court from rendering the appeal futile by changing the judgment into something different. Accordingly, *whether a matter is 'embraced' in or 'affected' by a judgment . . . depends on whether postjudgment proceedings on the matter would have any effect on the 'effectiveness' of the appeal.*" (*In re Marriage of Horowitz* (1984) 159 Cal.App.3d 377, 381 [205 Cal.Rptr. 880], italics added and citations omitted; see also 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 9, p. 40.)

---

[9] Hopkinson's habeas corpus proceeding simply contended that the state had violated his constitutional rights by not disclosing the evidence presented to the grand jury.

The granting or denial of a discovery request in itself will have no impact on the effectiveness of the appeal. The best that can be said for the majority's position is that the granting of the request might lead to the discovery of evidence which might lead to the amending of a habeas corpus petition pending in this court, which in turn might lead to a hearing on the habeas corpus petition which might moot all or part of the appeal. This is far too remote a danger to divest the trial court of jurisdiction under Code of Civil Procedure section 916, subdivision (a).

Thus the trial court's order should be sustained under Code of Civil Procedure section 916, subdivision (a). But I would not rest our decision on so narrow a basis. Even if defendant's appeal were final, and no collateral action were pending, the court should still have jurisdiction to inquire into well-founded charges that its decisions have been tainted by a pattern of inmate perjury and government complicity, and to grant discovery orders incident to that inquiry.

B. *Discovery in Connection With Habeas Corpus.*

Defendant filed a petition for habeas corpus with this court in 1984. We issued an order to show cause. Defendant filed a supplemental petition in 1986, which served also as a traverse to the return to the 1984 petition. We issued an amended order to show cause on the supplemental petition, but that order did not include the question whether Acker acted as a government agent in eliciting incriminating statements from defendant, rendering Acker's testimony inadmissible under *Massiah* v. *United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199] and *United States* v. *Henry* (1980) 447 U.S. 264 [65 L.Ed.2d 115, 100 S.Ct. 2183]. The majority therefore conclude that defendant cannot obtain discovery of Acker's file in connection with the habeas corpus proceeding pending here.

In the amended habeas corpus petition he filed in 1986, defendant alleged that Acker was a state agent, rewarded by the law enforcement system for eliciting information from fellow inmates; that he had a history of informing prior to the time he informed on and testified against defendant; that he had prior relationships with law enforcement officials and that they encouraged him to elicit information; that he was ostensibly no more than a fellow inmate; that he may have been deliberately placed in a cell next to defendant; and that he was not merely a passive listening post but, as Acker admitted, deliberately initiated conversations with defendant. (Compare *Kuhlmann* v. *Wilson* (1986) 477 U.S. 436 [91 L.Ed.2d 364, 364-365, 106 S.Ct. 2616]; *People* v. *Whitt* (1984) 36 Cal.3d 724 [205 Cal.Rptr. 810, 685 P.2d 1161].) The habeas corpus petition alleged that although Acker did not admit to being an informant when he testified in defendant's guilt phase

trial, he had informed in at least three or four other cases before he testified against defendant.[10] By the time of defendant's first penalty trial some four months later, the petition alleged, Acker had given information in at least three more cases.[11] Additionally, the petition alleged, Acker sought, was promised and received numerous benefits for informing, despite his testimony at the guilt phase and first penalty phase trials that he had received no promises in exchange for his testimony and expected no consideration. Those benefits allegedly included, inter alia, immunity on murder, kidnapping, robbery and grand theft charges pending against him, removal of tattoos and possibly other plastic surgery to remove identifying marks, and protective transfer to a facility where he would be safe from inmates who might attack him for being a "snitch." Finally, the petition alleged that Acker had testified falsely, and that representatives of the state were aware of the perjured character of Acker's testimony.

To state a prima facie basis for relief under *Massiah* v. *United States, supra,* 377 U.S. 201, and *United States* v. *Henry, supra,* 447 U.S. 264, a petitioner must show that a government agent—a prisoner acting under state direction or inducement—deliberately elicited incriminating statements from the defendant, and that such statements were prejudicial. (See *People* v. *Hovey* (1988) 44 Cal.3d 543, 559-561 [244 Cal.Rptr. 121, 749 P.2d 776] and cases there cited.) To state a prima facie case for relief based on the knowing use of perjured testimony, a petitioner must show that "[f]alse evidence that is substantially material or probative on the issue of guilt or punishment was introduced" (Pen. Code, § 1473, subd. (b)(1)) and that the perjury was prejudicial.[12] (*In re Wright* (1978) 78 Cal.App.3d 788, 808 [144 Cal.Rptr. 535].) We could have found defendant's 1986 petition stated a prima facie case on both grounds, but were led astray by our ignorance of the practices of informers in the Los Angeles County jail, and by the manner in which the allegations were set out in the petition. The petition put the *Massiah/Henry* claim in terms of a failure of counsel to investigate, but the allegations showed no significant deficiency. In hindsight, it is now clear that the pattern of informer perjury in the jail system was clever enough to deceive even a competent investigator. The petition also alleged

---

[10] Acker gave information about a murder of which his wife was accused at some time before January 1, 1979. He gave information about a murder of which fellow inmate Torres was accused, starting in March 1980. He contacted the sheriff's office to say that fellow inmate Anderson had confessed to him about a murder in early August 1980. He testified in defendant's guilt phase for the first time on August 19, 1980. During questioning, he admitted giving information on another case involving fellow inmates Burkett and Greer, and indicated that he may have given information in that case before he began informing on defendant.

[11] Those cases involved Acker's fellow inmates, Davis, LaScola and Williams.

[12] The former requirement, that the petition must allege that the prosecution knew or should have known of the falsity of the evidence, has been abolished. (See Pen. Code, § 1473, subd. (c).)

that Acker had informed on many inmates and received rewards, but it failed to allege specifically that any state representative had asked or directed Acker to elicit incriminating information from defendant, or that he had been promised or received a reward for his testimony in that case. Again in hindsight we see that such specific requests and promises are unnecessary; the state set up a system in which a savvy inmate knows that if he comes forward with a confession from a notorious prisoner, true or false, he will be rewarded. Finally, the petition's allegations of Acker's perjury concentrated not on the alleged false testimony describing defendant's confession—testimony that was clearly prejudicial—but on false statements concerning Acker's informing in other cases.

But even if the 1984 and 1986 petitions were not sufficient to state a prima facie case for relief, I find incredible the majority statement that, even treating the allegations in the mandate proceeding as a supplement to the petition, no prima facie case is stated. Defendant's response to the mandate petition makes clear that defendant now asserts that Acker testified falsely as to matters material and probative on the issues of special circumstance and penalty, which is grounds for habeas corpus under Penal Code section 1473, subdivision (b)(1).

Defendant has maintained from the initial trial that although he did converse with Acker, he did not share with Acker the details of his case, nor did he make the incriminating statements to which Acker testified. But the evidence to support his claim that Acker invented the confession is no longer limited to defendant's word. We have taken judicial notice of the report by the 1989-1990 Los Angeles County Grand Jury detailing how various inmates at the Los Angeles County jail successfully fabricated confessions by other inmates and how authorities encouraged or ignored the fabrications. It is true, as the majority point out, that nothing in that report names Acker as a participant in the fabrication scheme, and that there is no specific indication that the prosecution's files will yield information that will identify Acker as a participant. That, of course, is why defendant seeks discovery. But to characterize defendant's request as a attempt to "fish" through files to discover new grounds for relief, or to confirm "mere speculation" (maj. opn., *ante*, p. 1259) is grossly unfair; defendant states that he knows that Acker committed perjury and that Acker was a regular informant at a time when many informants regularly perjured themselves. His case is no more speculative than any case which must depend upon investigation and discovery to substantiate the allegations of specific fact.

The majority are concerned that if we accept defendant's allegations as sufficient to permit discovery of law enforcement records, we will have to allow it in every case challenging the use of testimony from an informant

housed at the Los Angeles County jail during the years 1979 through 1988. (See maj. opn., *ante*, p. 1260, fn. 56.) That, of course, is exactly what the district attorney proposed to the superior court, and what the superior court planned to do until this court granted review in the mandate action. However, the number of cases affected is relatively small. Although there are 8,600 persons confined in the jail at any one time, the grand jury report notes that the district attorney's jailhouse informant litigation team has identified just 153 cases in which jailhouse informants were called to testify in the 10 years prior to October 1988. (Rep. of the 1989-90 L.A. County Grand Jury, p. 4.) A list of jailhouse informant cases released by the Los Angeles County District Attorney's office and published in the Los Angeles Daily Journal on January 3, 1989, numbered 130; defendant's case was among them. Moreover, the majority gloss over a crucial fact alleged by defendant and supported by documentation: defendant was invited by the district attorney to make "any appropriate motion" concerning the possibility that Acker was involved in the confession fabrication scheme.[13] It is true that the district attorney did not "specifically indicate" that the prosecution's files would yield information that would undermine Acker's testimony, but neither did he deny that fact.

What must defendant allege to state a prima facie case under Penal Code section 1473, and thus acquire the right to discovery? First, he must allege that when Acker described what petitioner supposedly told him about the crime, Acker committed perjury. This, I believe, he has done. Defendant, of course, was present when the conversation occurred, and his statement under penalty of perjury would be direct evidence of what he actually told Acker.

We cannot, however, issue orders to show cause whenever a prisoner alleges that a prosecution witness has lied. The credibility of prosecution witnesses is generally resolved at trial, and a defendant's disagreement with the jury's assessment is not grounds for habeas corpus. Thus to state a prima facie case, defendant must also allege additional facts that have come to light subsequent to trial, which lend such additional weight to his claim that a new inquiry is warranted. Defendant here has met this burden, setting out both inconsistencies between that testimony and later discovered evidence and, more importantly, new evidence of a pattern of perjury by informers in the Los Angeles County jail at the time Acker was an informer in residence. The majority assert that habeas corpus "is not a device for investigating possible claims, but a means for vindicating actual claims." (Maj. opn., *ante*, p. 1260.) Defendant has actually claimed that Acker

---

[13] The district attorney has never been willing to commit himself to saying what motion would be "appropriate." Neither will the majority.

testified falsely as to material and probative facts bearing upon the finding of special circumstances and penalty—which is grounds for relief under Penal Code section 1473—and has set forth facts showing this to be a credible claim, thus meeting the majority's criteria.

Once an order to show cause issues, the issuing court should have discretion to grant discovery. Although there are apparently no California cases on point, the rule is clear in the federal courts. In the leading case, *Harris* v. *Nelson* (1969) 394 U.S. 286 [22 L.Ed.2d 281, 89 S.Ct. 1082], the United States Supreme Court upheld a federal district court order granting discovery in a habeas corpus proceeding, stating that "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry. Obviously, in exercising this power, the court may utilize familiar procedures, as appropriate . . . ." (*Id.* at p. 300 [22 L.Ed.2d at p. 291].) The American Bar Association Standards for Criminal Justice also endorse the use of discovery in habeas corpus proceedings (4 ABA Standards for Criminal Justice, std. 22-4.5 (2d ed. 1988) p. 22.46-22.49); the commentary to this standard explains that "One recurrent problem . . . arises when a prisoner alleges in the application an apparently meritorious claim but the evidence that can be adduced to support the claim is unknown to the court . . . . Controlled use of discovery devices, if only on a limited scale, will demonstrate what applications are baseless while marshaling the evidentiary basis for applications with merit." I have no doubt that we should follow this guidance and permit limited discovery in habeas corpus proceedings.

The majority, however, find no prima facie case. Their blithe perpetuation of the Catch-22 is particularly disturbing in a case in which it is clear that if defendant could gain access to the information he needs to satisfy the majority's stringent requirements for a prima facie showing that Acker's testimony was perjured, he could easily show prejudice. Acker's testimony, that defendant told him that he had been "tipped" to expect a police raid, that he wanted to "bag a cop," and that he planned to claim, falsely, that he believed the officers were members of a street gang at war with his neighborhood, is the principal evidence to support the special circumstance allegation that defendant intentionally killed a police officer engaged in the performance of duty. In fact, the original trial judge in this case recalled that

Acker's testimony was "critical to the issue of whether or not the special circumstance which was alleged was involved."[14]

The majority, however, declare that even though the state is withholding potentially exculpatory evidence, the limited scope and pleading requirements of habeas corpus prevent defendant from stating a prima facie case and discovering the concealed evidence. In light of their explanation of how the pleading requirements of habeas corpus can stifle discovery of critical evidence at every turn, it seems appropriate to quote a court with a different perspective on the scope of habeas corpus: "The writ of habeas corpus is the fundamental instrument for safeguarding individual freedom against arbitrary and lawless state action . . . . The scope and flexibility of the writ—its capacity to reach all manner of illegal detention—*its ability to cut through barriers of form and procedural mazes*—have always been emphasized and jealously guarded by courts and lawmakers. The very nature of the writ demands that it be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected . . . . [¶] . . . And this Court has emphasized, taking into account the office of the writ and the fact that the petitioner, being in custody, is usually handicapped in developing the evidence needed to support in necessary detail the facts alleged in his petition, that *a habeas corpus proceeding must not be allowed to founder in a 'procedural morass.'* " (*Harris v. Nelson, supra,* 394 U.S. 286, 290-292 [22 L.Ed.2d 281, 286], italics added.)

It is plain that the majority are uncomfortable with the conclusion that defendant has no direct remedy, either here or in the trial court, to obtain discovery of the Acker file. They suggest that defendant try other, more circuitous, legal remedies, but without any confidence that he will succeed in getting discovery.[15] They note that defendant retains extrajudicial means of investigation,[16] although I know of none that would compel access to

---

[14]The only other evidence to contradict the defense theory of the case was the testimony of the two deputies who said that they had interviewed defendant the day after the shooting and that at one point, he explained that he ran inside his house when he saw "the cops" coming. They further testified, however, that when they asked defendant to repeat what he had said about "the cops," he corrected them, explaining that he had not said that and that they must have been confused.

[15]The majority refer to Government Code section 6250 et seq., the California Public Records Act. But documents before this court show how the civil suit filed on behalf of another criminal defendant under that act to obtain information involving a Los Angeles County jailhouse informant has been stymied by several law enforcement agencies, who have apparently taken the position that the requested information is exempt from disclosure under the act.

One remedy that may work, however, is not mentioned by the majority: an action to discover the evidence presented before the grand jury. (See *ante,* pp. 1283-1284.)

[16]I note, in contrast, the initial position of the district attorney that the courtroom was the appropriate forum in which to determine which cases were affected by perjured informer testimony.

confidential law enforcement records. Finally, they express confidence that the People's lawyers will discharge their ethical obligation to disclose any material evidence they have. (Maj. opn., *ante*, pp. 1260-1261.) The confidence appears misplaced in light of the abrupt about-face witnessed here: the People's attorneys have moved to block discovery after inviting defendant to seek it, and continue to maintain that this is not a case in which they have any obligation of disclosure.

All of this discussion of alternative remedies is smoke, not substance. The bottom line is that the majority affirm the conviction and deny all discovery or collateral relief. The State of California may now proceed to execute the defendant without revealing information it has concealed which may show that defendant's conviction and penalty were procured with perjured testimony. This is a miscarriage of justice which may return to haunt us.

Appellant's petition for a rehearing was denied February 27, 1991. Broussard, J., was of the opinion that the petition should be granted.